FILED IN
COURT OF CRIMINAL APPEALS

August 4, 2015

ABEL ACOSTA, CLERK

ap-77,031
COURT OF CRIMINAL APPEALS
AUSTIN, TEXAS
Transmitted 7/29/2015 9:52:31 AM
Accepted 8/3/2015 3:17:52 PM
ABEL ACOSTA
CLERK

No. AP-77,031

## IN THE
## COURT OF CRIMINAL APPEALS
## OF TEXAS

**FRANKLIN DAVIS**,
Appellant

v.

**THE STATE OF TEXAS**,
Appellee

*On Appeal from the Criminal District Court No. 7 of Dallas County, Texas*
*In Cause No. F12-12630*

## STATE'S BRIEF

*The State Requests Oral Argument if Appellant Argues*

**Susan Hawk**
**Criminal District Attorney**
Dallas County, Texas

Counsel of Record:

**Rebecca D. Ott**
**Assistant District Attorney**
Appellate Division
133 N. Riverfront Boulevard, LB-19
Dallas, Texas 75207-4399
(214) 653-3829 (Phone)
(214) 653-3643 (Fax)
State Bar No. 24074842
rebecca.ott@dallascounty.org

*Attorneys for the State of Texas*

# TABLE OF CONTENTS

TABLE OF AUTHORITIES ....................................................................................v

STATEMENT REGARDING ORAL ARGUMENT ......................................... xviii

STATEMENT OF THE CASE....................................................................................1

STATEMENT OF FACTS ........................................................................................1

SUMMARY OF ARGUMENT .................................................................................51

ARGUMENT .............................................................................................................54

STATE'S RESPONSE TO ISSUES 1-3:....................................................................54

    THE TRIAL COURT DID NOT ERR IN DENYING APPELLANT'S BATSON CHALLENGES.

STATE'S RESPONSE TO ISSUE 4: ........................................................................70

    THE TRIAL COURT DID NOT ERR IN DISMISSING JOHN BIGLEY FROM THE JURY.

STATE'S RESPONSE TO ISSUE 5: ........................................................................80

    THE TRIAL COURT DID NOT ERR IN DENYING THE APPELLANT'S MOTION TO QUASH THE INDICTMENT.

STATE'S RESPONSE TO ISSUE 6: ........................................................................83

    THE TRIAL COURT DID NOT ERR IN DENYING THE APPELLANT'S MOTION FOR CONTINUANCE.

STATE'S RESPONSE TO ISSUES 7-10:....................................................................92

    THE TRIAL COURT'S RULINGS ON THE APPELLANT'S FOUR MOTIONS TO SUPPRESS WERE PROPER.

STATE'S RESPONSE TO ISSUE 11: ........................................................109

THE EVIDENCE IS LEGALLY SUFFICIENT TO SUPPORT THE APPELLANT'S
CONVICTION FOR CAPITAL MURDER.

STATE'S RESPONSE TO ISSUE 12: ........................................................117

THE TRIAL COURT DID NOT ERR IN OVERRULING THE APPELLANT'S
OBJECTION TO STATE'S EXHIBIT NUMBERS 40 AND 41.

STATE'S RESPONSE TO ISSUES 13-18: ...................................................122

THE TRIAL COURT DID NOT ERR IN SUSTAINING THE STATE'S OBJECTIONS
TO DEFENSE EXHIBITS A, B, C, E, F AND G.

STATE'S RESPONSE TO ISSUES 19-21: ...................................................134

THE TRIAL COURT DID NOT ERR IN SUSTAINING THE STATE'S OBJECTIONS
TO THE PROFFERED TESTIMONY OF DEFENSE WITNESSES ARTY HAYES,
ASHLYE SAMS AND LAMAR LEGGITON.

STATE'S RESPONSE TO ISSUE 22: ........................................................143

THE TRIAL COURT PROPERLY DENIED THE APPELLANT'S REQUEST FOR A
JURY INSTRUCTION ON ANTI-SPECULATION DURING THE GUILT-INNOCENCE
STAGE OF HIS TRIAL.

STATE'S RESPONSE TO ISSUE 23: ........................................................148

THE TRIAL COURT DID NOT ERR IN OVERRULING APPELLANT'S OBJECTION
TO THE PROSECUTION'S JURY ARGUMENT DURING THE GUILT-INNOCENCE
PHASE OF TRIAL.

STATE'S RESPONSE TO ISSUE 24: ........................................................158

THE EVIDENCE IS LEGALLY SUFFICIENT TO SUPPORT THE JURY'S ANSWER
TO SPECIAL ISSUE 1.

STATE'S RESPONSE TO ISSUES 25-35:..............................................................169

THE TRIAL COURT PROPERLY DENIED THE APPELLANT'S REQUESTED JURY
INSTRUCTIONS AND OVERRULED HIS OBJECTIONS TO THE CHARGE.

STATE'S RESPONSE TO ISSUES 36-37:..............................................................176

THE TRIAL COURT PROPERLY DENIED THE APPELLANT'S REQUESTED JURY
INSTRUCTION DEFINING EVIDENCE THAT REDUCES "MORAL
BLAMEWORTHINESS."

STATE'S RESPONSE TO ISSUES 38-48:..............................................................177

THE TRIAL COURT PROPERLY DENIED THE APPELLANT'S CHALLENGES TO
THE DEATH PENALTY STATUTE.

PRAYER ...................................................................................................180

CERTIFICATE OF COMPLIANCE.....................................................................181

CERTIFICATE OF SERVICE ............................................................................181

# TABLE OF AUTHORITIES

## Cases

*Acosta v. State*,
411 S.W.3d 76 (Tex. App.—Houston [1st Dist.] 2013, no pet.) ........................174

*Alba v. State*,
905 S.W.2d 581 (Tex. Crim. App. 1995) ............................................................88

*Almanza v. State*,
686 S.W.2d 157 (Tex. Crim. App. 1985) (op. on reh'g) ........................... 161, 162

*Anderson v. State*,
301 S.W.3d 276 (Tex. Crim. App. 2010) ............................................................93

*Banks v. State*,
643 S.W.2d 129 (Tex. Crim. App. 1982) ..........................................................173

*Barnes v. State*,
876 S.W.2d 316 (Tex. Crim. App. 1994) ............................................................88

*Batson v. Kentucky*,
476 U.S. 79 (1988) .................................................................................... 54, 55

*Beathard v. State*,
767 S.W.2d 423 (Tex. Crim. App. 1989) ............................................................88

*Bermea v. State*,
188 S.W.3d 337 (Tex. App.—Tyler 2006, no pet.) ...................................... 79, 81

*Blue v. State*,
125 S.W.3d 491 (Tex. Crim. App. 2003) ..........................................................195

*Bonds v. State*,
403 S.W.3d 867 (Tex. Crim. App. 2013) ................................................. 105, 107

*Bone v. State*,
77 S.W.3d 828 (Tex. Crim. App. 2002) ..............................................................70

*Bosquez v. State*,
446 S.W.3d 581 (Tex. App.—Fort Worth 2014, pet. ref'd) ...................... 158, 159

*Brooks v. State*,
990 S.W.2d 278 (Tex. Crim. App. 1999) ...............................................................78

*Broussard v. State*,
910 S.W.2d 952 (Tex. Crim. App. 1995) ............................................... 79, 80, 81

*Brown v. State*,
270 S.W.3d 564 (Tex. Crim. App. 2008) .......................................... 168, 175, 177

*Bynum v. State*,
767 S.W.2d 769 (Tex. Crim. App. 1989) ...............................................................87

*Campbell v. State*,
610 S.W.2d 754 (Tex. Crim. App. [Panel Op.] 1980).........................................167

*Cantu v. State*,
939 S.W.2d 627 (Tex. Crim. App. 1997) ................................................... 194, 197

*Carrillo v. State*,
597 S.W.2d 769 (Tex. Crim. App. 1980) ...............................................................77

*Chamberlain v. State*,
998 S.W.2d 230 (Tex. Crim. App. 1999) .............................................................132

*Chambers v. State*,
866 S.W.2d 9 (Tex. Crim. App. 1993) ...................................................................58

*Chance v. State*,
563 S.W.2d 812 (Tex. Crim. App. 1978) ...............................................................87

*Clayton v. State*,
235 S.W.3d 772 (Tex. Crim. App. 2007) .............................................................122

*Coble v. State*,
330 S.W.3d 253 (Tex. Crim. App. 2010) .............................................................199

*Dancy v. State*,
728 S.W.2d 772 (Tex. Crim. App. 1987) .............................................................114

*Darnes v. State*,
118 S.W.3d 916 (Tex. App.—Amarillo 2003, pet. ref'd) ...................................142

*Davis v. State*,
 202 S.W.3d 149 (Tex. Crim. App. 2006) ........................................................106

*Davis v. State*,
 329 S.W.3d 798 (Tex. Crim. App. 2010) ........................................................168

*Dewberry v. State*,
 4 S.W.3d 735 (Tex. Crim. App. 1999) ........................................................ 93, 97

*Druery v. State*,
 225 S.W.3d 491 (Tex. Crim. App. 2007) ......................................... 161, 162, 195

*Emery v. State,*
 881 S.W.2d 702 (Tex. Crim. App. 1994) ........................................................131

*Escamilla v. State*,
 143 S.W.3d 814 (Tex. Crim. App. 2004) ................................................. 195, 202

*Espada v. State*,
 No. AP-75,219, 2008 Tex. Crim. App. Unpub. LEXIS 806 (Tex. Crim. App.
 2008) (not designated for publication)..................................................... 195, 196

*Estrada v. State*,
 313 S.W.3d 274 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 905 (2011) 109,
 179, 192

*Ford v. State*,
 179 S.W.3d 203 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd)...............107

*Franks v. Delaware*,
 438 U.S. 154 (1978)........................................................................................114

*Freeman v. State*,
 340 S.W.3d 717 (Tex. Crim. App. 2011) ........................................................167

*Freeman v. State*,
 838 S.W.2d 772 (Tex. App.—Corpus Christi 1992, pet. ref'd) .................... 78, 83

*Gallo v. State*,
 239 S.W.3d 757 (Tex. Crim. App. 2007) ............................................. 93, 94, 131

*Garcia v. State*,
 126 S.W.3d 921 (Tex. Crim. App. 2004) ................................................. 167, 173

*Garcia v. State*,
201 S.W.3d 695 (Tex. Crim. App. 2006) ................................................... 144, 145

*Garcia v. State*,
981 S.W.2d 683 (Tex. Crim. App. 1998) .............................................................87

*Gardner v. State*,
306 S.W.3d 274 (Tex. Crim. App. 2009) ..........................................................192

*Garza v. State*,
126 S.W.3d 79 (Tex. Crim. App. 2004) ............................................................109

*Glover v. State*,
102 S.W.3d 754 (Tex. App.—Texarkana 2002, no pet.)....................................146

*Gonzales v. State*,
304 S.W.3d 838 (Tex. Crim. App. 2010) ..................................................... 94, 95

*Guzman v. State*,
955 S.W.2d 85 (Tex. Crim. App. 1997) ..................................................... 107, 143

*Hammett v. State*,
578 S.W.2d 699 (Tex. Crim. App. 1979) .............................................................88

*Hammons v. State*,
239 S.W.3d 798 (Tex. Crim. App. 2007) ................................ 151, 152, 157, 158

*Haughton v. State*,
805 S.W.2d 405 (Tex. Crim. App. 1990) ................................................... 151, 152

*Hernandez v. New York*,
500 U.S. 352 (1991).............................................................................................67

*Hicks v. Wainwright*,
633 F.2d 1146 (5th Cir. 1981) ................................................................... 96, 99

*Hinojosa v. State*,
433 S.W.3d 742 (Tex. App.—San Antonio 2014, pet. ref'd)............................174

*Hogue v. State*,
711 S.W.2d 9 (Tex. Crim. App. 1986) .................................................................88

*Hooper v. State*,
214 S.W.3d 9 (Tex. Crim. App. 2007) ...................................................... 122, 165

*Idaho v. Wright*,
497 U.S. 805 (1990)..................................................................................144

*Illinois v. Gates*,
462 U.S. 213 (1983).................................................................. 106, 108, 115

*Jackson v. State*,
33 S.W.3d 828 (Tex. Crim. App. 2000) ..........................................................195

*Jackson v. Virginia*,
443 U.S. 307 (1979)..................................................................................121

*Janecka v. State*,
937 S.W.2d 456 (Tex. Crim. App. 1996) ..................................................... 94, 98

*Johnson v. State*,
208 S.W.3d 478 (Tex. App.—Austin 2006, pet. ref'd) ............................. 152, 159

*Jones v. State*,
833 S.W.2d 118 (Tex. Crim. App. 1992) ........................................................110

*Jones v. State*,
982 S.W.2d 386 (Tex. Crim. App. 1998) ..........................................................83

*Keeton v. State*,
724 S.W.2d 58 (Tex. Crim. App. 1987) ...........................................................179

*Kelly v. State*,
413 S.W.3d 164 (Tex. App.—Beaumont 2012, no pet.) ....................................114

*King v. State*,
29 S.W.3d 556 (Tex. Crim. App. 2000) ...........................................................121

*Kirsch v. State*,
357 S.W.3d 645 (Tex. Crim. App. 2012) ..........................................................161

*Ladd v. State*,
3 S.W.3d 547 (Tex. Crim. App. 1999) ........................................... 131, 135, 195

*Lancon v. State*,
253 S.W.3d 699 (Tex. Crim. App. 2008) ............................................................128

*Landrum v. State*,
788 S.W.2d 577 (Tex. Crim. App. 1990) .............................................................77

*Lane v. State*,
971 S.W.2d 748 (Tex. App.—Dallas 1998, pet. ref'd)........................................108

*Laster v. State*,
275 S.W.3d 512 (Tex. Crim. App. 2009) ............................................................121

*Lawrence v. State*,
240 S.W.3d 912 (Tex. Crim. App. 2007) .............................................................86

*Linney v. State*,
401 S.W.3d 764 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd)...............158

*Long v. State*,
823 S.W.2d 259 (Tex. Crim. App. 1991) ............................................................135

*Luna v. State*,
268 S.W.3d 594 (Tex. Crim. App. 2008) ............................................................192

*Marquez v. State*,
921 S.W.2d 217 (Tex. Crim. App. 1996) ............................................................143

*Martinez v. Quarterman*,
481 F.3d 249 (5th Cir. 2007) ..............................................................................100

*Martinez v. State*,
327 S.W.3d 727 (Tex. Crim. App. 2010) ............................................................142

*Martinez v. State*,
91 S.W.3d 331 (Tex. Crim. App. 2002) ..............................................................141

*Martinez v. State*,
924 S.W.2d 693 (Tex. Crim. App. 1996) ............................................................192

*Mathis v. State*,
67 S.W.3d 918 (Tex. Crim. App. 2002) ...............................................................59

*Mays v. State*,
318 S.W.3d 368 (Tex. Crim. App. 2010) ........................................... 192, 194, 199

*Miller-El v. Dretke*,
545 U.S. 231 (2005) .................................................................... 63, 69, 72

*Moffett v. State*,
949 S.W.2d 778 (Tex. App.—Beaumont 1997, pet. ref'd) .................................77

*Montgomery v. State,*
810 S.W.2d 372 (Tex. Crim. App. 1990) ................................................. 79, 132

*Moraguez v. State*,
701 S.W.2d 902 (Tex. Crim. App. 1986) ................................................. 109, 110

*Moreno v. State*,
415 S.W.3d 284 (Tex. Crim. App. 2013) .............................................106

*Morrow v. State*,
862 S.W.2d 612 (Tex. Crim. App. 1993) .............................................123

*Mosley v. State*,
983 S.W.2d 249 (Tex. Crim. App. 1998) .............................................196

*Nieto v. State*,
365 S.W.3d 673 (Tex. Crim. App. 2012) .............................................62

*Nwosoucha v. State*,
325 S.W.3d 816 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd)..... 95, 96, 99

*Ortiz v. State*,
93 S.W.3d 79 (Tex. Crim. App. 2002) .............................................123

*Owens v. State*,
202 S.W.3d 276 (Tex. App.—Amarillo 2006, pet. ref'd) .................................77

*Paredes v. State*,
129 S.W.3d 530 (Tex. Crim. App. 2004) .............................................130

*Pena v. State*,
285 S.W.3d 459 (Tex. Crim. App. 2009) .............................................141

*Ponce v. State*,
  68 S.W.3d 718 (Tex. App.—Houston [14th Dist.] 2001, no pet.) ................ 83, 84

*Purkett v. Elem*,
  514 U.S. 765 (1995) .................................................................................58

*Raby v. State*,
  970 S.W.2d 1 (Tex. Crim. App. 1998) ...............................................196

*Ramos v. State*,
  934 S.W.2d 358 (Tex. Crim. App. 1996) ............................................77

*Reed v. Quarterman*,
  555 F.3d 364 (5th Cir. 2009) ...................................................... 55, 68

*Renteria v. State*,
  206 S.W.3d 689 (Tex. Crim. App. 2006) ..................................... 95, 197

*Reyes v. State*,
  30 S.W.3d 409 (Tex. Crim. App. 2000) ....................................... 76, 83

*Reyna v. State*,
  168 S.W.3d 173 (Tex. Crim. App. 2005) ......................... 139, 140, 141

*Ripkowski v. State*,
  61 S.W.3d 378 (Tex. Crim. App. 2001) ..............................................134

*Roberts v. State*,
  220 S.W.3d 521 (Tex. Crim. App. 2007) ...........................................199

*Rodriguez v. State*,
  232 S.W.3d 55 (Tex. Crim. App. 2007) .............................................105

*Rodriguez v. State*,
  232 S.W.3d 55 (Tex. Crim. App. 2007) .............................................114

*Rodriguez v. State*,
  No. AP-75,901, 2011 Tex. Crim. App. Unpub. LEXIS 320 (Tex. Crim. App.
  Mar. 16, 2011) (not designated for publication) ...................................193

*Romero v. State*,
  800 S.W.2d 539 (Tex. Crim. App. 1990) ...........................................130

*Rosales v. State*,
   841 S.W.2d 368 (Tex. Crim. App. 1992) ................................................................95

*Routier v. State*,
   112 S.W.3d 554 (Tex. Crim. App. 2003) ................................................ 76, 78, 83

*Russeau v. State,*
   171 S.W.3d 871 (Tex. Crim. App. 2005) ................................................ 195, 197

*Russeau v. State*,
   291 S.W.3d 426 (Tex. Crim. App. 2009) ...................................................... passim

*Saldano v. State*,
   232 S.W.3d 77 (Tex. Crim. App 2007) .......................................................... passim

*Santellan v. State*,
   939 S.W.2d 155 (Tex. Crim. App. 1997) ...............................................................79

*Satterwhite v. State*,
   858 S.W.2d 412 (Tex. Crim. App. 1993) .............................................................167

*Shuffield v. State*,
   189 S.W.3d 782 (Tex. Crim. App. 2006) ................................................ 134, 135

*Smith v. State*,
   297 S.W.3d 260 (Tex. Crim. App. 2009) .............................................................197

*Smith v. State,*
   5 S.W.3d 673 (Tex. Crim. App. 1999) .................................................... 144, 145

*Sneed v. State*,
   209 S.W.3d 782 (Tex. App.—Texarkana 2006, pet. ref'd)................................84

*State v. Duarte*,
   389 S.W.3d 349 (Tex. Crim. App. 2012) ................................................ 112, 114

*State v. McClain*,
   337 S.W.3d 268 (Tex. Crim. App. 2011) .........................................................106

*State v. Moff*,
   154 S.W.3d 599 (Tex. Crim. App. 2004) ...........................................................86

*Strickland v. Washington*,
466 U.S. 668 (1984).................................................................................. 99, 100

*Swain v. State*,
181 S.W.3d 359 (Tex. Crim. App. 2005) ...........................................................110

*Swearingen v. State*,
143 S.W.3d 808 (Tex. Crim. App. 2004) ................................................. 106, 108

*Thomas v. State*,
408 S.W.3d 877 (Tex. Crim. App. 2013) ................................................. 110, 111

*Thomas v. State*,
No. 05-05-01379-CR, 2006 WL 2022404, 2006 Tex. App. LEXIS 6303 (Tex. App.—Dallas July 20, 2006, no pet.) (not designated for publication)..... 164, 165

*Thompson v. State*,
9 S.W.3d 808 (Tex. Crim. App. 1999) ...............................................................99

*Threadgill v. State*,
146 S.W.3d 654 (Tex. Crim. App. 2009) ..........................................................197

*Thuesen v. State*,
No. AP-76,375, 2014 Tex. Crim. App. Unpub. LEXIS 191 (Tex. Crim. App. Feb 26, 2014) (not designated for publication) ......................................................197

*Tome v. United States*,
513 U.S. 150 (1995)........................................................................................151

*Ungar v. Sarafite*,
376 U.S. 575 (1964)................................................................................... 95, 96

*United States v. Figueroa*,
618 F.2d 934 (2nd Cir. 1980)..........................................................................132

*Valdez v. State*,
952 S.W.2d 622 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd)..................78

*Villarreal v. State*,
453 S.W.3d 429 (Tex. Crim. App. 2015) ..........................................................162

*Vinson v. State*,
252 S.W.3d 336 (Tex. Crim. App. 2008) ..........................................................143

*Wardrip v. State*,
56 S.W.3d 588 (Tex. Crim. App. 2001) ...............................................179

*Watkins v. State*,
245 S.W.3d 444 (Tex. Crim. App. 2008) .................................... passim

*Weatherred v. State*,
15 S.W.3d 540 (Tex. Crim. App. 2000) .................................... 130, 142

*Wesbrook v. State*,
29 S.W.3d 103 (Tex. Crim. App. 2000) .................................... 168, 169

*Whitehead v. State*,
437 S.W.3d 547 (Tex. App.—Texarkana 2014, pet. ref'd).......................... 83, 84

*Williams v. State*,
631 S.W.2d 955 (Tex. App.—Austin 1982, no pet.).............................................79

*Williams v. State*,
937 S.W.2d 479 (Tex. Crim. App. 1996) ............................................140

*Williams v. State*,
958 S.W.2d 186 (Tex. Crim. App. 1997) ............................................130

*Wilson v. State*,
7 S.W.3d 136 (Tex. Crim. App. 1999) ............................................168

*Woodward v. Epps*,
580 F.3d 318 (5th Cir. 2009) ...........................................................65

*Young v. State*,
283 S.W.3d 854 (Tex. Crim. App. 2009) ...........................................56

*Young v. State*,
826 S.W.2d 141 (Tex. Crim. App. 1991) .................................... 68, 69

## **Constitutional Provisions**

Tex. Const. art. I, § 10..........................................................................81

U.S. CONST. amend. IV ........................................................................97

U.S. CONST. amend. VI ........................................................................81

**Statutes**

Tex. Code Crim. Proc. Ann. art. 18.01(b) (West 2015) ...........................................97

Tex. Code Crim. Proc. Ann. art. 29.03 (West 2006) ...............................................87

Tex. Code Crim. Proc. Ann. art. 29.08 (West 2006) ........................................ 87, 89

Tex. Code Crim. Proc. Ann. art. 35.261(a) (West 2006).........................................55

Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007) .............................................145

Tex. Code Crim. Proc. Ann. art. 36.15 (West 2007) .............................................145

Tex. Code Crim. Proc. Ann. art. 36.29 (b) (West 2006) .........................................74

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(a) (West Supp. 2014) .....................175

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(b)(1) (West Supp. 2014) ................158

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(c) (West Supp. 2014) .....................158

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(e)(1) (West Supp. 2014).................176

Tex. Code Crim. Proc. Ann. art. 37.071, § 2(f)(4) (West Supp. 2014) .................176

Tex. Code Crim. Proc. Ann. art. 38.36(a) (West 2005).........................................129

Tex. Penal Code Ann. § 1.07(a)(22) (West Supp. 2014).........................................82

Tex. Penal Code Ann. § 19.03 (a)(2) (West Supp. 2014)......................................111

Tex. Penal Code Ann. § 36.06(a) (West 2015)......................................................111

**Rules**

Tex. R. App. P. 33.1........................................................................ 126, 127

Tex. R. App. P. 33.1(a) ............................................................................66

Tex. R. App. P. 33.1(a)(1) ......................................................................127

Tex. R. App. P. 44.2(b) .......................................................... 79, 131, 155, 157

Tex. R. Evid. 103(a)(2) ..........................................................................126

Tex. R. Evid. 201 ...........................................................................................62

Tex. R. Evid. 403 .................................................................... 118, 119

Tex. R. Evid. 611(b)...................................................................141

Tex. R. Evid. 613(c) ...................................................................134

Tex. R. Evid. 801(c) ...................................................................130

Tex. R. Evid. 801(d)............................................................ 129, 134

Tex. R. Evid. 801(e)(1)(B)........................................................135

Tex. R. Evid. 802 .................................................................. 130, 134

Tex. R. Evid. 803 .......................................................................130

Tex. R. Evid. 803(3)............................................................ 130, 131

## Other Authorities

2 Wayne R. Lafave, Search and Seizure: A Treatise on the Fourth Amendment §
    3.3 at 98 (4th ed. 2004) ......................................................102

# STATEMENT REGARDING ORAL ARGUMENT

The State requests the opportunity to present oral argument if the Court grants the Appellant's request to argue.

**TO THE HONORABLE COURT OF CRIMINAL APPEALS:**

The State of Texas submits this brief in response to the brief filed by the Appellant, Franklin Davis.

## STATEMENT OF THE CASE

This is an automatic appeal from a sentence of death. *See* Tex. Code Crim. Proc. Ann. art. 37.071, § 2(h) (West Supp. 2014). The trial court sentenced the Appellant to death on November 16, 2013 for the capital murder of Shania Gray. The Appellant filed his brief on February 27, 2015. He presents forty-eight allegations of reversible error.

## STATEMENT OF FACTS

### *Guilt/Innocence*

#### *State's Case-in-Chief*

In September 2010, fourteen year-old Shania Gray was a freshman in high school and had just started her first job babysitting Jennifer Dibrell's three young children. (RR60: 75–77). The Appellant was the father of Jennifer's youngest child, Dezire. (RR60: 75–77, 79). After several months of babysitting, the Appellant suggested they give Shania a Blackberry cell phone as payment. (RR60: 80; SX: 235).

One night in early April 2011, Shania's mother Sherry noticed a text message on Shania's phone from "Wish." (RR60: 81). Sherry, who had met the

1

Appellant once on Christmas, knew that he went by that nickname. (RR60: 75, 78–79, 81). Sherry took the phone and saw a message asking Shania why she was no longer coming over to babysit. (RR60: 81, 87). The next message Sherry saw said: "I want you. I just can't have you right now." (RR60: 87). When Sherry asked Shania about the messages, she became visibly upset and began to cry. (RR60: 88).

Sherry took Shania to Jennifer's house to discuss the messages, but Jennifer did not seem surprised by the messages; in fact, she was nonchalant about the entire situation. (RR60: 88–89). Sherry asked Jennifer to call the Appellant on the phone. (RR60: 89). The Appellant would not speak with Sherry, but told Jennifer to have her call him the following day after work. (RR60: 89).

Shania was still upset and crying on the drive home. (RR60: 91). Sherry decided to take Shania to her grandmother's house, two blocks away, to spend the night. (RR60: 91). Sherry wanted an opportunity to talk to her husband Marvin about what course of action they should take. (RR60: 91–92).

The following morning, Sherry sent the Appellant a text message informing him that they were going to call the police regarding the inappropriate text messages between him and Shania. (RR60: 92). The Appellant responded and claimed Shania was lying. (RR60: 92). Later that day, Shirley Brown, the mother of one of Shania's friends, brought Shania home and asked to talk to Sherry. (RR60: 98–101). Shania had told Shirley that the Appellant had sexually assaulted

2

her. (RR60: 98–99, 101). That evening, Sherry's husband called the Appellant. (RR60: 93). The Appellant claimed that he did not know the text messages were from Shania and had responded to them as a joke. (RR60: 93–94).

At that point, Sherry contacted Officer Johnny Ivy, the Student Resource Officer ("SRO"), at Shania's high school. (RR60: 95). Sherry told Officer Ivy that the father of the children that Shania had been babysitting was sending her inappropriate text messages. (RR60: 96). Officer Ivy contacted the Mesquite Police Department on Sherry's behalf, and an officer arrived at their home a few hours later. (RR60: 97). The officer spoke to Shania and took a general statement. (RR60: 105–06). Shania then met with Detective Snyder at the Mesquite Police Department. (RR60: 105–07). Snyder scheduled an appointment for Shania at the Dallas Children's Advocacy Center ("DCAC"). (RR60: 105–07). Sherry took Shania for a forensic interview and then to Children's Medical Center for a REACH examination. (RR60: 107; SX: 239). Sherry was later contacted by Detective Snyder and informed that the Appellant had been indicted on four counts of sexual assault of a child. (RR60: 108; SX: 9, 10, 11, 12).

In September 2012, Shania transferred to Hebron High School in Carrollton. (RR60: 112–13). Shania did not have a driver's license, so Sherry drove her to and from school because they were still living in Mesquite. (RR60: 113–14). Sherry and Shania would communicate by text message during the day. (RR60: 114–15).

On her second day of school, September 6, 2012, Shania sent Sherry a text message telling her that she was going to stay after school for physics tutoring. (RR60: 116–17, 121).

Sherry arrived to pick Shania up at approximately 4:05pm. (RR60: 116, 121). When Sherry called Shania to let her know she was at the school, Shania told her that the tutoring session was wrapping up and she would be out in a few minutes. (RR60: 117). Sherry reminded Shania that they had choir practice that evening. (RR60: 117). By 4:20pm, Sherry began to text Shania, but received no response. (RR60: 118). After thirty minutes passed, Sherry barraged Shania with calls, but her phone went straight to voice mail. (RR60: 118–19).

Sherry decided to go inside the school to look for Shania, but the door to the physics classroom was locked and the lights were off. (RR60: 121). Sherry then checked the gymnasium and spoke with a coach who was able to contact Shania's physics teacher, Christine Cone. (RR60: 122, 150–53). Cone confirmed that Shania came to her class for tutoring that afternoon, but left at approximately 4:00pm after she received a phone call from her Sherry. (RR60: 150–54). Shania told Cone that she "had to hurry and go; my mom's waiting on me." (RR60: 155). This was the last time Shania was seen alive. (RR61: 228). The search for Shania continued until nearly midnight to no avail. (RR60: 123–30).

4

The next morning, September 7, 2012, Sherry went back to the school and spoke with SRO Forest Langston. (RR60: 131, 172–75). Langston contacted Mesquite Horn High School, Shania's previous school, and learned that Shania was the named victim in four sexual assault cases currently pending against the Appellant. (RR60: 131, 136–37, 179–81). Langston pulled the phone records for Shania's phone and discovered that she had been in contact with someone with a 903-603-8786 number around the time she disappeared. (RR60: 175–76). Langston called the number; however, no one answered and the voice mail was not set up. (RR60: 176). Langston learned that the phone was a prepaid phone purchased at Walmart and had no subscriber information. (RR60: 177).

Langston also checked the school's surveillance video and found footage of Shania exiting the south side of the building. (RR60: 185–89; SX: 16). She appeared to have a cell phone in her hand. (RR60: 189; SX: 16). The video also showed a gray Dodge Stratus parked on the south side of the building. (RR60: 186–89; SX: 16).

At this point, Detective Dena Williams with the Carrollton Police Department became involved in the case. (RR60: 132–33). Williams obtained the call records for the 903-603-8786 number based on exigent circumstances. (RR61: 58). The 903 number had only been in contact with four other numbers, so Williams called each of the numbers and left a message. (RR61: 220–21).

Shakeema Morsley returned the detective's call and informed her that she believed that the Appellant was the person contacting her from the 903 number. (RR61: 222). Morsley did not have the Appellant's phone number, but she did have a number for his wife, Jawanna Arrington. (RR61: 223).

Williams called Jawanna and was able to speak to with her and the Appellant. (RR61: 223). Williams told them that she was investigating a missing child case and asked them about the 903 number. (RR61: 224). Both denied knowing anything about the 903 number. (RR61: 224–25). Jawanna owned a 2005 gray Dodge Stratus that was registered to an address in Irving. (RR60: 218–20).

Carrollton Police Detectives Perritt and Cook drove to the address that Jawanna's 2005 gray Dodge Stratus was registered to in Irving while Williams was on the phone with the Appellant. (RR61: 218–21, 225–26). The detectives made contact with the Appellant when he stepped outside of his apartment to take out some trash. (RR61: 218–21, 225–26). The detectives were able to confirm that neither Shania nor any evidence of a crime scene were present at the Appellant's apartment. (RR61: 226). The Appellant agreed to come to the police department to talk to Detective Williams. (RR61: 224, 226–27). The Appellant drove himself and his wife in their own vehicle. (RR61: 224, 226–27).

By the time the Appellant arrived at the Carrollton Police Department it was 1:48am on Saturday September 8, 2012. (RR61: 227). In the first of four

interviews with the police, the Appellant denied any involvement in Shania's disappearance. (RR63: 25–26; SX: 57, 57C). The Appellant insisted that he was innocent of the sexual assault charges and told Williams that Shania had sent him some text messages admitting that she lied about the assaults because her mother made her. (SX: 57, 57C). The Appellant offered to show Williams the text messages on his T-Mobile smart phone[1]. (RR62: 26–27). At the time of this interview, Detective Williams did not have any data from the cell phone towers and did not know that the text messages that the Appellant wanted to show her were fake. (RR62: 25–26, 30–32). At the conclusion of the interview, the Appellant was placed under arrest for outstanding traffic warrants from Balch Springs and was also placed on a forty-eight hour investigative hold. (RR62: 39–41; SX: 57, 57C).

Detective Jeremy Chevallier conducted the second interview with the Appellant, which the Appellant initiated. (RR62: 39–41, 51; SX: 57, 57B). He told Chevallier he wanted to talk to him because he forgot to tell Detective Williams that he had recorded conversations between himself and Shania. (SX: 57, 57B). The Appellant claimed that he recorded the conversations because he felt like his court-appointed attorney was not going to do a good job. (SX: 57, 57B). The Appellant told Chevallier that the recordings contained statements from Shania that

---

[1] The record reflects the number for the Appellant's T-Mobile phone is 972-302-1976. (SX: 50, 51, 52).

contradicted what she told the police. (SX: 57, 57B).  The Appellant continued to deny any involvement in Shania's disappearance. (SX: 57, 57B).

Approximately an hour and a half after his second interview, Chevallier was notified that the Appellant wanted to speak with him again. (RR62: 71).  During this third interview, the Appellant admitted that the phone with the 903 number was his and he admitted to killing Shania. (SX: 57, 19A).  The Appellant confessed to taking Shania to a park off of Interstate 635, shooting her twice, and then putting his foot on her neck until she stopped breathing. (SX: 57, 19A).  He then rolled her body into the Trinity River and left the park. (SX: 57; 19A).  During the interview, Shania's body was found floating face-down in the Trinity River in a secluded section of Sam Houston Trail Park near the intersection of Interstate 635 and the George Bush Tollway. (RR61: 108–17; RR62: 73; SX: 57, 19A).  At the end of the interview, the Appellant agreed to take Chevallier to the crime scene. (RR62: 75, 79).

Shania's body was in the process of being recovered when they arrived. (RR62: 78).  Crime scene investigators found a backpack containing Shania's identification card and other papers identifying her near her body. (RR63: 130; SX: 113, 114, 115).  The Appellant took police to two ponds where he had disposed of evidence.  From these ponds, police recovered a Diamondback .380 handgun, which the Appellant identified as the gun he used to shoot Shania, Shania's iPhone,

8

and the Appellant's muddy shoes. (RR62: 79, 90–92; RR63: 131, 133, 180–81; SX: 58, 221).

On September 9, 2012, Detective Williams and Detective Grigg were notified that the Appellant wanted to talk to them again. (RR62: 117). They went to the jail and met with him for his fourth interview. (RR62: 117–18; RR63: 20; SX: 72, 72A). During the interview, the Appellant talked about the sexual assault charges and again told Williams about the text messages Shania sent him. (RR63: 26). The Appellant claimed that when Shania got in the car just prior to her murder, she told him: "I'm going to tell the truth. You're right, this never happened. It was my mama that made me do it." (RR63: 26).

The autopsy revealed that Shania had been shot twice. (RR63: 261–63). One of the gunshot wounds entered the back of her right shoulder, traveled through the muscles of her shoulder and neck, and exited through the right side of her neck. (RR63: 264). The second gunshot wound entered the lower left side of Shania's back and ended up in the iliopsoas muscle of her right hip. (RR63: 264). The bullet was recovered from her body. (RR63: 264). Neither bullet struck any major blood vessels or organs. (RR63: 264). Shania had another injury, to her throat, that was consistent with asphyxia. (RR63: 265). Though decomposition made it difficult to see the injury to Shania's neck, it was clear that the thyroid cartilage that makes up the voice box was fractured, an injury consistent with pressure from

9

a foot or knee being applied to the area. (RR63: 265–66). The medical examiner testified that the cause of death was homicidal violence including gunshot wound and asphyxia, with the asphyxia including both the neck compressions and possible drowning. (RR63: 278–79).

The Diamondback .380 handgun, two cartridge cases, and two bullets were sent to the Tarrant County Medical Examiner's Crime Lab for examination. (RR62: 95–96). The two cartridge cases and one of the bullets were recovered from the crime scene, and the second bullet was recovered during Shania's autopsy. The crime lab determined that the cartridges and the bullets were fired by the handgun recovered from the pond. (RR62: 104)

Data from T-Mobile and AT&T was also used to track the movement of the Appellant and Shania during her disappearance. The data showed that on the evening of September 5, 2012, at approximately 10:11pm, the Appellant's phone[2] hit off of a cell tower near Shania's house. (RR61: 197–98; SX: 56). At that time, Shania's phone was not hitting off of the tower near her home, indicating that she was not there. (RR61: 195–96). Over the next several hours, multiple text messages and calls were exchanged between the numbers. (RR61: 195–99; SX: 56). By the end of the conversations, at approximately midnight, the Appellant's

---

[2] This examination used the 903-603-8786 throwaway phone. (RR61: 188–91).

cell phone was hitting off of a tower near his apartment, and Shania's cell phone was hitting off of a cell phone tower near her home. (RR61: 197–98; SX: 56).

At approximately 12:36pm on September 6, 2012, the Appellant's cell phone hit off of a cell tower near Shakeema Morsley's apartment. (RR61: 201). From 3:30pm until approximately 4:30pm, the Appellant and Shania's cell phones were both hitting off of a cell tower near Hebron High School. (RR61: 201–04). At approximately 5:15pm, Shania's phone hit off of a cell tower near the Appellant's apartment, and shortly thereafter, was no longer in contact with the network. (RR61: 204–05). Additionally, cell phone records showed that the Appellant received two calls to his 972-302-1976 smart phone at approximately 4:01pm on September 6, 2012. (RR61: 178; SX: 50, 51, 52). The calls hit off of a cell tower located near Hebron High School. (RR61: 178–79; SX: 50, 51, 52).

Considerable evidence was also recovered from the Appellant's T-Mobile smart phone (972-302-1976). Jeff Shaffer, a Special Agent with the Dallas Field Office of the Secret Service, conducted a forensic examination of the phone. (RR60: 229, 231; SX: 18). Shaffer's forensic examination revealed:

- A deleted contact named "throwaway" with a cell phone number 903-603-8786. (RR60: 247–48; SX: 20).

- A picture of Shania downloaded onto the phone on July 13, 2012. (RR60: 249–50; SX: 20).

11

- Multiple Google searches:

    o On August 28, 2012 at 5:26pm, the Appellant searched for gun shows in Dallas. (RR60: 252–53; SX: 20).

    o On August 29, 2012, the Appellant conducted searches for a Diamondback .380 handgun and its price. (RR60: 254–55; SX: 20).

    o On September 6, 2012 at 1:53pm, the Appellant searched for Hebron High School. (RR60: 257; SX: 20).

- On August 30, 2012, the Appellant placed multiple calls to a person named Chris.[3] (RR60: 254).

- A map search for the intersection of I-635 and Highway 161, the location of Sam Houston Trail Park, where Shania's body was found. (RR60: 264; SX: 21).

- Six text messages were also recovered from the Appellant's phone. (RR60: 266). The messages all appeared to be from the number 214-709-6861, Shania's cell phone number. (RR60: 266; SX: 20).

    o The first message, sent on August 27, 2012 at 8:25pm[4], stated: "Ar3 u still mad @ m3?" (RR60: 266–68; SX: 20).

    o The second message, sent at 8:35pm, stated: "Sorry I li3d on u but my momma mad3 m3 do it. If we go to court ima t3ll th3m u never touched me. My my momma go b3 mad @ m3 but fuck that bitch I can't stand her no ways. Please 4give me." (RR60: 267–68; SX: 20).

    o The third message, sent at 9:40pm, said: "Is this mr. Wish#." (RR60: 267–68; SX: 20).

    o The fourth message, sent on August 28, 2012 at 7:50pm, said only: "Mr. Wish?" (RR60: 267–68; SX: 20).

---

[3] The trial testimony showed that the Appellant bought a gun from a man named Christopher Allen on August 30, 2012. (RR63: 131).

[4] All times were in Coordinated Universal Time, or "UTC". (RR60: 267–68; SX: 20).

- o The fifth message, sent at 7:53pm, said: "I beli3v3 if I t3ll the truth sh3 will punish m3 for a long tim3 and I want b3 able to play basketball." (RR60: 267–68; SX: 20).

- o The final message, sent at 8:04pm, said: "Pl3as3 r3spond back if this is still your numb3r." (RR60: 267–68; SX: 20).

The timeline recovered from the phone showed that on August 27, 2012 at 7:55pm UTC, an application called "Fake Call & SMS & Call Log" was installed on the phone. (RR60: 268; SX: 42, 43). All of the messages and calls from number 214-709-6861 came after the installation of the fake SMS and call log application. (RR60: 270–71). The cell phone records for the two numbers did not show any calls or text messages that corresponded with those occurring after the installation of the fake SMS and call log application. (RR60: 277–78).

Because the six text messages appearing to come from Shania were suspicious, additional forensic examination was conducted on the Appellant's phone by Andrew Hoog, an expert in smart phone data recovery. (RR61: 130–32). Hoog was able to determine that the six text messages that appeared to be sent from Shania's cell phone were fake and had been created by the fake SMS and call log application. (RR61: 150). Hoog's examination of the Appellant's phone also revealed:

- A calendar entry for a July 24, 2012 court date. (RR61: 151).

- Google searches for:

  - "Can you record a person without them knowing in Texas?" and "Can you record a person by phone without them knowing in Texas?" on July 18, 2012. (RR61: 152–53).

  - "Best way to get off of a sexual assault charge." and "With no proof that you did the murder, can you still be held in jail?" at 12:55pm the same day. (RR61: 154).

  - "Can you voice-record a minor over the phone in Texas?" and "Can tape-record conversation with a person story changing and get you off a charge?" on July 19, 2012. (RR61: 154–55).

  - "Can tape-recorded conversation be used in court?" and "Can tape-recorded conversation against a minor?" on July 23, 2012. (RR61: 155).

- Logins to Facebook accounts for Jazmine Brown and Domee Elkins Brown. (RR61: 157–61). While logged in as Jazmine, the Appellant sent a friend request to Shania. (RR61: 160–61; SX: 48).

- An Intellius search for Shania Gray in Texas. (RR61: 162).

An hour-long recorded conversation was also recovered from the phone. (RR60: 236). In the recording, the Appellant, using the false identity "D," questioned Shania at length about the sexual assaults. (RR61: 92; SX: 19, 19B). He also told Shania to tell the prosecutors that she lied about the sexual assault charges and that she would not get in trouble because she was a minor. (SX; 19, 19B). The Appellant also told her: "[I]f he turn around and go to the pen and get out, he might have a grudge towards you, and you know, say, come after you . . . when he get out of jail." (SX: 19, 19B).

*Defense Case-in-Chief*

Detective Brandon Snyder, with the Mesquite Police Department, was the lead detective investigating the sexual assault charges against the Appellant. (RR64: 27–28). Snyder testified that Shania's mother discovered the text messages between the Appellant and Shania on April 7, 2011. (RR64: 31). The family did not contact the police department and make a report until April 14, 2011. (RR64: 31). Snyder was assigned to the case on April 15, 2011. (RR64: 29). Snyder was informed that the Appellant had contacted the police department on April 11, 2015, in order to determine if a report had been made about him. (RR64: 30).

Once Snyder was assigned to the case, he scheduled a forensic interview for Shania at the DCAC on April 21, 2011. (RR64: 31–32). Snyder was present when Caitlin Clevenger conducted the interview. (RR64: 88). In the interview, when Clevenger asked Shania if "anything like this had ever happened before," Shania told Clevenger "no." (RR64: 107–08; SX: 239). After the forensic interview, Snyder interviewed Sherry, who gave him consent to process Shania's cell phone so that he could access the text messages. (RR64: 32).

The cell phone was processed on April 25, 2011. (RR64: 33). One of the contacts in Shania's Blackberry was for "Wish," with the number 972-302-1976. (RR64: 74–75). Shania also had his birthday listed on her calendar. (RR64: 75).

15

The April 7, 2011 string of text messages between the Appellant and Shania was recovered. (RR64: 76; SX: 235). The first message from the Appellant said: "Wow ok then goodbye," and was sent at 21:50:30. (RR64: 76; SX; 235). Shania responded: "Imm not saynn goodbye just yet…" at 21:50:56. (RR64: 76; SX: 235). The Appellant responded: "Thats foul so im pose to sit around an wait! Man whateva," at 21:51:47. (RR64: 76; SX: 235). Shania replied: "Nope now yhu gettn mad for wahh!!!!!! Yhu got 2 for the price if one wahh yhu complainin for…….tryna have yhur cake nd eat it too," at 21:53:19. (RR64: 76; SX: 235). The Appellant responded: "Just want u but cant fully have u yet," at 21:54:17. (RR64: 77; SX: 235). Snyder testified that the text exchange between Shania and the Appellant looked like a conversation between individuals in an intimate relationship with one another. (RR64: 113–14).

The Appellant denied the allegations when Snyder interviewed him. (RR64: 44; DX: 2). He told Snyder that he thought Shania had a crush on him. (RR64: 50; DX: 2). The Appellant also said that Shania would invite boys over while she was babysitting. (RR64: 51; DX: 2). The Appellant told Snyder that he deleted the text messages. (RR64: 63; DX: 2). He told Snyder that he was "just playing around," and was just explaining to Shania that she was too young and he could not see her. (RR64: 77; DX: 2). Snyder did not take the Appellant's phone. (RR64: 63; DX: 2).

16

Following his interview with the Appellant, Snyder interviewed the outcry witnesses. (RR64: 53). Snyder testified that one of the outcry witnesses told him that Shania had changed her story. (RR64: 40). He did not interview the children that Shania was babysitting. (RR64: 53). Snyder testified that Shania told him the children were sent to clean their room or were outside when he assaulted her. (RR64: 54). Snyder did not interview Jennifer, the children's mother, because she was not present when the assaults occurred. (RR64: 55). Snyder did not visit the location of the assaults. (RR64: 57).

The Appellant testified that he killed Shania because she ruined his life. (RR64: 136). According to the Appellant, he lost everything because she lied about the sexual assaults. (RR64: 136). The Appellant characterized the time prior to the allegations as "happy," but claimed that "Shania's lies" changed everything. (RR64: 145). The Appellant had just married Jawanna and he had just been promoted at Dr. Pepper, despite having only been there for three or four months. (RR64: 142–44).

The Appellant was unable to return to Dr. Pepper after his arrest for the sexual assault charges because he could no longer pass a background check and he was forced to file for unemployment. (RR64: 145–49). The Appellant testified that his wife looked at him differently because he was unable to provide for his family; they were no longer able to go to the movies, go out to eat or go shopping. (RR64:

17

148, 151). When they argued, Jawanna would tell the Appellant that everything was on her shoulders because she was the sole provider. (RR64: 152).

The Appellant testified that he met Shania for the first time on Christmas 2010. (RR64: 174–75). He would see her when he went to visit Jennifer's kids, which was usually about four times a week. (RR64: 187). The Appellant testified that Shania had a nice personality and made him laugh. (RR64: 182–83). The two formed a bond and he started to care for her like a sister. (RR64: 183). In fact, Shania would confide in him. (RR64: 190). The Appellant estimated that he spent six or seven hours a week with her. (RR64: 190–91). However, he denied ever being alone with her. (RR64: 193). The Appellant denied having sex or any sexual contact with her and also denied swatting or grabbing her butt. (RR64: 183).

The Appellant testified that when he first received text messages from Shania, he did not know that they were from her. (RR64: 207). He claimed that Shania asked him whether or not he loved Jawanna, and he told her that he did, which was why he was going to marry her. (RR64: 209–10). The Appellant claimed that Shania then told him that she wished she had not gotten her feelings involved because she wanted him. (RR64: 210). It was then that he sent her the text messages telling her he could not have her "like that" because she was too young. (RR64: 212). The Appellant claimed that the text message he sent her stating: "Wow ok then gudbye," and "That's foul so im pose to sit around an wait!

18

Man whateva" were referring to how long it was taking Shania to respond to his previous message[5]. (RR64: 213; SX: 235).

The Appellant testified that he knew Shania had a crush on him because she had flirted with him on previous occasions. (RR64: 212). He denied flirting with her but characterized himself as a "charmer." (RR64: 213). The Appellant did not want to hurt her feelings so he was trying to "let her down easily." (RR64: 214). Appellant explained that the text: "Nope now yhu gettn mad for wahh!!!!!! Yhu got 2 for the price if one wahh yhu complainin for…….tryna have yhur cake nd eat it too," was referring to him having sex with Jennifer after he was engaged to Jawanna. (RR64: 215–16; SX: 235). The Appellant claimed that Jennifer told Shania about the encounter. (RR64: 217).

The Appellant hired Tom Cox to represent him on the sexual assault charges and agreed to pay him $15,000, $6,000 coming from the Appellant's car, which he signed over to Cox. (RR64: 158–59). The Appellant agreed to a payment plan to pay the remaining $9,000. (RR64: 158–59). He tried to pay the remainder of the fee using his unemployment benefits, but he only received $275 to $300 every two weeks. (RR64: 158–59). In the end, he was only able to pay Cox $4,600 in cash because his unemployment benefits ran out. (RR64: 161–62). According to the Appellant, Cox never hired an investigator to look into the charges and never set

---

[5] Cell phone records show that less than one minute passed between the texts. (SX: 235).

his cases for trial. (RR64: 162, 165). However, Cox did tell him that Shania had trichomoniasis, a sexually transmitted disease. (RR64: 166).

When the Appellant told Cox he could no longer pay him, Cox asked the court to withdraw from the case. (RR64: 163–64). The court granted the withdrawal and appointed Hugo Aguilar to represent him in August 2012. (RR64: 171). The Appellant testified that he never met with Aguilar aside from when he was first appointed and Aguilar never returned his phone calls. (RR64: 172). The Appellant became concerned that Aguilar was not going to help him, so he began his own investigation. (RR65: 21).

First, he began to look for anything online that could be used to attack Shania's character. (RR65: 22). The Appellant went to Shania's Facebook page, but it was private. (RR65: 22). The Appellant created a fake Facebook profile under the name Jazmine Brown and tried to communicate with Shania. (RR65: 23). Shania, however, did not accept his friend request. (RR65: 24).

Next, the Appellant contacted his nephew Domee Elkins for access to his Facebook page. (RR65: 24). The Appellant chose Elkins because he was young and handsome. (RR65: 24). The Appellant sent Shania a friend request under Elkins' profile and she accepted. (RR65: 24). He was then able to access her profile and found her phone number. (RR65: 25). He decided to contact her by

text message. (RR65: 25). The Appellant bought a "throwaway" phone from Walmart to contact Shania. (RR65: 26).

That night, the Appellant contacted Shania claiming to be "D," a relative of Elkins. (RR65: 27, 34). The Appellant had looked on Facebook for a profile he could claim was "D's" and decided to use Artis Powell's. (RR65: 27, 35). The Appellant told Shania his middle name was Dwayne, so he went by "D." (RR65: 34). He told Shania if she wanted to see what he looked like, she should visit Powell's Facebook page. (RR65: 27). The Appellant had already sent Powell a message from the Jazmine Brown Facebook page warning Powell not to respond to any messages from Shania because she was underage. (RR65: 26–27).

Two or three days after the Appellant first sent Shania a text message, she called him. (RR65: 30). At first, the Appellant thought Shania had figured out what was going on, but then she sent him a text message telling him she wanted to talk. (RR65: 30). The Appellant went down to his car and called her back on the throwaway phone. (RR65: 30). He placed the call on speakerphone and recorded it using his smart phone. (RR65: 30). The Appellant testified that he recorded seven of their conversations. (RR65: 30). The Appellant admitted that there was not much on two or three of the recordings. (RR65: 30–31).

The Appellant felt good about his investigation because in one of the recordings, Shania said there were only three sexual assaults instead of four, and

she also stated that one of the assaults occurred in the bedroom of his apartment. (RR65: 32; SX: 19, 19B). The Appellant testified that this contradicted what she said in the DCAC video because she said it happened in the bathroom at his apartment. (RR65: 31–32; SX: 19, 19B, 239). The Appellant said that the other recording also proved her bad character because she talked about having sex. (RR65: 32). The Appellant made all of the recordings within a week of having first contacted her. (RR65: 33).

The Appellant testified that he took the recordings to his attorney, who was "kind of iffy" about them. (RR65: 35). He then drove to Mesquite and was going to play the recordings for Sherry and Marvin, but began to worry that they would claim he forced his way into their house. (RR65: 35–37). The Appellant was on the phone with his son Trey's mother Linda at the time, and she told him about an application that could be downloaded and used to make fake text messages. (RR65: 37). The Appellant decided that the fake text messages would give him the "extra push" to prove his point and get the prosecutor to dismiss the case. (RR65: 39). The Appellant admitted that he created the fake text messages. (RR65: 40–41). He also admitted that he bought a gun from Linda's brother, Christopher Allen. (RR65: 43).

The Appellant testified he went to the James' house on September 5, 2012, with the gun. (RR65: 38, 48). He contemplated killing the entire family, but when

he thought about Shania's younger brother, who was completely innocent, he got back in his car and left. (RR65: 38, 48). The Appellant admitted to sitting in his car outside of their house for thirty to forty-five minutes, just thinking. (RR65: 49).

On September 6, 2012, "D" received a text message from Shania wanting to meet. (RR65: 54). Shania told him that she was at Hebron High School. (RR65: 54). The Appellant testified that he wanted to meet with Shania to "tell her how she ruined my life. How . . . the small lie she told took everything from me." (RR65: 55).

The Appellant testified that he was going to meet Shania when she was supposed to be in tutoring. (RR65: 57). Shania told him to park by the tennis court. (RR65: 57). The Appellant denied having the gun with him while he was standing outside waiting for her; instead, he claimed he left it in his car. (RR65: 59–60). When Shania came out of the door, she called his cell phone and asked if that was him with the hat on his head. (RR65: 58–59). The Appellant answered affirmatively and turned toward her. (RR65: 59). Shania froze when she saw him and said: "Oh, shit." (RR65: 59).

The Appellant testified that he told Shania he was not going to hurt her and just wanted to talk to her. (RR65: 59). He claimed that Shania relaxed and walked with him to the car. (RR65: 60–61). The Appellant opened the passenger door for her and she got in. (RR65: 61). He denied forcing her to get in the car or using the

gun. (RR65: 62). However, the Appellant admitted that Shania saw the gun. (RR65: 67). He testified that he had placed the gun in the door handle, but when he began to drive, it would slide around, so he placed the gun in his lap between his legs. (RR65: 67).

The Appellant drove to Sam Houston Trail Park, where he and his wife had walked the Campion Trail two or three months earlier. (RR65: 67–69). During the drive he thought about his childhood and how his grandfather and mentally retarded brother had raped him. (RR65: 72). He also thought about his daughter and the holes in her shoes. (RR65: 72). He told Shania that he had been on her Facebook page and saw pictures of her enjoying herself while her lies had ruined his life. (RR65: 71). He told her he had to give his Ford Mustang to a lawyer and he could not provide for his kids. (RR65: 66). He also told her that he had been outside of her house the night before and was going to kill everyone inside. (RR65: 66). The Appellant testified that he started to cry, and Shania reached up and placed her hand on his and told him she was sorry. (RR65: 66–67).

When they arrived at the park, they sat in silence for a few minutes. (RR65: 70–71). The Appellant told her that he was in pain and she should be in pain too. (RR65: 71). Shania told him that her life had not been happy. (RR65: 73). She told him she had an abortion. (RR65: 73). The Appellant testified that, as soon as

24

she said that, he told her to get out of the car and leave her cell phone on the dashboard. (RR65: 73).

They walked to the sidewalk and down a slope towards the Trinity River. (RR65: 73–74). The Appellant testified that he told Shania to go down the slope and wait approximately ten minutes, and then she could come back up and go call her mother. (RR65: 74). The Appellant told her that he did not care what she told her mother, but she could not tell her that he had kidnapped her because she got in the car willingly. (RR65: 74).

When Shania was about halfway down the slope, he turned and started to walk away, but stopped, pulled the gun out of his pocket, turned around, and shot Shania in the back. (RR65: 75). Shania lost her balance and fell into the water. (RR65: 76). The Appellant shot her again. (RR65: 76). He testified that he was not sure where he shot her, but he had been trying to shoot her in the head with the first shot. (RR65: 76).

According to the Appellant, Shania tried to swim out of the water toward the embankment. (RR65: 76). The Appellant went down the embankment "to finish what I was doing." (RR65: 77). He told Shania he was not going to shoot her again, and helped pull her out of the water. (RR65: 77–78).

The Appellant testified that Shania said: "Why, Wish?" (RR65: 79). She told him that the right side of her body was going numb. (RR65: 79). Once she

25

was out of the water, the Appellant told her to lie down. (RR65: 79–80). Shania was not showing any emotion and complied with his instructions. (RR65: 80). While she was lying there, looking up at him, he put his foot on her neck. (RR65: 80). The Appellant was not sure how long he stood there with his foot on her neck. (RR65: 81). When he finally removed his foot, he told her he was sorry and rolled her into the river. (RR65: 82).

The Appellant went back to his car, sat for a few minutes, and then left the park to dispose of the items he had used. (RR65: 84). First, the Appellant broke the throwaway phone and threw it out of the window near the crime scene. (RR65: 85). He then threw Shania's iPhone in a pond near his gym. (RR65: 85). He put his muddy sneakers in the storm drain next to the pond. (RR65: 86). Next, he threw the clip from the gun out of the window while he was driving on Interstate 635. (RR65: 86). He threw the gun into a pond on the way to pick his wife up from work. (RR65: 86). The Appellant testified that Jawanna did not get off of work until 9:00pm, but he arrived at 8:00pm, and sat in the car and cried. (RR65: 87). The Appellant testified that he could not sleep that night. (RR65: 88). The police came to his apartment the following day and he went with them to the Carrollton Police Department, voluntarily. (RR65: 90).

The Appellant admitted that the four video-taped interviews with the police were full of lies, but claimed that he was telling the truth about being innocent of

the sexual assaults. (RR65: 91–100). The Appellant testified that he lied because he was trying to cover up what he had done. (RR65: 91). The Appellant denied any involvement in the crime in the first two interviews, but finally confessed because his mother would have wanted him to. (RR65: 91–97). The Appellant admitted that he did not tell the detectives everything, including the fact that the text messages were fake. (RR65: 97).

The Appellant agreed to the fourth interview with the detectives because he wanted closure and wanted to confess everything. (RR65: 100). The Appellant testified that he agreed to interviews with Channel 4 and Channel 8 because he wanted to get everything off of his chest, and he wanted everyone to know that he did not have sex with Shania. (RR65: 101). The Appellant testified that he knew he was going to win if he went to trial on the sexual assault charges because he had the recordings of Shania. (RR65: 106). The Appellant testified that the recordings showed that her story changed multiple times. (RR65: 106).

On cross-examination, the Appellant admitted that he began to plan to kill Shania in July 2012. (RR65: 108). The Appellant admitted that every time he contacted Shania he was pretending to be "D." (RR65: 109). The Appellant agreed that Shania had a crush on "D." (RR65: 109). The Appellant admitted that he told the police he did not have a 903 number, he did not contact Shakeema Morsley, he did not go to Carrollton or Mesquite, and he was not at Hebron High School.

(RR65: 115). The Appellant admitted that he had lied to the detectives because he thought he could get away with Shania's murder. (RR65: 115, 119). The Appellant admitted that he never told anyone that the text messages were fake. (RR65: 112). In fact, during his interview with David Schechter from Channel 8, he said that he had text messages that proved that Shania lied. (RR65: 122–23). The Appellant testified that he was confident he would win at trial because of the recordings, not because of the text messages; however, he called his attorney immediately after he made the text messages. (RR65: 138). He admitted that he would have used the text messages at the trial even though they were fake. (RR65: 139).

The Appellant admitted that he told the detective with the Carrollton Police Department and David Schechter with Channel 8 that Shania had made up the sexual assault allegations because her mother made her. (RR65: 127). However, during the conversations Shania had with "D," she never said that she lied about the sexual assaults and never told him that her mother made her lie. (RR65: 130).

Lynne Corsi, an attorney and licensed social worker, testified as an expert in child sexual assault cases. (RR65: 193–96). Corsi did not review any of the materials related to this capital murder, but she did review the files, police reports and interviews related to the sexual assault allegations. (RR65: 196). Corsi reviewed Tom Cox's file and testified there was nothing substantive in the file

28

relating to any potential defense, despite the fact that Cox had spent a year on the case. (RR65: 204). Cox did not file any motions in the Appellant's case. (RR65: 204). Corsi also reviewed Hugo Aguilar's file, and while there were notes in the file, there were no discovery motions, interview notes, or any indication that Aguilar had met with the Appellant. (RR65: 205–06). There was no indication that either Cox or Aguilar ever requested or employed an investigator to work on the case. (RR65: 206–07).

Corsi testified that if she had represented the Appellant on the sexual assault charges she would have immediately filed a motion for an investigator. (RR65: 208). She would have met with the Appellant on numerous occasions and asked him to bring collateral witnesses, whom she would have interviewed separately. (RR65: 208). She would have requested discovery from the State, and would have specifically requested Shania's forensic interview. (RR65: 208–09). She would have also listened to the recordings that the Appellant made. (RR65: 210).

Arty Hayes, the Appellant's brother-in-law and his pastor, provided counseling to the Appellant concerning the sexual assault allegations. (RR65: 263–67). Hayes testified that the Appellant and Jawanna drove from Dallas to Texarkana to meet with him. (RR65: 268). Hayes and his co-pastor, William Cooper, met with the Appellant alone first. (RR65: 267). The Appellant wanted them to know that he was innocent and was very disturbed about the situation.

(RR65: 267). According to Hayes, the Appellant seemed very concerned and depressed. (RR65: 268).

*State's Rebuttal*

Shirley Brown, and her two daughters Julia and Jazmine, testified that Shania told them about the sexual assaults. Shirley testified that Shania came to her house crying in the spring of 2011. (RR65: 290). Shania told Shirley that she had something she wanted to tell her but was scared because if she told anyone, "someone would come up hurt." (RR65: 291). Ultimately, Shania told Shirley that a man had been raping her when she was babysitting. (RR65: 292). He would hold a sword to her neck and force himself on her. (RR65: 292).

Julia Adams also testified that Shania told her that a man was raping her when she was babysitting. (RR65: 304–06). Shania told her that he would put swords in her face and threatened that if she told anyone about what was going on he would hurt her and her family. (RR65: 305–06).

Shania told Julia that the sexual intercourse was a "habit" at first. (RR65: 308–09). Julia clarified that this meant that the Appellant had already threatened her, "so she tried to look over it, tried to cope with it," but then he became rough with her. (RR65: 309). Shania became afraid because he told her: "I'm going to kill your family if you tell. Remember if you tell, I'm going to kill you and your

family." (RR65: 309). Julia testified that Shania did not want to have sex with the Appellant. (RR65: 309).

Jazmine Adams testified that there was a day in April 2011 when Shania came to school dressed in sweats instead of her school uniform. (RR65: 318–19). Shania told Jazmine that her mother had caught her texting a twenty year-old man and put her out of the house. (RR65: 319). Jazmine found out that the Appellant had sexually assaulted Shania. (RR65: 320).

Jennifer Dibrell testified that she retrieved the Appellant's property from the Mesquite Police Department following his arrest for the sexual assault charges. (RR65: 334–35). The Appellant told her not to give Jawanna his cell phone. (RR65: 335). Jennifer testified that she and the Appellant argued about him being there when Shania was babysitting because there was no reason to have a babysitter if the Appellant was going to be at the apartment with the kids. (RR65: 337). Jennifer also testified that when the sexual assault allegations came up, the Appellant asked her to write a statement for him stating that her children said he was never alone with Shania, but she refused. (RR65: 337–38).

Jawanna Arrington testified that the Appellant picked her up from work on September 6, 2012. (RR65: 351). Jawanna noticed that the Appellant had sprayed a lot of cologne in the car, and she thought there had been another woman in the car. (RR65: 352). Jawanna testified that the Appellant was more affectionate than

31

usual that night. (RR65: 353). They took a bubble bath, cooked dinner, and were intimate. (RR65: 353).

Jawanna testified that the Appellant never showed her the text messages that led to the sexual assault charges. (RR65: 353–54). He only told her "his version of what they said." (RR65: 354). He told Jawanna that Shania had sent him a text message asking him if he loved Jawanna. (RR65: 354). The Appellant told Jawanna that he said yes, and Shania responded: "I wish I didn't have these feelings." (RR65: 34). The Appellant told Jawanna he replied: "I can't have you in that way." (RR65: 355). The Appellant told her he did not want to hurt Shania's feelings. (RR65: 355). They did not discuss the messages any further. (RR65: 355). After the Appellant was arrested for capital murder, Jawanna moved his belongings, including some swords, out of her apartment and gave them to his sister. (RR65: 356).

### Punishment Phase

#### State's Case-in-Chief

During the punishment phase of the Appellant's trial, the State presented evidence of the Appellant's escape from Parkland Hospital while in the custody of the Dallas County Sheriff's Department awaiting trial for capital murder. Dallas County Sheriff's Deputy Steven Underwood testified that he was assigned to guard the Appellant on the evening of December 4, 2012. (RR66: 143–84). The

32

Appellant was admitted to Parkland on December 1st after complaining that he was dizzy, and was due to be discharged that evening at 9:30pm. (RR66: 147; RR68: 68; SX: 240). This was the Appellant's sixth visit to Parkland since his arrest for capital murder in September. (RR68: 67–68; SX: 240). Shortly after 8:00pm, the Appellant asked Underwood if he could take a shower before he was taken back to jail. (RR65: 147). Underwood agreed. (RR66: 148).

The Appellant was restrained with leg restraints and handcuffs, and Underwood decided to remove them so the Appellant could shower. (RR66: 148). Once Underwood removed the Appellant's leg restraints, he sat up on the side of the bed and turned to face Underwood. (RR66: 148). When the handcuffs were also removed, the Appellant told Underwood: "I'm sorry, man," and grabbed Underwood by his gun holster and vest and backed him into the wall. (RR66: 148–50). The Appellant had some type of sharp object in his left hand and told Underwood he would cut him if he moved. (RR66: 150–51). Underwood grabbed the Appellant and backed him into the left corner of the room. (RR66: 151). The two wrestled around and the Appellant reached for Underwood's gun. (RR66: 151).

Underwood tried to knock the Appellant to the ground but was unable to. (RR66: 151–52). The two continued to wrestle, and then Underwood heard a "pop." (RR66: 152). Underwood's holster had broken and the Appellant had his

gun. (RR66: 152). The gun was a fully loaded Glock 22, 40-caliber. (RR66: 167, 170). Underwood put his hands in the air and complied with the Appellant's commands to get on the ground. (RR66: 155–56). The Appellant then fled the room. (RR66: 157). Underwood called his supervisor and chased after the Appellant, but was unable to apprehend him. (RR66: 179).

After his escape, the Appellant fled the hospital to a residential neighborhood a few blocks from the hospital. (RR66: 187–88). At approximately 8:30pm, the Appellant knocked on Mary Cassio's door and asked for help. (RR66: 184–85). The Appellant claimed that someone was shooting at him and stole his car. (RR66: 185). He did not have a shirt or shoes and was wearing hospital pants and hospital bracelets. (RR66: 186). Cassio, whose three teenage children and daughter-in-law were also in the home, did not let him in. (RR66: 184–86). Instead, she told the Appellant she was going to call 911. (RR66: 186). The Appellant told her not to call the police because he had warrants, and took off running down the street. (RR66: 187). When Cassio went outside, she found a yellow hospital sock on the ground which appeared to contain a gun. (RR66: 189). Cassio testified that while the Appellant did not show any aggression toward her, she also testified that there were multiple people in the home, which the Appellant was able to see. (RR66: 196–98).

Senior Corporal Christian Dalesandro, a sniper and negotiator with the Dallas SWAT team, testified generally about the duties of the Dallas Police Department SWAT team, and specifically about his involvement in the Appellant's capture following his escape from Parkland Hospital. (RR67: 49–71). Dalesandro responded to a location off of Harry Hines Boulevard on December 4, 2012. (RR67: 49–50, 52). Approximately twenty-two to twenty-five Dallas SWAT officers were at the location. (RR67: 55). The Appellant had been located in a red Austin's Barbeque van parked between two buildings. (RR67: 54; SX: 292, 293, 294, 295). A patrol sergeant was speaking with the Appellant, but Dalesandro eventually took over the communications. (RR67: 56). Dalesandro and the SWAT snipers were unable to see the Appellant's left hand and were concerned he had a weapon. (RR67: 60–61).

Dalesandro noted that there were no negotiations with the Appellant because there were no hostages and there was nothing he wanted from the Appellant. (RR67: 57). Instead, Dalesandro informed the Appellant that he was surrounded by Dallas SWAT and was no longer dealing with the Parkland Police or with the Dallas Police Department. (RR67: 59). Dalesandro informed the Appellant that he could place his hands out of the vehicle, surrender, and be taken back into custody without further event. (RR67: 59). Otherwise, they would use alternatives that would be more difficult for the Appellant. (RR67: 59). Dalesandro explained that

35

they could shoot gas into the vehicle which would have made it difficult, if not impossible, for the Appellant to stay inside. (RR67: 59–60). Ultimately, the Appellant came out of the vehicle and was returned to custody. (RR67: 61).

In addition to the evidence of the Appellant's escape, the State also presented evidence of the Appellant's criminal history through certified copies of his prior convictions. (SX: 245–48). On August 30, 1999, the Appellant pled guilty the offense of theft $1,500 and was sentenced to five years' deferred adjudication community supervision. (SX: 245). His probation was revoked on October 29, 2001, and he was sentenced to fifteen months' confinement in state jail. (SX: 245). One of the grounds for the revocation was the commission of a new offense—burglary of a motor vehicle on or about January 30, 2001. (RR66: 141–42; SX: 245). On October 12, 2001, the Appellant entered a plea of guilty to the offense of evading arrest detention and was sentenced to thirty days in jail. (SX: 246). On that same day, the Appellant also pled guilty to the offense of failure to identify and was sentenced to thirty days in jail. (SX: 247). On November 26, 2007, the Appellant pled guilty to the charge of fleeing or attempting to elude a police officer and was sentence to twenty-two days in jail. (SX: 248).

The State also presented testimony concerning the Appellant's lies, manipulation, infidelity and violence against women. Over the course of

36

approximately five years, the Appellant had five children with different women: daughter Kurstyne with Latrice Brown in 2000; son Trey with Linda Crawford in 2001; son Ahmad with Labrena Henderson in 2001; daughter Dezire with Jennifer Dibrell in 2004; and son TK[6] with Nicole.

Linda Crawford, the mother of the Appellant's twelve year-old son Trey, testified about several incidents where the Appellant was physically violent with her. (RR66: 80). The first incident occurred when she was seven or eight months pregnant with Trey. (RR66: 85). Linda testified that she surprised the Appellant at his apartment and found him with another woman. (RR66: 85, 101). Linda tried to push her way into the apartment, but the Appellant came outside, pushed her and told her to "get going and don't come around here." (RR66: 86, 103–04). He grabbed her by the throat and held her against the building, then told her to leave. (RR66: 86). He pushed her and shoved her away from the apartment, all the way to a convenience store. (RR66: 86).

Sometime after Trey was born, the Appellant called her over to his apartment so they could be "intimate." (RR66: 87). While she was there, Labrena, the mother of the Appellant's other son, returned home and wanted to know why Linda was there. (RR66: 87–88, 106). The Appellant pretended not to know, and feeling embarrassed, Linda began to argue with him. (RR66: 88). At one point,

---

[6] The record does not reflect when TK was born.

Linda threw a baby's milk bottle at the Appellant, hitting him in the face. (RR66: 116). The Appellant picked up the bottle and poured the milk over her head. (RR66: 116, 118–19).

As Linda was leaving, the Appellant swung a clothes hanger at her and hit her on her arm. (RR66: 88). Linda was holding Trey, who was only a few months old, and had to "let him go" to defend herself against the Appellant's assault. (RR66: 88). She was able to catch Trey before he hit the ground, but she ended up with a cut on her arm from the clothes hanger. (RR66: 88). Linda's father called the police and the Appellant was arrested for assault. (RR66: 88).

Linda testified that she knew the Appellant had a thirteen year-old daughter, Kurstyne with Latrice Brown, another son named Ahmad, who is approximately twelve, with Labrena Henderson, and another son named TK with a woman named Nicole. (RR66: 89–90). Linda did not learn that TK was the Appellant's son until her was arrested in this case, despite the fact that TK and his mother lived in the same apartment complex as Linda and Trey, and the two boys played together. (RR66: 90).

Labrena Henderson, the mother of the Appellant's son Ahmad, testified that shortly after she had Ahmad, the Appellant would leave for days at a time and not tell her where he was going. (RR66: 127–28). On one occasion, when Labrena questioned the Appellant about where he had been, he got upset and pushed her up

against a wall. (RR66: 127–28). Labrena immediately left and went to her mother's house. (RR66: 128).

The Appellant was also violent with his wife Jawanna. Jawanna testified that the Appellant "put his hands on her" on several occasions. (RR66: 202). He would choke her, threaten her with knives, and on two occasions, had put a gun to her head. (RR66: 202, 209–10). Jawanna testified that the incidents would begin with an argument, and when she responded to his anger with silence, he would grab her around the neck with both hands and choke her. (RR66: 202–03). Jawanna testified that this happened more than twenty times over the course of their relationship. (RR66: 204). Jawanna testified that they would argue about everything from the Appellant having a bad day to her catching him texting other women. (RR66: 205). On one occasion when they were arguing over her cell phone, the Appellant forced Jawanna to the floor against the fireplace. (RR66: 204). She ended up with bruises and scratches on her back from the bricks on the fireplace. (RR66: 204). Jawanna did not call the police because she loved the Appellant and did not want him to get in trouble, nor did she want her family to find out about the abuse. (RR66: 203).

Finally, the State presented the testimony of Melodye Nelson, a 24-year veteran of the Texas Department of Criminal Justice ("TDCJ"), and an expert in the Texas prison system. (RR67: 94–156). Nelson is currently the senior warden

of the Mountain View Unit, a maximum security facility that houses the female death row population, and she previously served as the major of correctional officers at the Polunsky Unit, which houses the male death row population. (RR67: 95–96).

Nelson testified generally about the number and types of facilities in the TDCJ, the number of inmates and guards, how inmates are classified, and the opportunities for violence within the Texas prison system. (RR67: 95–156). Nelson testified that, despite the security present in the TDCJ, violence still occurs in both minimum security areas and on death row. (RR67: 119–20). This includes assaults, sexual assaults, gang activity and murder. (RR67: 120).

*Appellant's Case-in-Chief*

The Appellant presented evidence concerning his difficult childhood, including his mother's murder and his upbringing in foster care. Clifford Harper, a former detective with the St. Louis Metropolitan Police Department ("SLMPD") in St. Louis, Missouri, worked many crimes in the Cabanne Courts neighborhood where the Appellant was raised. (RR67: 166). The neighborhood was known for its gang activity, drugs, and violent crime. (RR67: 166). Harper characterized the neighborhood as one of the worst in St. Louis. (RR67: 166).

During Harper's twenty years with the SLMPD, he spent six years as a homicide detective. (RR67: 165). One of the homicides Harper investigated was

the February 1, 1997 murder of Appellant's mother, Brenda Elkins. (RR67: 167–68, 179). Elkins was raped, sodomized and shot point blank in the head with a 12-gauge pump shotgun. (RR67: 168). Harper described the crime scene as one of the worst he had ever seen. (RR67: 177). Jerry Brandon was ultimately convicted of the crime and remains in prison. (RR67: 177). The Appellant was not present during the murder. (RR67: 180).

Rose McGill, the Appellant's foster mother when he was fifteen, testified that the Appellant was always full of joy. (RR67: 217, 221, 224). He was obedient and did not cause any disruptions while he lived with her. (RR67: 227). However, McGill felt that the Appellant had a lot of anger because he felt that someone in his family should have taken him and his brother in, rather than letting them go into foster care. (RR67: 225). The Appellant even had relatives that lived down the street from McGill; however, they did not want to take him into their home. (RR67: 225–26). McGill made sure that the Appellant had contact with his family while he was living with her, but the Appellant expressed quite a bit of resentment toward them. (RR67: 225).

The Appellant's older sister, Dorothy, ended up taking the Appellant and his brother once she turned twenty-one. (RR67: 227–29). McGill was against this and would have welcomed the Appellant to continue living with her. (RR67: 227). McGill believed that the Appellant's sister was not stable enough to care for two

teenagers when she was only twenty-one or twenty-two years old, and was additionally caring for her own two young sons. (RR67: 227–29).

While McGill noted that the Appellant needed love, he never needed any special resources from the State. (RR67: 239). McGill taught the Appellant how to abide by the rules, to keep his hands to himself, and to be respectful to women. (RR67: 239–40). The Appellant was always respectful to her and the other children. (RR67: 240). McGill was disappointed when she learned about his behavior when he went to live with his sister. (RR67: 240–41). She would talk to the Appellant and tell him that he was getting on the wrong track, but there was nothing else she could do. (RR67: 241). McGill always had a place for the Appellant, even up to the present day. (RR67: 243–44).

Dorothy Elkins, the Appellant's older sister, testified about the environment she and her siblings grew up in. (RR67: 246). When Dorothy was approximately three or four years old, CPS began an investigation into the family, and became concerned that their mother, Brenda, was not properly caring for her and her brother Tony. (RR67: 247–48). Tony, the oldest sibling, is mentally disabled and has been in an assisted living center in Missouri his entire life. (RR67: 246). Dorothy was sent to California, where she lived for the next five or six years, until she was nine years old. (RR67: 248). When Dorothy returned to St. Louis, she

learned that her mother had given birth to five children while she was gone. (RR67: 248). The Appellant was the youngest of the children. (RR67: 249, 266).

The family lived in a three bedroom apartment in the Cabanne Courts neighborhood, where drugs and violence were common. (RR67: 249–51). The children were not allowed to play outside because of the violence, but when they did go outside they often saw drug deals and shootings. (RR67: 250–52). On one occasion, people came to their apartment looking for their uncle because he had been selling drugs on another person's territory. (RR67: 253). The men shot her uncle in the leg in front of everyone. (RR67: 253).

Dorothy's grandfather, Lawrence, also lived with them. (RR67: 250). Dorothy testified that her grandfather molested everyone in the house, including her. (RR67: 265). She also testified that he was the father of Brenda's oldest son, Tony. (RR67: 165–66). As far as sleeping arrangements, Brenda had her own room, her grandfather and her brother Michael shared a room, and the other five children slept in the third bedroom. (RR67: 251). Dorothy shared a bunk bed with her sister, while her three brothers shared another bunk bed. (RR67: 251).

The family lived there until Dorothy was fourteen or fifteen years old. (RR67: 251). They had to move when Brenda was arrested for shooting a man. (RR67: 256). CPS placed all of the children in foster care. (RR67: 251–52, 257). Dorothy and her sister went to one foster home, while the brothers were sent to a

different home. (RR67: 257).  At some point, the Appellant was separated from his brothers and was sent to yet another foster home. (RR67: 257).  However, their Aunt Rose and Uncle James quickly came and took all of the children to live with them in Texarkana, Arkansas. (RR67: 258).

Their mother was released from prison approximately two-and-a-half years later, and came to live with them in Texarkana. (RR67: 258–59).  They lived with Aunt Rose and Uncle James until Brenda was able to afford an apartment. (RR67: 259).  They were reunited for less than a year when Brenda was arrested for violating her parole and was sent back to Missouri. (RR67: 259).  Dorothy, who was seventeen, stayed with her aunt and uncle, while her younger brothers— Sammy, John and the Appellant—went back to foster care. (RR67: 260).  Dorothy believed that the Appellant lived in at least four different foster homes during his teenage years. (RR67: 257).

Eventually, the Appellant and Sammy came to live with her. (RR67: 261– 62).  Dorothy had a four bedroom apartment where she lived with her two sons and their father. (RR67: 262).  When the Appellant turned seventeen, he moved out of Dorothy's apartment and moved in with his girlfriend, Kenzie Monroe. (RR67: 263).  Dorothy agreed that the Appellant moved a lot during his twenties, moving from Illinois to Georgia to California. (RR67: 264).  When he met Jawanna Arrington, he finally began to settle down. (RR67: 264).

On cross-examination, Dorothy testified that her grandfather never forced her to have sexual intercourse, but had fondled her. (RR67: 271–72). Dorothy also testified that during the summer of 2012, when the sexual assault cases were pending, the Appellant attended Rob's All-White Boat party and also hosted an anniversary party at his apartment. (RR67: 280–83; SX: 300). She testified that the Appellant was happy on those occasions and there had been money for alcohol at the party. (RR67: 283–85).

Brenda Griffin, the Appellant's therapist at the Youth Home, a non-profit facility for troubled youths and teenagers in Texarkana, Arkansas, testified that the Appellant was at the facility for three-and-a-half months when he was fifteen. (RR68: 22–24). Griffin testified that the Appellant had very few ties in the world, but was very bonded with his family. (RR68: 24). The Appellant did not have any disciplinary problems while he was at the Youth Home. (RR68: 28).

Patrick Gill, a counselor at the Youth Home, worked with the Appellant during his time at the facility. (RR68: 33). Gill testified that the Appellant was always respectful, polite and did what was asked of him. (RR68: 34). The Appellant was sent to Youth Home a month after his mother was murdered because he was having problems dealing with her death. (RR68: 34–35). The Appellant talked about his mother's death and worked on his coping skills. (RR68:

36). Gill testified that the Appellant completed the program faster than most. (RR68: 36).

Sergenant Ed Chattaway with the Texarkana Police Department testified that the Appellant assisted in the arrest of his uncle, Robert Elkins. (RR67: 184). Chattaway was the lead investigator working on two robberies that occurred in Texarkana, Arkansas in June 2004. On June 4th, a masked man robbed a Triple J at gunpoint; and on June 15th, a man robbed an E-Z Mart and raped the store clerk. (RR67: 199, 202–03).

A Crime Stoppers tip naming Elkins as the perpetrator was received on June 9.[7] ((RR67: 186, 203). Based on that tip, Chattaway began surveillance of Elkins. (RR67: 204). On June 22nd, the Appellant contacted Chattaway and told him that he had information on Elkins' involvement in the crimes. (RR67: 86–87). Chattaway learned that the Appellant had been arrested with his uncle on June 7th for possession of a criminal instrument. (RR67: 199–200; SX: 297). A flashlight, pliers, gloves, and a holster for a handgun were recovered from the car that Elkins was driving. (RR67: 199–200).

Chattaway met with the Appellant and was told that Elkins had committed a couple of robberies and had raped a store clerk at an E-Z Mart. (RR67: 187–88).

---

[7] Crime Stoppers records revealed that a $1,000 reward was paid for the tip. (RR67: 207; SX: 299).

46

Appellant also told Chattaway that Elkins was planning to rob an Advance Auto Parts store if certain employees were present at the time. (RR67: 189). As a result of the Appellant's information, a small team was set up to conduct surveillance of the store on June 22, 2004. (RR67: 189, 206). While Elkins did make an appearance at the store that night, he never got out of his vehicle and left shortly after the store closed. (RR67: 190–92). Chattaway and his team set up surveillance again the next night, June 23, 2004 following another tip from the Appellant. (RR67: 192).

Elkins did arrive that night and after behaving in a suspicious manner, was confronted by Chattaway's team, and ultimately taken into custody. (RR67: 192–95). Elkins had a silver handgun, a toboggan with eye holes cut out, and gloves at the time he was taken into custody. (RR67: 196). Elkins, who was ultimately charged with two counts of aggravated robbery, rape and possession of a firearm, and attempted aggravated robbery, was sentenced to two terms of life imprisonment. (RR67: 197; DX: 34). Appellant testified at the November 2007 trial. (RR67: 207).

James Aiken testified as an expert on the prison system. (RR68: 49). Aiken reviewed the records related to the Appellant's case, including the records concerning his escape from Parkland Hospital (RR68: 49, 57, 63). Aiken testified that an escape has to be "diagnosed," meaning that the circumstances surrounding

the escape need to be reviewed, i.e., what was the opportunity, how well planned was it, how old is it, and whether the prison system can adequately manage someone who has been involved in that type of activity. (RR68: 58). Aiken testified that an escape is not necessarily predictive of whether that person will try to escape again. (RR68: 58). Aiken also testified that as a person gets older, he generally becomes more compliant, especially in a super-structured environment like prison. (RR68: 57).

Aiken discussed what he referred to as prisoners with "juice" and prisoners without "juice." (RR68: 61). Prisoners with "juice" are prisoners who can control every aspect of a prison operation by using power and control. (RR68: 61). Inmates without "juice" are not movers and shakers, and are vulnerable within the system. (RR68: 61). Aiken testified that the Appellant's vulnerability level was extremely high because of the nature of his offense. (RR68: 62). In Aiken's opinion, the Appellant would not have any "juice" in prison, and the biggest issue with the Appellant would be keeping him alive if he was exposed to the general population. (RR68: 62). Aiken did not interview the Appellant, but relied instead on the official reports from the police and correctional officers. (RR68: 63–64).

Frank AuBuchon, an expert in the Texas prison system, testified that if the Appellant was sentenced to life without parole and placed in general population, the least restrictive custody level the Appellant could be assigned is G4, for a

minimum of ten years. (RR68: 89). However, in AuBuchon's opinion, the Appellant should be sent to administrative segregation because of the circumstances surrounding this offense and because he physically assaulted a law enforcement officer and disarmed him in order to escape. (RR68: 89). AuBuchon testified that if an inmate was willing to take the necessary steps and risks to effectuate an escape once, he would likely be willing to do it again. (RR68: 97). Accordingly, AuBuchon opined that the TDCJ would want to lock such an inmate down in the most secure situation possible until the inmate presented less of a risk or no risk of escaping. (RR68: 97).

Latrice Brown, the mother of the Appellant's oldest child Kurstyne, testified that the Appellant cared for Kurstyne while she served three years in prison. (RR68: 110–11, 114–15). Latrice also testified that the Appellant and his sisters paid her electric bill for her on one occasion when she had been unable to afford it. (RR68: 113). She denied that the Appellant had ever been physically violent with her. (RR68: 117). However, she did receive a letter from the Appellant in July 2013, while he was in jail, in which he opened the letter by writing he was "pissed off at you right now." (RR68: 115–16). Latrice testified that he was mad at her because she was not getting Kurstyne to write to him while he was in jail. (RR68: 115–16, 118–19).

Finally, the Appellant's daughter Kurstyne testified that she was happy when she lived with the Appellant and Jennifer Dibrell. (RR68: 125–27). She also testified that she had not seen the Appellant since he was arrested in this case, but she loves him very much. (RR68: 128).

*State's Rebuttal*

Sherry Gray-James testified about the night that the Appellant escaped from Parkland Hospital. (RR69: 20). Sherry testified that her husband was at work and she and her son Zachary were home alone. (RR69: 20). Detective Williams called her and told her that the Appellant had escaped and expressed concerns for her safety. (RR69: 21–22). Sherry testified that she was terrified. (RR69: 21–22). She turned off all of the lights in the house and held Zachary. (RR69: 22). Sherry testified that she thought the Appellant was going to kill her. (RR69: 22).

Sherry also testified that Zachary missed Shania, and would watch videos of Shania singing. (RR69: 23). Because Zachary is nonverbal he cannot communicate how he feels about what happened, but he kisses the phone when he watches the videos. (RR69: 23). Finally, Sherry explained:

> The impact that it's had on our life is nothing compared to what Shania went through. I wouldn't even dare try to compare it. But having my safety taken away, having my daughter brutally taken away because of someone who was a coward, having my daughter's integrity questioned, all of this loss is just compounded because one person couldn't tell truth. Shania had no reason to lie. The impact it had on me was because I raised a kid that had good values. I raised a kid who had good morals. I raised a kid that the only person in this

50

courtroom that had something bad to say about is the person who killed her.

[…]

To have somebody come to your house and even contemplate taking your life threatens every single fiber of your safety. Every day when I leave my house, I'm looking around. I don't know him. Never knew him. I don't know anything about him. If I had known that he was even remotely close to my daughter and in any arm's length of her, there's no way she would have baby-sat. There's absolutely no way.

For that, I have to think about that every single day that a baby-sitting job cost her her innocence; it cost her her life; it cost her her future. Her very first baby-sitting job. And that shouldn't have happened.

(RR69: 23–25).

## SUMMARY OF ARGUMENT

*Issues 1-3*: The trial court properly denied the Appellant's *Batson* challenges to the State's exercise of peremptory challenges against three minority veniremembers. The Appellant has not met his burden to show that the State's strikes were the product of racial discrimination.

*Issue 4*: The decision to dismiss John Bigley from the jury was a proper exercise of the trial court's discretion. After receiving evidence and hearing testimony concerning Bigley's work related pressures, the trial court properly determined that Bigley was disabled due to emotional stress and would be unable to fully and fairly perform the functions of a juror. Alternatively, any error was harmless.

51

*Issue 5*:  The trial court properly denied the Appellant's motion to quash the indictment.

*Issue 6*:  The trial court acted within its discretion in denying the Appellant's November 1, 2013 motion for continuance.  The trial court's actions did not deny the Appellant his constitutional right to due process or deny him the effective assistance of counsel on the issue of mitigation during the punishment phase of his trial.

*Issues 7-10*:  The trial court's rulings on the Appellant's four motions to suppress were proper.

*Issue 11*:  The evidence is sufficient to support the Appellant's conviction for capital murder.  Contrary to the Appellant's assertions, the record is replete with evidence showing the Appellant killed Shania Gray to prevent her from testifying against him at the upcoming sexual assault trial, and considering all of the evidence in the light most favorable to the jury's verdict, a rational trier of fact could have found the essential elements of capital murder beyond a reasonable doubt.

*Issue 12*:  The trial court did not abuse its discretion by overruling the Appellant's Rule 403 objection to two photographs depicting the complainant's body at the crime scene.

*Issues 13-18*: The Appellant failed to preserve his complainants concerning the admission of the six audio recordings, Defense Exhibits A, B, C, E, F, and G, containing phone conversations the Appellant recorded between Shania Gray and himself while he employed his false identity "D." While the Appellant argues on appeal that the recordings were admissible under Article 38.36 of the Code of Criminal Procedure, he did not offer the recordings pursuant to that statute at trial. Alternatively, the trial court properly excluded the recordings as inadmissible hearsay, and the Appellant has failed to show harm.

*Issues 19-21*: The trial court properly sustained the State's objections to the testimony of defense witnesses Arty Hayes, Ashlye Sams, and Lamar Leggiton that the Appellant told them he had not sexually assaulted Shania Gray. The statements were hearsay and were not admissible as prior consistent statements under Rule 801(e)(1)(B).

*Issue 22*: The trial court properly denied the Appellant's request for a jury instruction on anti-speculation during the guilt-innocence phase of his trial. The jury was properly instructed on the law applicable to the Appellant's case.

*Issue 23*: The Appellant has not shown that the prosecutor's arguments fell outside the permissible areas of jury argument. In any event, the argument taken as a whole was harmless in light of the overwhelming evidence of the Appellant's guilt.

*Issue 24*: The evidence was legally sufficient to support the jury's answer to the future dangerousness special issue.

*Issues 25-35*: The Appellant's arguments regarding the punishment charge are inadequately briefed and multifarious. Regardless, the trial court properly denied his requested instructions and properly overruled his objections to the charge.

*Issues 36-37*: The trial court properly denied the Appellant's requested jury instructions defining evidence that reduces "moral blameworthiness." This Court has already considered the arguments raised by the Appellant and has rejected them.

*Issues 38-48*: The Appellant's admittedly meritless federal constitutional challenges to the Texas death penalty statute are presented only to preserve the complaints for federal habeas review. And while Appellant invites this Court to revisit its prior holdings against his position, he provides no new authority for this Court or the State to address.

## ARGUMENT

**STATE'S RESPONSE TO ISSUES 1-3: THE TRIAL COURT DID NOT ERR IN DENYING THE APPELLANT'S *BATSON* CHALLENGES.**

In Issues 1 through 3, Appellant contends that the trial court erred in overruling his objection based on *Batson v. Kentucky*, 476 U.S. 79 (1988) to the State's use of peremptory challenges on veniremembers Syrene Mitchell, Louise

Horsley, and Freddie Watson. (Appellant's Brief at pp. 53–66). These contentions lack merit and should be overruled.

### *Applicable Law*

The Texas Code of Criminal Procedure and the U.S. Constitution prohibit the use of peremptory challenges to exclude prospective jurors on the basis of race. Tex. Code Crim. Proc. Ann. art. 35.261(a) (West 2006); *Batson*, 476 U.S. at 85; *Watkins v. State*, 245 S.W.3d 444, 447 (Tex. Crim. App. 2008). Under *Batson*, a defendant must first make a prima facie showing that the prosecution exercised its peremptory challenges on the basis of race. *Reed v. Quarterman*, 555 F.3d 364, 368 (5th Cir. 2009). If the defendant makes that showing, the burden shifts to the prosecutor to present race-neutral explanations for striking the jurors in question. *Id*. The court must then determine whether the defendant has carried his burden of proving purposeful discrimination. *Id*.

At the second step of this process, the proponent of the strike need only tender an explanation that is race-neutral. *Watkins*, 245 S.W.3d at 447. The ultimate plausibility of that race-neutral explanation is to be considered as part of the third step of the analysis. In the third step, the trial court determines whether the opponent of the strike (usually the defendant) has satisfied his burden of persuasion to establish by a preponderance of the evidence that the strike was indeed the product of the proponent's racial discrimination. *Id*. Whether the

55

opponent satisfies this burden, is a question of fact for the trial court to resolve in the first instance. *Id.*

Where the prosecutor articulates his reasons for the challenged peremptory strike in the record and the trial court rules on the ultimate question of intentional discrimination, the issue of whether the defendant established a prima facie case becomes moot. *See Watkins*, 245 S.W.3d at 447; *Young v. State*, 283 S.W.3d 854, 866 (Tex. Crim. App. 2009).

This Court should not overturn the trial court's resolution of the *Batson* issue unless it determines that the trial court's ruling was clearly erroneous. *See Watkins*, 245 S.W.3d at 447–48. In assaying the record for clear error, this Court should consider the entire record of voir dire. It may consider arguments or considerations not presented to the trial court so long as they are manifestly grounded in the appellate record. *Id.* at 448. A trial court's conclusion that a facially race-neutral explanation for a peremptory challenge is genuine, rather than a pretext, should be given great deference and reversed only when that conclusion is, in view of the record as a whole, clearly erroneous. *Id.*

### *Analysis*

### *1. Appellant failed to establish a prima facie case of discrimination, but the issue is moot.*

After the parties exercised their peremptory strikes, the Appellant objected to the composition of the jury and asserted his *Batson* objections. (RR53: 25–27).

The Appellant identified three African-American potential jurors that the State struck. (RR53: 26–27). The State objected on the basis that Appellant had failed to establish a prima facie case. (RR53: 27). However, without waiting to obtain a ruling, the State explained its reasons for striking the prospective jurors. (RR53: 27–31). Consequently, this Court must assume that Appellant satisfied his step-one obligation to make a prima facie case of purposeful discrimination and address only the second and third steps. *See Watkins*, 245 S.W.3d at 448; *see also Chambers v. State*, 866 S.W.2d 9, 23 (Tex. Crim. App. 1993) (where the State fails at trial to object to the trial court's failure to rule on the defendant's prima facie case, that issue becomes moot and it cannot be raised on appeal).

## 2. The State's explanations for its strikes of the three prospective jurors were race-neutral.

At the second step of the *Batson* process, the prosecutor need only tender an explanation that is race-neutral on its face. *Purkett v. Elem*, 514 U.S. 765, 769 (1995) (indicating the State has a burden of production in the second step merely to present a facially valid explanation for its strike); *Watkins*, 245 S.W.3d at 447. The State satisfied this burden.

### Syrene Mitchell and Louise Horsley

At the *Batson* hearing, the State explained that it struck all qualified prospective jurors, "regardless of anything else that they said," who ranked themselves as a "3" or higher on question number two of their questionnaire.

57

(RR53: 28). Question number two asks: "With reference to the death penalty, which of the following statements **best** represents your feelings?" (Q. p. 2) (emphasis in original). A ranking of "3" indicates the following opinion: "Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances." (Q. p. 2).

The State explained that it struck every person on the qualified-juror panel that selected number "3," including Syrene Mitchell (Juror 396-A, an African-American male), Steven Sperry (Juror 1336-A, a Caucasian male), Louise Horsley (Juror 422-B, an African-American female), and Penelope Cook (Juror 149-C, a Caucasian female), from the alternate pool, on the same grounds. (RR53: 28–29). The record reflects that the State also struck Steven Sperry (Juror 1336-A, a Caucasian male), who also selected "3" in response to this question. (RR53: 16, Q. p. 2). The State's reason was grounded in Mitchell's and Horsley's opinion about the death penalty and is race-neutral. Courts have found similar grounds as facially neutral. *See, e.g., Mathis v. State*, 67 S.W.3d 918, 924–25 (Tex. Crim. App. 2002) (holding prosecutor's explanations—that he struck a juror because she was in favor of the death penalty only in two specified circumstances and she felt the death penalty was imposed too frequently—were facially race-neutral).

Additionally, the State noted that Mitchell "would hold the State to a higher burden of proof in a death penalty case." (RR53: 28). During voir dire, Mitchell stated multiple times that he would hold the State to a higher burden of proof than beyond a reasonable doubt because this was a case in which the State was seeking the death penalty. (RR22: 101–04; 148–57). The State challenged Mitchell for cause on this basis, but the challenge was denied. (RR22: 157). This explanation is also race-neutral. *See, e.g., Watkins*, 245 S.W.3d at 450–51 (prosecutor's explanation in a burglary case that the juror would hold the State to a higher burden than proof beyond a reasonable doubt, especially in order to assess a life sentence, was race-neutral).

*Freddie Watson*

At the *Batson* hearing, the State provided the court with three reasons that it exercised its peremptory challenge against Watson. (RR53: 29–31, 36–38). First, the State noted that it struck Watson because of his answer to question number twelve on the juror questionnaire. (RR53: 29–30; 36–37; Q. p. 4). Question number twelve asks:

> The crime of "Obstruction" means harming or threatening to harm another person to prevent or delay the service of that person as a witness or perspective witness. The law in the State of Texas says that the ***intentional murder of an individual during the course of committing or attempting to commit the offense of "obstruction"*** is a capital offense for which, depending on the facts and circumstances of the case, a sentence of life without parole or the death penalty may be imposed? Do you agree with the punishment range outlined above?

59

(Q. p. 4) (emphasis in original). While Watson checked "yes" in response to the question, in the explanation portion of his answer Watson wrote: "Life without parole would be better for me." (Watson, Q. p. 4). Second, the State noted that although Watson acknowledged during voir dire that he had heard some of the facts of this case, he had failed to disclose this on his questionnaire. (RR38: 96–98; RR53: 30; 37). Finally, Watson also indicated during voir dire that he believed a person charged with a crime should be released from jail pending the outcome of the trial. (RR53: 30–31). According to the State, it struck Watson due to the combination of these three things. (RR53: 29–31; 36–38).

*Conclusion*

The record supports all of the State's proffered race-neutral explanations for exercising peremptory strikes against the three prospective minority jurors. Therefore, the trial court did not clearly err in finding that the State satisfied its burden of producing facially race-neutral explanations for its peremptory strikes. *See Watkins*, 245 S.W.3d at 451.

**3. Appellant failed to establish by a preponderance of the evidence that the strikes were the product of racial discrimination.**

Appellant failed to demonstrate purposeful discrimination by the State. Here, the defendant has the burden to persuade the trial court that the prosecutor's explanations for the State's strikes were incredible or disingenuous. *Watkins*, 245 S.W.3d at 457. The focus of the *Batson* inquiry in this stage is on the genuineness,

not reasonableness, of the asserted non-racial motive. *Nieto v. State*, 365 S.W.3d 673, 676 (Tex. Crim. App. 2012). The question of pretext is a question of fact for the trial court to resolve, subject to reversal on appeal only for clear error. *Watkins*, 245 S.W.3d at 457.

Appellant primarily contends that the State's strikes must have been racially motivated because these jurors were qualified jurors and had some characteristics potentially favorable to the State's position on the death penalty. (Appellant's Brief at pp. 53–61). The jurors' qualifications for jury service are irrelevant to the analysis, however. Factors relevant to determining whether purposeful discrimination has been proven include the following:

1. whether the State utilized its option to shuffle the jury panels in a manner that supported an inference of race discrimination;

2. whether the prosecutor's office trying the case followed a formal policy to exclude minority venire members from jury service which was known to at least one of the prosecutors at trial;

3. whether the State exercised its peremptory challenges to eliminate a far greater proportion of minority venire members than non-minority venire members;

4. whether the reasons the State asserted for eliminating the minority venire members in question appeared to apply equally well to many non-minority venire members whom the State did not challenge; and

5. whether the State directed questions expressly designed to elicit grounds for peremptory challenges disproportionately, in a manner that suggested an intent to single out minority venire members for elimination.

*Watkins*, 245 S.W.3d at 448–49 (relying on *Miller-El v. Dretke*, 545 U.S. 231, 240–64, 266 (2005)).  This Court looks to the collective and cumulative impact of these non–exclusive factors in determining whether an inference of racial discrimination is so powerful that it overcomes the deference given to trial court. *See id.* at 449, 457.

An analysis of these factors demonstrates that Appellant's claim of purposeful discrimination lacks merit.

### (1) Jury Shuffle

There was no jury shuffle in this case.  The parties selected the group of qualified jurors from a March 22, 2013 special venire.  (RR5).  Appellant does not assert or demonstrate that the venire was shuffled or otherwise arranged in a manner to decrease the possibility of a minority member.

### (2) Formal Policy Prohibits Discrimination

The Dallas County District Attorney's office's notorious formal policy of excluding minorities is a relic of a bygone era.   It is common knowledge that the office policy of the last several years not only forbids such discrimination, it requires an investigation into sustained *Batson* challenges and authorizes discipline ranging from reprimand to termination. The State asks this Court to take judicial notice of this well-known fact. Tex. R. Evid. 201.

## (3) Proportionality of Strikes

Appellant argues that even one racially motivated peremptory strike violates *Batson* and he makes no effort to demonstrate a pattern of discriminatory strikes. He does not identify the size or racial makeup of the pool of qualified venire members. Nor does he analyze the number of strikes used by either side or how they were used. He merely argues that the State used 3 of its 12 peremptory strikes to eliminate 50% of the African-Americans on the qualified prospective jury panel. (Appellant's Brief at p. 64). The State disagrees with this statistic. In actuality, the statistical data evinces no discriminatory intent.

The data evinces no discriminatory intent by the State. The panel of qualified jurors consisted of 49 people (45-person panel for the 12-person jury and a 4-person pool for the alternates). Of these, 37 (or 75.5%) were Caucasian, 8 (or 16.3%) were African-American, and 4 (or 8.2%) were Hispanic. The State exercised 13 peremptory strikes (12 strikes in order to select a 12-person jury and one strike in the selection of alternates). (RR53: 11–24). Eight of those 13 strikes (61.5%) were used on Caucasians, 3 (23.1%) were used on African-Americans, and 2 (15.4%) were used on Hispanic jurors. (RR53: 11–22). Appellant exercised 13 strikes.[8] (RR53: 11–24). He struck 1 African-American, 1 Hispanic, and 11 Caucasians. (RR53: 11–24). The result was a 12-member jury consisting of 2

---

[8] The record does not reflect how many strikes the Appellant was permitted.

African-Americans, 2 Hispanics, and 8 Caucasians, with 1 African-American and 1 Caucasian as alternate jurors.

By striking 3 African-American jurors, the State eliminated only 37.5% of the African-Americans on the panel, not 50% as the Appellant alleges. Nevertheless, the number of African-Americans struck by the State is, by itself, an irrelevant statistic. It gains relevance only by establishing its correlation to the entire panel. *See Woodward v. Epps*, 580 F.3d 318, 339 (5th Cir. 2009) (holding that the State's striking 100 percent of the black jurors alone does not support a finding of discrimination and does not show any disparity in relation to the non-minority jurors). In the Appellant's case, the correlation shows no discriminatory intent.

Of the 49 veniremembers who could conceivably be chosen for the Appellant's jury, 8 (16.3%) were African-American. A random selection would yield either 2 or 3 African-American jurors in the 14 jurors selected (12 plus 2 alternates) (or 16.3% of fourteen, equaling 2.28 jurors). *See Watkins*, 245 S.W.3d at 451–52 (holding a random selection from a 22% African-American venire would yield 2 or 3 African-American jurors because 22% of 12 jurors, plus 1 alternate, was 2.86).

The 12-member jury here consisted initially of 8 Caucasians, 2 African-Americans, and 2 Hispanics, with an African-American as the first alternate and a

Caucasian as the second alternate. John Bigley, a Caucasian juror, was dismissed by the court prior to the beginning of the trial. (CR3: 108; RR56; RR57: 78–82). The first alternate, an African-American, took Bigley's place, meaning that the final 12-member jury now had 3 African-Americans. (CR3: 108). Thus, 16.3% of the qualified jurors were African-American and 25% of the 12-person jury was African-American. Accordingly, the jury had 3 African-Americans, more African-Americans than would be expected from a *random selection* of the 49 qualified jurors. The statistical analysis fails to show any racial discrimination, and this factor strongly supports the trial court's ruling.

### (4) Comparative Analysis

Appellant contends on appeal that the prosecutor's stated reasons are a pretext for race discrimination because non-minority jurors with similar responses were not struck by the State. (Appellant's Brief at pp. 55–56 (regarding Mitchell), 57–58 (regarding Horsley), 60–61 (regarding Watson), 62 (regarding all three jurors)). At the *Batson* hearing, however, defense counsel failed to provide a comparative analysis on the jurors. (RR53: 25–31, 33–38). Counsel did not cross-examine the prosecutor about his reasons for not striking any similarly situated venire members. (RR53: 25–31, 33–38). As such, the prosecutor had no opportunity to respond to counsel's allegations. Appellant should not be permitted to raise claims of disparate treatment for the first time on appeal. By failing to

properly present this claim at trial, he denied the prosecutor the opportunity to create a record on the prosecutor's strategy, and he denied the trial court an opportunity to rule on the claim. Whether a prosecutor intended to discriminate on the basis of race is a question of historical fact properly decided in the trial courts. *See Hernandez v. New York*, 500 U.S. 352, 367–69 (1991). State procedural rules demand that allegations of disparate treatment by the prosecutor be raised in the trial court, so that they can be properly answered by the State and decided by that court. *See* Tex. R. App. P. 33.1(a); *Watkins*, 245 S.W.3d at 457–58 (Keller, P.J., concurring); *Young v. State*, 826 S.W.2d 141, 147–49 (Tex. Crim. App. 1991) (Campbell, J., dissenting).

The State acknowledges this Court's majority opinion in *Young* that a non-capital defendant is not required to raise a comparative analysis in the trial court to have evidence of such considered on appeal. *Young*, 826 S.W.2d at 145–46. The Fifth Circuit has applied *Young* to a capital case and criticized this Court's inconsistency in its application of the contemporaneous objection rule to *Batson* claims in capital cases. *Reed*, 555 F.3d at 370.

This Court should explicitly overrule *Young*. *See generally Watkins*, 245 S.W.3d at 457–58 (Keller, P.J., concurring); *Young*, 826 S.W.2d at 147–49 (Campbell, J., dissenting). Its majority—and the courts that rely on it—view the comparative analysis as merely an appellate argument that can be fairly addressed

for the first time on appeal. *Young*, 826 S.W.2d at 146. In truth, it is a factual allegation of unfair treatment between jurors. If properly raised in the trial court, the prosecution's response may provide additional facts for the appellate court to consider when reviewing the *Batson* ruling. If raised at trial successfully, the trial court can cure the error before trial even begins.

If not raised at trial, the prosecutor's mental process and the trial judge's credibility decision concerning the non-strikes are simply omitted from the record. Jurors are not products of a set of cookie cutters, and the *unexplained* decision not to strike a non-minority juror who shares one trait in common with a minority juror is held against the State on appellate review. *See, e.g., Miller-El*, 545 U.S. at 244 (stating, "If, indeed, Fields's thoughts on rehabilitation did make the prosecutor uneasy, he should have worried about a number of white panel members he accepted with no *evident* reservations.") (emphasis added). The prosecutor's explanation of her voir dire strategy and the trial court's ruling on the strategy is critical to a fair appellate review.

At the very least, a prosecutor should enjoy favor on appeal when the matter is not raised at trial, much like the presumption against a finding of ineffective assistance of defense counsel. In claims regarding violations of a client's constitutional right to counsel, this Court has stated that "counsel should ordinarily be accorded an opportunity to explain her actions before being condemned as

unprofessional and incompetent." *Bone v. State*, 77 S.W.3d 828, 836 (Tex. Crim. App. 2002). A prosecutor's credibility is the heart of *Batson* review, and she should be accorded no less of an opportunity to explain her actions.

This Court should conclude that the comparative analysis is not preserved for review or, alternatively, presume that the comparative analysis favors the prosecutor absent affirmative evidence on the record.

In any event, Appellant has wholly failed to establish that the potential jurors who are the focus of his *Batson* challenge were similarly situated to non-minority potential jurors who were not struck.

*Syrene Mitchell and Louis Horsley*

As argued above, the State struck each and every qualified prospective juror regardless of race who ranked him/herself as a "3," indicating a belief that, "Although I do not believe that the death penalty should ever be imposed, as long as the law provides for it, I could assess it under the proper set of circumstances." (Q. 2; RR53: 28–29, 35–36). The State struck all 5 "3s" on the qualified prospective juror panel. (RR53: 28–29, 35–36). Appellant points to no evidence to the contrary. He cannot show disparate treatment of Mitchell and Horsley compared to accepted non-minority veniremembers. As such, Appellant has failed to show that the prosecutor's explanation was a pretext for discrimination.

*Freddie Watson*

The State explained that it struck Watson because he was the only person on the panel that (1) knew about the facts of the case, (2) wrote on his questionnaire that "life without parole would be better for me" in a case in which the aggravating factor elevating the charge to capital murder was obstruction, and (3) he believed that people charged with a crime should be released pending the outcome of the trial. (RR53: 29–31, 36–38). Appellant has not shown that any other prospective jurors that responded similarly, and the State finds none.

Importantly, during the *Batson* hearing, defense counsel did not challenge the prosecutor's stated reason. Whether Appellant's counsel personally felt such information should be the basis for a strike, is irrelevant; nothing indicates this was a pretext for discrimination. He cannot show that Watson was treated differently from non-minority venire members who the State accepted.

*Conclusion*

Appellant has wholly failed to show that any of the three jurors that are the focus of the first three issues on appeal were similarly-situated to non-minority jurors that were not struck by the State.

### (5) Disparate Questioning

Finally, Appellant points to no instances of disparate questioning by the State. *Cf. Miller-El*, 545 U.S. at 256–57 (prosecutors used a graphic script when

describing the death penalty to African-American jurors who were ambivalent to the death penalty more often than with white jurors who also were ambivalent). Nor is any disparate questioning apparent in the record.

*Conclusion*

Appellant has not established by a preponderance of the evidence that the State's exercise of its peremptory challenges against three African-Americans was the product of racial discrimination. Appellant has not shown that the State's explanations did not apply equally to non-minority venire members that the State did not challenge, that the State directed questions expressly designed to elicit grounds for peremptory challenges disproportionately, or that a formal policy excludes minorities from jury service. The record before this Court supports the trial court's resolution of the fact question of pretext. Consequently, the trial court did not err in denying Appellant's *Batson* challenges against prospective jurors Mitchell, Horsley and Watson. *See Watkins*, 245 S.W.3d at 456–57.

Issues 1 through 3 should be overruled.

**STATE'S RESPONSE TO ISSUE 4:  THE TRIAL COURT DID NOT ERR IN DISMISSING JOHN BIGLEY[9] FROM THE JURY PANEL.**

In Issue 4, the Appellant argues that the trial court abused its discretion by dismissing Juror John Bigley from the jury because the court did not fully develop

---

[9] While Appellant refers to John Bigley as Juror Number 4, the record reflects that Bigley was actually Juror Number 6. (RR53: 32, 39).

70

the issue of whether Bigley's emotional state made him unfit and unable to continue as a juror under Article 36.29(b). (Appellant's Brief at pp. 66–70).

### Pertinent Facts

The record reflects that Bigley filled out the juror questionnaire on March 22, 2013. (RR29: 74). At that time, Bigley stated that he worked as an independent consultant on business development for start-up tech companies. (Juror Questionnaire). On June 6, 2013, Bigley was called for individual voir dire. (RR29: 74–155). Bigley noted that he had taken a job with a software firm called In Continuum. (RR29: 82; RR56: 14; CR2: 314). Bigley explained that he was the channel manager for Microsoft and was scheduled to go to training in early September, but because this was a new job, other things could come up. (RR29: 82). Bigley also expressed concern about putting too many demands on his new employer. (RR29: 82). Bigley stated that he was told that the trial would be over by the first of September. (RR29: 82). During his voir dire, the State informed Bigley that the trial had a firm start date of August 19, 2013. (RR29: 83–84). Bigley stated that he "should be" available on August 19th, and the last two weeks of August. (RR29: 83).

On July 5, 2013, Bigley was selected as juror number six. (RR53: 39). On August 8, 2013, Appellant filed his first motion for continuance. (CR2: 221–79). On August 20, 2013, the trial court granted the motion and reset the trial for

71

November 4, 2013. (CR2: 241). Following the continuance, the court coordinator contacted the jurors, and of those, only Bigley indicated that he would not be available on November 4, 2013 due to a conflict with work. (RR56: 6, 12–13).

On August 29, 2013, a hearing was held pursuant to Article 36.29(b) of the Code of Criminal Procedure to determine whether Bigley should be dismissed from the jury. (RR56: 5). The trial judge noted that he had called Bigley to discuss the situation, and Bigley was adamant that due to his work situation he did not believe he could be fair and impartial to both sides and carefully weigh the evidence because his mind would be elsewhere. (RR56: 6).

The judge stated that he contacted Bigley's boss, Philip Hyde, located in the Netherlands, via email. (RR56: 7). The email exchange was admitted for purposes of the hearing. (RR56: 7; CR2: 313–17). Hyde informed the court that he understood the importance of jury service, but explained that Bigley was vital to the fledgling software company. (CR2: 314). Hyde explained that Bigley was the company's only employee located in the United States and was responsible for developing and managing strategic relationships with IBM, Microsoft, and NEC. (RR56: 8; CR2: 314). Hyde further explained that the company planned to expand more aggressively into the United States in 2014. (CR: 314). Therefore, Bigley would be vital during the fourth quarter of 2013, and "taking him out of the loop"

during the relevant two week period in November would be a "serious detriment" to the business." (CR: 314).

At the hearing, Bigley testified that he would be distracted during the trial because he would be thinking about the work he would need to do in the mornings and evenings before and after court each day. (RR56: 14–15). Bigley explained: "So I will be thinking of other things while I'm – you know, if I'm – I have to admit to you, I will probably be drifting a little bit." (RR56: 14–15). After Bigley provided further details about his job and his duties, the following exchange occurred:

THE COURT: Let me ask you this, Mr. Bigley. Is it fair to say that because of your emotional state, you're concerned that you would not be attentive during the trial?

BIGLEY: That's correct.

(RR56: 18). Bigley stated that "if push came to shove, I would be here, but I don't want to be here under a cloud." (RR56: 24). On September 6, 2013, the trial court entered an order dismissing Bigley and replaced him with first alternate Sheila Justice. (CR3: 108).

### *Applicable Law*

Article 36.29(b) of the Code of Criminal Procedure provides:

If alternate jurors have been selected in a capital case in which the state seeks the death penalty and a juror dies or becomes disabled from sitting at any time before the charge of the court is read to the

73

> jury, the alternate juror whose name was called first under Article 35.26 of this code shall replace the dead or disabled juror. Likewise, if another juror dies or becomes disabled from sitting before the charge of the court is read to the jury, the other alternate juror shall replace the second juror to die or become disabled.

Tex. Code Crim. Proc. Ann. art. 36.29 (b) (West 2006).

A disability for purposes of Article 36.29 includes "any condition that inhibits a juror from fully and fairly performing the functions of a juror." *Routier v. State*, 112 S.W.3d 554, 588 (Tex. Crim. App. 2003); *Reyes v. State*, 30 S.W.3d 409, 411 (Tex. Crim. App. 2000). This Court has noted that a juror is disabled if he becomes physically, mentally, or emotionally impaired and can no longer fully and fairly perform the functions of a juror. *Landrum v. State*, 788 S.W.2d 577, 579 (Tex. Crim. App. 1990); *Carrillo v. State*, 597 S.W.2d 769, 771 (Tex. Crim. App. 1980).

Lacking the ability to concentrate due to emotional stress caused by a death in the family, a family illness, or time pressures of a new job have been held examples of such disabling conditions. *Ramos v. State*, 934 S.W.2d 358, 369 (Tex. Crim. App. 1996); *see also Owens v. State*, 202 S.W.3d 276, 277 (Tex. App.—Amarillo 2006, pet. ref'd) (stress of not being able to find child care); *Moffett v. State*, 949 S.W.2d 778, 783 (Tex. App.—Beaumont 1997, pet. ref'd) (stress of "personal family problems"); *Freeman v. State*, 838 S.W.2d 772, 774 (Tex. App.—Corpus Christi 1992, pet. ref'd) (stress of being absent from work).

Questioning a juror on the record develops a record for the reviewing court to evaluate whether the trial court properly determined that a juror had a physical, mental, or emotional condition preventing him from fully and fairly performing the functions of a juror. *Valdez v. State*, 952 S.W.2d 622, 624 (Tex. App.—Houston [14th Dist.] 1997, pet. ref'd).

The determination as to whether a juror is disabled is within the discretion of the trial court, and absent an abuse of that discretion, no reversible error will be found. *Routier*, 112 S.W.3d at 588; *Brooks v. State*, 990 S.W.2d 278, 286 (Tex. Crim. App. 1999). A trial court abuses its discretion when it acts without reference to guiding rules or principles. *Montgomery v. State,* 810 S.W.2d 372, 380 (Tex. Crim. App. 1990). As long as the trial court's ruling is within the "zone of reasonable disagreement," there is no abuse of discretion. *Santellan v. State*, 939 S.W.2d 155, 169 (Tex. Crim. App. 1997).

### *Applicability of Article 36.29 to the Appellant's Case*

Article 36.29 applies once the jury is sworn. *Broussard v. State*, 910 S.W.2d 952, 957 (Tex. Crim. App. 1995) (citing *Williams v. State*, 631 S.W.2d 955, 957 (Tex. App.—Austin 1982, no pet.)); *Bermea v. State*, 188 S.W.3d 337, 339 (Tex. App.—Tyler 2006, no pet.). While the jury in this case was selected on July 25, 2013, the jury was not sworn until November 4, 2013. (RR53: 31–32, 38–39; RR60: 35–36). Juror Bigley was excused from service, and replaced by first

alternate Sheila Justice, on September 6, 2013, prior to the time the jury was sworn. (CR3: 108; RR53: 32, 39). Accordingly, Article 36.29 was not applicable to the Appellant's case. The Appellant, however, does not challenge the applicability of the statute; rather, he challenges the trial court's dismissal of Bigley because the court did not delve deeply enough into Bigley's emotional state under Article 36.29.

Nevertheless, this Court has upheld the application of Article 36.29 by a trial court faced with the same situation as the one presented in this case. In *Broussard*, the trial court excused a juror after the jury was selected, but before the jury was sworn, finding that he was disabled due to work related pressure. *Broussard*, 910 S.W.2d at 957. In so doing, the trial court relied on Article 36.29(b) and replaced the excused juror with an alternate juror. *Id*. On appeal, the defendant argued that the trial court had erred in applying Article 36.29 and should not have replaced the excused juror with the alternate; instead, the trial court should have chosen a replacement from the jurors remaining on the original panel list. *Id*. at 957. This Court denied the defendant's challenge, explaining:

> Faced with the need to complete the jury, and having no specific statutory directive, the trial court chose an acceptable option by replacing the disabled venireman with a venireman who had already been qualified and accepted by both parties. We find no error in the court's action.

*Id*. at 958. This Court further held that even if the trial court had erred, any error in replacing the juror with the first alternate was harmless, reasoning that had the trial court waited until the jury was sworn, the trial court would have been bound by Article 36.29(b) and would have been required to replace the disabled juror with the first alternate. *Id*.

In this case, the trial court was faced with the same situation. Bigley became unable to serve after the jury was selected but before it was sworn; accordingly, the trial court's application of Article 36.29(b) was appropriate under the circumstances. *See also Bermea*, 188 S.W.3d at 339.

### *Application*

The trial court's determination that Juror Bigley's emotional state had rendered him unable to serve as a juror, was soundly within its discretion. The trial court fully developed the issue of whether Bigley's work concerns would prevent him from fulfilling his duties as a juror. Here, not only did the trial court contact Bigley and Bigley's employer to determine the merit of Bigley's claims, but the trial court also questioned Bigley at the hearing and was able to hear Bigley's responses to questioning from both the State and defense.

The record reflects that Bigley had only recently started a new position with a software company based in the Netherlands, and he was the company's only employee located in the United States. (CR: 314; RR56: 8, 14–15). Bigley was

responsible for creating relationships with many large companies, including Microsoft, and Bigley noted that the fourth quarter of the year was vital to his work, especially, as his boss explained, due to the company's plans to expand into the United States the following year. (CR: 314; RR56: 14–15). Bigley admitted that his attention would wander during the trial because he would be focusing on what he needed to do for work during any breaks in the trial. (RR56: 14–15). The trial court could have reasonably concluded that Bigley would be preoccupied with scheduling meetings and making contacts during the court proceedings, and as such, would not be attentive to the testimony or evidence presented at Appellant's trial.

The trial court was in the best position to observe and evaluate Bigley's answers to the questions posed to him and his demeanor during the proceedings. Based on his observations, the judge determined that Bigley was disabled due to his preoccupation with work concerns, which adversely affected his emotional state, and would inhibit him from fully and fairly performing the functions of a juror. *See Routier*, 112 S.W.3d at 588; *Reyes*, 30 S.W.3d at 411; *Freeman*, 838 S.W.2d at 774. Nothing in the record suggests that this determination was an abuse of discretion.

Moreover, even if the trial court erred in determining that Bigley was disabled, the error was harmless. The alleged error involved the application of a

statutory scheme and is non-constitutional error. *Whitehead v. State*, 437 S.W.3d 547, 556 (Tex. App.—Texarkana 2014, pet. ref'd), *Ponce v. State*, 68 S.W.3d 718, 721–22 (Tex. App.—Houston [14th Dist.] 2001, no pet.) (citing *Jones v. State*, 982 S.W.2d 386, 391 (Tex. Crim. App. 1998)). Texas Rule of Appellate Procedure 44.2(b) provides that any non-constitutional "error, defect, irregularity, or variance that does not affect substantial rights must be disregarded." Tex. R. App. P. 44.2(b).

A defendant is not harmed by a trial court's error in discharging a juror where the record shows the alternate juror seated in the discharged juror's place was subjected to the same selection process, was properly sworn, heard all of the evidence, heard the trial court's charge, and was seated before deliberations. *Whitehead*, 437 S.W.3d at 556; *Sneed v. State*, 209 S.W.3d 782, 788 (Tex. App.—Texarkana 2006, pet. ref'd). The record reflects that Shirley Justice was chosen as the first alternate using the same selection process as Bigley, and was properly sworn, heard all of the evidence and the charge, and was seated before deliberations. *See Sneed*, 209 S.W.3d at 788*; Ponce*, 68 S.W.3d at 722. Accordingly, the Appellant has the failed to show that he was harmed by the dismissal of Bigley and seating of Shirley Justice. Issue 4 should be overruled.

In Issue 5, Appellant contends that the trial court erred in overruling his motion to quash the indictment. Appellant argues that the indictment fails to allege an offense with the degree of certainty necessary to give him notice of the particular offense with which he was charged. Appellant specifically notes that the indictment fails to allege the manner and means by which he allegedly committed the offense of obstruction. (Appellant's Brief at pp. 70–72). Appellant's contentions are without merit and this issue should be overruled.

### *Pertinent Facts*

The indictment in this case alleges that the Appellant:

> . . . did unlawfully then and there intentionally cause the death of SHANIA GRAY, an individual, hereinafter called deceased, by SHOOTING THE DECEASED WITH A FIREARM, A DEADLY WEAPON, AND BY ASPHYXIATING THE DECEASED, and the defendant was then and there in the course of committing and attempting to commit the offense of OBSTRUCTION.

(CR1: 44). Appellant filed a motion to quash the indictment on October 17, 2013. (CR3: 127–28). In his motion, Appellant argued that the indictment "fails to specify the manner and means by which he allegedly committed the offense of obstruction with sufficient specificity to allow Defendant to defend himself." (CR3: 127). Appellant further asserted that the phrase "in the course of committing and attempting to commit the offense of obstruction" did not notify

him of what part of Section 36.06 of the Penal Code he was "supposed to have violated, who was obstructed, or why." (CR3: 127–28). The trial court denied the Appellant's motion following a hearing on October 18, 2013, finding that the indictment provided sufficient certainty under Article 21.11 of the Code of Criminal Procedure. (RR58: 6). The trial court also noted that there had been ample discovery and pleadings to provide the defendant with sufficient notice of the allegations against him. (RR58: 6–7).

### *Law and Application*

When reviewing a trial court's decision to deny a motion to quash an indictment, the reviewing court applies a *de novo* standard of review. *Lawrence v. State*, 240 S.W.3d 912, 915 (Tex. Crim. App. 2007) (citing *State v. Moff*, 154 S.W.3d 599, 601 (Tex. Crim. App. 2004)). A defendant must be given notice before trial of the "nature and cause" of the accusation against him. *See* U.S. CONST. amend. VI; Tex. Const. art. I, § 10. The notice must be given with sufficient clarity and detail to enable the defendant to anticipate the State's evidence and prepare a proper defense to it. *See* U.S. CONST. amend. VI; Tex. Const. art. I, § 10; *Moff*, 154 S.W.3d at 601–02; *Garcia v. State*, 981 S.W.2d 683, 685 (Tex. Crim. App. 1998).

An indictment must allege all of the facts and circumstances necessary to establish all material elements of the offense charged in plain and intelligible

language. *Garcia*, 981 S.W.2d 685; *Bynum v. State*, 767 S.W.2d 769, 779 (Tex. Crim. App. 1989). "An indictment or information must by direct and positive averments allege all of the constituent elements of the offense sought to be charged." *Chance v. State*, 563 S.W.2d 812, 814 (Tex. Crim. App. 1978). The Penal Code defines "elements of offense" as "(A) the forbidden conduct; (B) the required culpability; (C) any required result; and (D) the negation of any exception to the offense." Tex. Penal Code Ann. § 1.07(a)(22) (West Supp. 2014).

In the context of a prosecution for capital murder, this Court has repeatedly held that an indictment need not allege the constituent elements of the aggravating feature which elevates a murder to capital murder. *See, e.g., Alba v. State*, 905 S.W.2d 581, 585 (Tex. Crim. App. 1995) (murder in the course of committing burglary); *Barnes v. State*, 876 S.W.2d 316, 323 (Tex. Crim. App. 1994) (same as *Alba*); *Beathard v. State*, 767 S.W.2d 423, 431 (Tex. Crim. App. 1989) (same as *Alba*); *Hogue v. State*, 711 S.W.2d 9, 14 (Tex. Crim. App. 1986) (murder in the course of committing arson); *Hammett v. State*, 578 S.W.2d 699, 708 (Tex. Crim. App. 1979) (murder in the course of committing robbery).

Accordingly, the State was not required to allege the elements of obstruction in the instant case. Appellant does not provide any authority which excepts the facts and circumstances of this case from the general rule. Furthermore, as noted by the trial court at the hearing on the motion to quash, Appellant was on notice of

the exact claims against him through the discovery process as well as through the pleadings filed by the State. (RR58: 5–7).

Because the trial court did not err in denying Appellant's motion to quash the indictment, Issue 5 should be overruled.

**STATE'S RESPONSE TO ISSUE 6: THE TRIAL COURT DID NOT ERR BY DENYING THE APPELLANT'S NOVEMBER 1, 2013 MOTION FOR CONTINUANCE.**

In Issue 6, Appellant contends that the trial court erred in denying his November 1, 2013 motion for continuance. Appellant argues that this error denied him due process and rendered his counsel ineffective on the issue of mitigation because his trial counsel were unable to properly investigate new evidence concerning his childhood sexual abuse. Appellant further argues that this denied him a fair punishment hearing. (Appellant's Brief at pp. 73–74). Appellant's contention lacks merit and should be overruled.

### *Pertinent Facts*

At a pretrial hearing on September 21, 2012, the trial court set the Appellant's trial for April 15, 2013. (RR3: 4–5; RR4: 4–5). On October 8, 2012, the trial court reset the trial to August 19, 2013 at the request of defense counsel; no written motion for continuance was filed. (RR6: 6–7). On August 9, 2013, the Appellant filed his first written motion for continuance. (CR2: 221–79; RR60: 20). In the motion, Appellant asserted that additional time was needed to prepare Appellant's mitigation case. (CR: 221–79). Specifically, defense counsel noted

that they were having a difficult time obtaining un-redacted records from the Missouri Department of Social Services, which were relevant to Appellant's childhood. (RR55: 4–5).

In their motion, defense counsel noted that it was obvious from an examination of the redacted records that sexual abuse had occurred in Appellant's childhood home; however, they were unable to determine "whether [Appellant] was abused, whether his siblings were abused, whether he witnessed abuse, [or] what family member did the abusing." (RR55: 5). Counsel noted that these issues were extremely important to their mitigation case. (RR55: 5). The trial court did not rule on the Appellant's motion for continuance at that time. On August 20, 2013, the trial court granted the Appellant's motion and reset the trial to November 4, 2013. (CR2: 241).

On November 1, 2013, the Friday prior to the start of the trial, defense counsel filed a second written motion for continuance. (CR3: 137–140). In the motion, filed pursuant to Article 29.06 of the Code of Criminal Procedure, defense counsel stated:

> It has come to the attention of defense counsel that the Defendant, Mr. Franklin Davis, has an extensive history of sexual abuse perpetrated upon him. New evidence has come to light as of the afternoon of October 31, 2013. This evidence is paramount to the effective representation of Mr. Davis. This evidence must be investigated for both guilt/innocence issues as well as possible mitigation evidence in a possible punishment hearing.

(CR3: 137).   No further facts were provided.   Counsel did not explain what the

new evidence was, what witnesses might be needed, or how much time they would

need to complete their investigation. (CR3: 137–40).   Neither the motion itself or

the supporting affidavit were signed by defense counsel. (CR3: 138–39).

On the morning of November 4, 2013, the first day of trial, the trial court

held a hearing on the motion. (RR60: 19).   The court noted that the trial had

already been reset twice and that this second written motion for continuance was

filed at the "11th hour" on Friday at 3:33PM. (RR60: 19–20).   The court further

noted that the motion was strikingly similar to the Appellant's first written motion

for continuance; which also concerned the acquisition of evidence of the

Appellant's childhood sexual abuse. (RR60: 20).   The court further noted that

during a pretrial hearing on October 25, 2013, there had been no mention of the

potential that the defense might need another continuance. (RR60: 20–21).

The court also noted that the Appellant's motion did not meet the

requirements of Article 29.07 of the Code of Criminal Procedure because it did

state that the necessary testimony could not be procured from any other source

known to the defendant and that the defendant had a reasonable expectation of

procuring the testimony by the next term of court. (RR60: 21).

In response, defense counsel argued:

MR. WYATT:   Your Honor, late on the day on Thursday October
31st, I was speaking with the defendant in this case during a contact

85

visit at Lew Sterrett, first floor mezzanine. And during that conversation things came to light about the defendant's past which only the defendant could be able to address specifically.

This is not something that was contained in the records that were the source of the Defense asking for the last motion for a continuance in August. That led us to the point where we are now, Your Honor.

The information contained in the records that were the gravamen of the motion for continuance in August, after we've investigated those claims made in those records from the Department of Human Services in St. Louis, Missouri, and the defendant being made aware of those records, on Thursday at the 11th hour, as the Court has stated, information came to me, specifically to me, about the defendant's past and things that have happened specifically to him that only he would be able to testify to.

This is not something that is cumulative because nobody else can testify directly as to what has happened to Mr. Davis himself. And as I stated in the motion, when we're talking about an extensive history of sexual abuse perpetrated upon him, only he can speak about the acts, about the things that were done to him by the people who did them to him, and what time, when, how all these things occurred.

So that is why it is paramount that the Defense have a motion for continuance to further develop this issue and this evidence that has just recently come to light based on that conversation on October 31st.

The information that we have will shed light on Mr. Davis's life, and in context this crime, and special issues involved in this case. Specifically, Special Issue No. 2, mitigation evidence based on what he told me.

And Your Honor, because of that, and because we have proof of it from or some proof of it from the DHS records that were part of the motion for continuance in August, at this point in time, Your Honor, we have to more fully develop that. And that's why we've asked for this motion for continuance based on the statements of Mr. Davis on October 31st.

(RR60: 22–23). Defense counsel conceded to the trial court that the Appellant was

the only person that had the necessary information, and as far as defense counsel

knew, there were no other witnesses to procure. (RR60: 23–24). The trial court denied the motion, but instructed defense counsel to have their investigator continue his investigation into the new evidence and provide the court with a daily update on the status of the investigation. (RR60: 26).

### *Preservation and Applicable Law*

A sworn, written motion is required to preserve a trial court's denial of a motion for continuance for appellate review. *Anderson v. State*, 301 S.W.3d 276, 280–81 (Tex. Crim. App. 2010); *Dewberry v. State*, 4 S.W.3d 735, 755 (Tex. Crim. App. 1999); *see also* Tex. Code Crim. Proc. Ann. arts. 29.03, 29.08 (West 2006).

This Court reviews a trial court's denial of a motion for continuance under an abuse of discretion standard. *Gallo v. State*, 239 S.W.3d 757, 775 (Tex. Crim. App. 2007). (citing *Janecka v. State*, 937 S.W.2d 456, 468 (Tex. Crim. App. 1996)). To establish an abuse of discretion, there must be a showing that the defendant was actually prejudiced by the denial of his motion. *Id*. To establish an abuse of discretion, the defendant must show (1) that the trial court erred in denying the motion and (2) that the lack of continuance actually prejudiced the defendant. *Id*.; *see also Gonzales v. State*, 304 S.W.3d 838, 842–43 (Tex. Crim. App. 2010).

The defendant must show that the case made for the delay was so convincing that no reasonable trial judge could conclude that scheduling and other

87

considerations as well as fairness to the State outweighed the defendant's interest in the delay of the trial. *Gonzales*, 304 S.W.3d at 842–43. With respect to the second prong, prejudice will be found from a denial of continuance "only if the record shows with considerable specificity how the defendant was harmed by the absence of more preparation time than he actually had." *Id*. Speculation will not suffice to obtain reversal for a trial court's failure to grant a continuance. *Nwosoucha v. State*, 325 S.W.3d 816, 825 (Tex. App.—Houston [14th Dist.] 2010, pet. ref'd) (citing *Renteria v. State*, 206 S.W.3d 689, 702 (Tex. Crim. App. 2006)).

"The matter of continuance is traditionally within the discretion of the trial judge, and it is not every denial of a request for more time that violates due process even if the party fails to offer evidence or is compelled to defend without counsel." *Ungar v. Sarafite*, 376 U.S. 575, 590 (1964). "There are no mechanical tests for deciding when a denial of a continuance is so arbitrary as to violate due process. The answer must be found in the circumstances present in every case, particularly the reasons presented to the trial judge at the time the request is denied." *Rosales v. State*, 841 S.W.2d 368, 374 (Tex. Crim. App. 1992) (quoting *Ungar*, 376 U.S. at 589–90); *Nwosoucha*, 325 S.W.3d at 828.

However, in the absence of an abuse of discretion, there generally can be no violation of due process. *Nwosoucha*, 325 S.W.3d at 828 (citing *Hicks v. Wainwright*, 633 F.2d 1146, 1148 (5th Cir. 1981) ("When a denial of a continuance

forms a basis of a petition for a writ of habeas corpus, not only must there have been an abuse of discretion, but it must have been so arbitrary and fundamentally unfair that it violates constitutional principles of due process.")).

### *Application*

The Appellant has failed to preserve his complaint for appellate review. Appellant's motion does not comply with Article 29.08 of the Code of Criminal Procedure because the motion was not properly sworn. (CR3: 137–39). The affidavit included with the motion for continuance was signed by a notary and contains the notary's jurat, but it is not signed by the affiant—Appellant's defense counsel. (CR3: 139). A motion for continuance that is not sworn preserves nothing for review. *See* Tex. Code Crim. Proc. Ann. art. 29.08 (West 2006); *Dewberry*, 4 S.W.3d at 755–56. Nevertheless, Appellant has failed to show that the trial court erred in denying his motion or that he was actually prejudiced by the denial.

The November 1, 2013 motion for continuance was Appellant's third requested continuance. Two previous continuances had been granted at the Appellant's request; the first continuance reset the trial from April 13, 2013 to August 19, 2013, and the second continuance reset the trial to November 4, 2013. (RR6: 6–7; CR2: 241). The November 1, 2013 motion for continuance contains only general averments that new evidence had been brought to defense counsel's attention concerning Appellant's "extensive history of sexual abuse." (CR3: 137).

No supporting facts were alleged and there is no mention of the amount of time needed to complete the investigation into the "new evidence" or to locate a material witness. (CR3: 137–39). Furthermore, at the hearing on the motion, defense counsel conceded that the only person with the necessary information concerning the abuse was the Appellant. (RR60: 22–24). Counsel further noted that they did not expect there to be any additional witnesses who could testify about the alleged sexual abuse. (RR60: 23–24).

Moreover, it is clear from the record that defense counsel were aware that some form of sexual abuse occurred in the Appellant's childhood home as of August 8, 2013, when defense counsel informed the trial court that they were trying to obtain the un-redacted records from the Missouri Department of Social Services. (RR55: 4–5). The trial court gave Appellant and his defense team three months to obtain the records and conduct their mitigation investigation. However, Appellant waited until October 31, 2013 to provide his counsel with this "new evidence" that he was sexually abused as a child. Counsel offered no explanation for the last minute revelation by Appellant, or why counsel and Appellant had not previously discussed the issue. Consequently, Appellant has failed to show that the trial court erred in denying the motion.

Appellant has also failed to show any specific prejudice resulting from the denial of the motion for continuance. *See Janecka*, 937 S.W.2d at 468. Examples

of specific prejudice are allegations of unfair surprise, inability to effectively cross-examine any of the State's witnesses, or demonstrating that crucial testimony would have been given by a potential witness. *Id.* There is nothing in the record showing the specific facts that a witness would have testified to or what any further investigation would have revealed. Moreover, the trial court instructed defense counsel to have their investigator continue his investigation into the matter and provide a daily update on the status of the investigation. (RR60: 26). There is no evidence in the record that any further investigation conducted by the defense produced any evidence favorable to Appellant's mitigation case. Accordingly, Appellant has failed to show that the trial court abused its discretion in denying his motion for continuance. Likewise, because the Appellant has failed to establish an abuse of discretion he has also failed to show that he was denied due process. *See Hicks*, 633 F.2d at 1148; *Nwosoucha*, 325 S.W.3d at 828.

Finally, because the Appellant has not established any specific prejudice as a result of the denial of his motion, he is also unable to show that he was denied the effective assistance of counsel during the punishment phase of his trial. In order to show that he was denied the effective assistance of counsel, the Appellant must prove by a preponderance of the evidence that (1) counsel's representation fell below an objective standard of reasonableness, and (2) there is a reasonable probability that the results of the proceedings would have been different in the

absence of counsel's errors. *See Strickland v. Washington*, 466 U.S. 668, 686 (1984); *Thompson v. State*, 9 S.W.3d 808, 812 (Tex. Crim. App. 1999). Based on this record, the Appellant cannot show that the results of the proceedings would have been different—that the jury "would have concluded that the balance of aggravating and mitigating circumstances did not warrant death." *See Strickland*, 466 U.S. at 695; *Martinez v. Quarterman*, 481 F.3d 249, 254 (5th Cir. 2007) (applying *Strickland* standard in Texas death penalty case). Accordingly, this Court should overrule Issue 6.

**STATE'S RESPONSE TO ISSUE 7-10: THE TRIAL COURT DID ERR IN DENYING THE APPELLANT'S MOTIONS TO SUPPRESS.**

In Issues 7 through 10, Appellant contends that the trial court erred in denying his motions to suppress the evidence obtained pursuant to four search warrants. Appellant's contentions lack merit and should be overruled.

### *Pertinent Facts*

On September 8, 2012, three search warrants were issued in this case. At the time the warrants were issued, Shania's disappearance was being treated as a kidnapping. (CR2: 168–72, 177–82, 186–95, 200–04). Each of the search warrants contained a supporting affidavit alleging the following relevant facts:

> On Thursday, September 6, 2012, Shania Ambriehl Gray was last seen at Hebron High School at 4207 Plano Parkway, Carrollton, Denton County, Texas. She was attending an after school tutoring class and had received a telephone call from her mother. Shania Ambriehl Gray told her teacher that she was going to meet her

mother, Sherry James. Shania left the classroom to walk out of the school and meet her mother, who was waiting in a car. Shania Ambriehl Gray never arrived at her mother's car and has not been seen since her tutoring class.

[….]

Officers discovered that in 2011, Shania Ambriehl Gray had reported several Sexual Assault cases to the Mesquite Police Department. The suspect, Franklin Davis (B/M/01171982), was arrested and is currently awaiting trial for these offenses. Detective Williams contacted your Affiant, Detective C. Cook #754, to assist with the investigation.

[….]

Officers obtained Shania Ambriehl Gray's cellular telephone information due to exigent circumstances. While investigating the activity on Shania Ambriehl Gray's cellular telephone, officers found the telephone number 903-603-8786. During the time period from September 5, 2012 to September 6, 2012, several call and text messages were made from Shania Ambriehl Gray's cellular telephone to cellular telephone number 903-603-8786.

Officers obtained the call data for 903-603-8786 due to exigent circumstances. One of the numbers called by 903-603-8786 was 214-909-8567. Officers called 214-909-8567 and spoke to Shakeema Morsley. Officers asked Shakeema Morsley is she could tell them who had been calling her from 903-603-8786. Shakeema Morsley said that she believed this person was Franklin Davis. Shakeema Morsley knows Franklin Davis through her friend and work associate, Jawanna Arrington, who is in a dating relationship with Franklin Davis. Shakeema stated that she strongly believed this was Franklin Davis due to the content of the communications, which would only be known to Franklin Davis.

Officers looked at the cellular telephone data for Shania Ambriehl Gray and the 903-603-8786, which is believed to belong to Franklin Davis, and found that they had been in proximity with each other during the same time frame on September 6, 2012. After 5:17

PM CST on September 6, 2012 it appears that Shania Ambriehl Gray's cellular telephone was turned off.

[….]

(CR2: 169–70, 179–80; 190–91).

The first warrant was to obtain a sample of the Appellant's DNA and to photograph his body. (CR2: 168–72). Police took two buccal swabs and multiple photographs of the Appellant's body pursuant to the warrant. (CR2: 172). The second warrant was to search the 2005 Dodge Stratus registered to the Appellant's wife, which was also driven by the Appellant. (CR2: 177–82). A bank receipt, trace evidence, multiple fingerprints, and DNA swabs were taken during the search of the vehicle. (CR2: 182). The third search warrant was for the Appellant's residence located at 10223 North MacArthur Boulevard #254, Irving, Texas. (CR2: 186–95). The search of the Appellant's residence resulted in the seizure of two plastic bags containing household trash, a black spiral notebook containing personal writings, miscellaneous paperwork, a black Adidas shirt, black basketball shorts, and a pair of weightlifting gloves. (CR2: 194–95). The clothing and gloves were found together in a gray laundry tub. (CR2: 195). Police also took photographs of the residence. (CR2: 194).

On September 8, 2012, the Appellant was arrested on outstanding traffic warrants and was also placed on a forty-eight hour investigative hold. (RR61: 227; RR62: 39–41; SX: 57, 57B). The complainant's body was found that afternoon.

(RR62: 73). After confessing to a detective that he had murdered Shania, the Appellant was arrested for capital murder. (RR62: 112).

On September 12, 2012, a fourth search warrant was issued to search the contents of Appellant's T-Mobile My Touch LG-E739 smart phone. (CR2: 200–04). Analysts were able to access and retrieve the Appellant's internet search history, Facebook logins, text messages, and several recorded phone conversations, among other data. (RR60: 252–70; RR61: 90–92, 135).

On July 31, 2013, the Appellant filed four pretrial motions to suppress the evidence. (CR2: 164–204). The Appellant alleged that the facts contained in the affidavits supporting the warrants were insufficient to establish probable cause. (CR2: 164–204). A pretrial hearing was held on the Appellant's motions on August 30, 2013. (RR57: 60–70). Neither party called any witnesses at the hearing. (RR57: 60–70). Instead, defense counsel reiterated their argument from the motions. (RR57: 63).

Counsel attacked the use of information provided to police by Shakeema Morsley to link the Appellant to the 903-603-8786 phone number ("903 number") which, based on cell phone records, had been in communication and in close proximity to the complainant around the time of her disappearance. (RR57: 61–63). Defense counsel argued that the police had no prior knowledge of Morsley and there was nothing to suggest she was credible. (RR57: 61–62). Counsel also

argued that there was no basis for obtaining the Appellant's DNA because, at the time the warrant was issued, there was nothing to compare the Appellant's DNA to. (RR57: 63, 65). Additionally, counsel argued that there was no evidence to suggest that a kidnapping had occurred. (RR57: 65).

Finally, counsel argued that the fourth warrant, obtained on September 12, 2012, after the first three warrants were executed, was obtained using information and evidence acquired through the execution of the first three warrants. (RR57: 66). Counsel asserted that because the first three warrants were not valid, the fourth warrant was tainted. (RR57: 66).

On September 6, 2013, the trial court issued findings of fact on the four motions to suppress. (CR3: 52). The trial court granted the Appellant's first motion to suppress, in part, excluding the DNA evidence obtained via the two buccal swabs. (CR3: 71). The trial court found the affidavit supporting the search warrant did not contain probable cause "as it pertains to these items." (CR3: 71). However, the trial court found that there was probable cause to photograph the Appellant's body, and denied the Appellant's motion to suppress the photographs. (CR3: 71–72). The trial court denied the other three motions to suppress, finding that all three affidavits for the search warrants were supported by probable cause. (CR3: 52–53; 82–83, 97–98).

## *Applicable Law*

The Fourth Amendment to the United States Constitution provides that "no warrants shall issue, but upon probable cause, supported by oath or affirmation, and particularly describing the place to be searched, and the person or things to be seized." U.S. CONST. amend. IV. Article 18.01(b) of the Texas Code of Criminal Procedure provides that "[n]o search warrant shall issue for any purpose in this state unless sufficient facts are first presented to satisfy the issuing magistrate that probable cause does in fact exist for its issuance." Tex. Code Crim. Proc. Ann. art. 18.01(b) (West 2015).

The search warrant must be supported by a sworn affidavit "setting forth substantial facts establishing probable cause." *Id.* Probable cause sufficient to support a search warrant exists if, under the totality of the circumstances presented to the magistrate, there is a fair probability or substantial chance that contraband or evidence of a crime will be found at the specified location at the time the warrant is issued. *Bonds v. State*, 403 S.W.3d 867, 876 (Tex. Crim. App. 2013); *Rodriguez v. State*, 232 S.W.3d 55, 60 (Tex. Crim. App. 2007); *Davis v. State*, 202 S.W.3d 149, 154 (Tex. Crim. App. 2006).

The sufficiency of a search-warrant affidavit is determined by considering the totality of the circumstances set forth within the four corners of the affidavit. *Moreno v. State*, 415 S.W.3d 284, 287 (Tex. Crim. App. 2013). The magistrate

may interpret the probable cause affidavit in a non-technical, common-sense manner and he may draw reasonable inferences from it. *See Illinois v. Gates*, 462 U.S. 213, 235–38 (1983); *State v. McClain*, 337 S.W.3d 268, 271 (Tex. Crim. App. 2011); *Davis*, 202 S.W.3d at 154; *Swearingen v. State*, 143 S.W.3d 808, 811(Tex. Crim. App. 2004). The magistrate is not required to find proof beyond a reasonable doubt or by a preponderance of the evidence, but only a probability that contraband or evidence of a crime will be found in a particular place. *Ford v. State*, 179 S.W.3d 203, 212 (Tex. App.—Houston [14th Dist.] 2005, pet. ref'd).

An appellate court conducts an independent, or *de novo*, review of a trial court's ruling on a motion to suppress evidence seized pursuant to a search warrant. *Bonds v. State*, 403 S.W.3d 867, 873 (Tex. Crim. App. 2013). This is because the trial court was not in an appreciably better position than the appellate court to determine whether the magistrate was justified in concluding, based on the information set forth in the affidavit, that a search would uncover evidence of wrongdoing. *See Guzman v. State*, 955 S.W.2d 85, 89 (Tex. Crim. App. 1997); *Lane v. State*, 971 S.W.2d 748, 752 (Tex. App.—Dallas 1998, pet. ref'd). The magistrate's finding of probable cause is not, however, reviewed *de novo*. *Bonds*, 403 S.W.3d at 873 (citing *Swearingen*, 143 S.W.3d at 810–11).

Instead, the appellate court, like the trial court, looks to whether, considering the totality of the circumstances, the magistrate had a substantial basis for

concluding that probable cause existed to support issuance of the search warrant. *See Gates*, 462 U.S. at 236, 238–39; *Bonds*, 403 S.W.3d at 873; *Swearingen*, 143 S.W.3d at 811. This deferential standard of review is consistent with the Fourth Amendment's strong preference for searches conducted pursuant to a warrant. *See Gates*, 462 U.S. at 236; *Bonds*, 403 S.W.3d at 873.

## *Issue 7*

In Issue 7, Appellant contends that the trial court erred in denying his motion to suppress the photographs and DNA taken pursuant to the search warrant because the facts contained in the search warrant affidavit were insufficient to establish probable cause.

First, the record reflects that the trial court granted the Appellant's motion to suppress the DNA obtained from the buccal swabs. (CR3: 71). Accordingly, Appellant's issue is moot. Additionally, Appellant waived any error in the denial of his motion to suppress the photographs when he stated he had "no objection" to their admission at trial. (RR63: 182, 197–98).

When a motion to suppress is denied, the defendant does not need to object to the same evidence at trial in order to preserve error on appeal. *Garza v. State*, 126 S.W.3d 79, 84 (Tex. Crim. App. 2004); *Moraguez v. State*, 701 S.W.2d 902, 904 (Tex. Crim. App. 1986). However, this Court has held that when a defendant affirmatively states during trial that he has "no objection" to the admission of the

complained-of evidence, he waives any error in the admission of the evidence despite the pretrial ruling. *Estrada v. State*, 313 S.W.3d 274, 302 (Tex. Crim. App. 2010), *cert. denied*, 131 S. Ct. 905 (2011); *Swain v. State*, 181 S.W.3d 359, 368 (Tex. Crim. App. 2005); *Jones v. State*, 833 S.W.2d 118, 126 (Tex. Crim. App. 1992); *Moraguez*, 701 S.W.2d at 904. However, this Court recently clarified that this principle is context-dependent, explaining that if the whole record plainly demonstrates the defendant did not intend, and the trial court did not construe, the "no objection" assertion to abandon the earlier preserved complaint, the complaint is not waived. *See Thomas v. State*, 408 S.W.3d 877, 885 (Tex. Crim. App. 2013). This Court further explained:

> On the other hand, if from the record as a whole the appellate court simply cannot tell whether an abandonment was intended or understood, then, consistent with prior case law, it should regard the "no objection" statement to be a waiver of the earlier-preserved error. Under the latter circumstances, the affirmative 'no objection' statement will, by itself, serve as an unequivocal indication that a waiver was both intended and understood.

*Id*. at 885–86.

The record in this case does not plainly demonstrate that the Appellant did not intend to waive his complaint, nor does the record reflect that the trial court did not construe counsel's statement of "no objection" as an abandonment of the complaint. It is clear that counsel reviewed the photographs that were offered into

evidence and had no objection to them. (RR63: 182, 197–98). Accordingly, Appellant has waived his complaint regarding the photographs.

Issue 7 should be overruled.

### *Issues 8 and 9*

In Issues 8 and 9, the Appellant contends that the affidavits in support of the search warrants for the vehicle and residence were insufficient to establish probable cause because the only information linking the Appellant to the disappearance of the complainant came from an unknown and unreliable source. The Appellant argues that the information police obtained from Shakeema Morsley identifying him as the individual contacting her from the 903 number should have been treated in the same manner as information obtained from an anonymous informant. The Appellant contends that the police had no way of knowing the true identity of the person identifying herself as Morsley, and additionally, the information she provided was unreliable.

Appellant's assertion that the information provided by Morsley should have been treated like an anonymous tip is wholly without merit. While "[t]ips from anonymous or first-time confidential informants of unknown reliability must be coupled with facts from which an inference may be drawn that the informant is credible or that his information is reliable," this is not necessary in cases involving citizen informants. *State v. Duarte*, 389 S.W.3d 349, 358 (Tex. Crim. App. 2012).

A "citizen informant" is an average citizen who happens to find himself in the position of victim or witness to criminal conduct and thereafter tells the police what he knows as a matter of civic duty. *Id*. at 356 (quoting 2 Wayne R. Lafave, Search and Seizure: A Treatise on the Fourth Amendment § 3.3 at 98 (4th ed. 2004)). Accordingly, a citizen informant is presumed to speak with the voice of honesty and accuracy. *Id*. at 356–57.

The information at issue in this case came from a private citizen who was contacted by police during the course of their investigation. Morsley was neither an anonymous informant nor a confidential informant, she was a citizen informant. The affidavit reflects that Morsley was contacted by police officers at her 214-909-8567 number after the officers identified her number as one that had been in contact with the 903 number. When officers inquired as to whether she knew the identity of the person contacting her from that number, Morsley was willing to identify herself to police and provide them with the information they needed. Morsley was anything but anonymous; in fact, the affidavit contains both her name and phone number. Accordingly, her identity is readily ascertainable from the search warrant affidavit. Because Morsley was a citizen informant, there was no need to establish her basis of knowledge or veracity.

However, the affidavit does contain the facts necessary to establish Morsley's veracity and basis of knowledge. The affidavit reflects that Morsley

knew the Appellant through Jawanna Arrington, her friend and work associate. Arrington was in a "dating relationship"[10] with the Appellant. Furthermore, the affidavit reflects that Morsley believed that the Appellant was the person contacting her from the 903 number due to the content of the communications she received, the contents of which would have only been known to the Appellant. To the extent that the Appellant challenges the affidavit because it does not contain the specific contents of the communications that led Morsley to believe that the Appellant was the person contacting her, this Court has said that "[t]he focus is not on what other facts could or should have been included in the affidavit; the focus is on the combined logical force of facts that are in the affidavit." *Duarte*, 389 S.W.3d at 354–55 (citing *Rodriguez v. State*, 232 S.W.3d 55, 62 (Tex. Crim. App. 2007)).

---

[10] While the Appellant attacks Morsley's reliability because the affidavit refers to the Appellant and Arrington as being in a "dating relationship" rather than married, it is clear from the record that Morsley was aware that Arrington and the Appellant were married. Following her phone conversation with Detective Cook, Morsley went to the Carrollton Police Department and met with Detective Teniente. (DX: 1 at p. 28–31). During her interview with the detective, Morsley informed him that she knew the Appellant because he was married to Arrington, and they were married in June 2011. (DX: 1 at p. 30).

And while this information was not available to the magistrate when he made his probable cause determination, it shows that Morsley knew Appellant and Arrington were married, and any characterization of their relationship as a "dating relationship" was either an oversight or misstatement by Detective Cook, rather than a lack of knowledge of the actual status of the relationship on the part of Morsley. A misstatement in an affidavit that is the result of simple negligence or inadvertence will not make a search warrant invalid. *See Dancy v. State*, 728 S.W.2d 772, 783 (Tex. Crim. App. 1987); *Kelly v. State*, 413 S.W.3d 164, 174–75 (Tex. App.—Beaumont 2012, no pet.) (citing *Franks v. Delaware*, 438 U.S. 154, 164–65 (1978)). Appellant's attack on Morsley's reliability and veracity on this basis is without merit.

Accordingly, the affidavit contains sufficient facts such that the magistrate could have reasonably inferred that the Appellant was associated with the 903 number contacting Shania prior to her disappearance, and had been in close proximity to her when she disappeared. Thus, viewing the totality of the circumstances, Detective Cook's affidavit contained sufficient facts and circumstances to provide the magistrate with a substantial basis for concluding there was a fair probability that a search of the Appellant's vehicle and residence would uncover evidence related to Shania's disappearance. *See Gates*, 462 U.S. at 236. Consequently, probable cause existed to support the issuance of the search warrants.

Appellant's Issues 8 and 9 are, therefore, without merit and this Court should overrule them.

### *Issue 10*

In Issue 10, Appellant contends that the trial court erred in denying his motion to suppress the evidence obtained from his black T-Mobile My Touch LG-E739 smart phone. Appellant contends that the information used to obtain the search warrant for his smart phone was tainted because it was acquired as a result of the three searches conducted with the September 8, 2012 search warrants, which Appellant contends were invalid. Appellant further argues that once the evidence

from the first three searches is suppressed, it leaves no legally obtained information to obtain the fourth search warrant.

Appellant's contentions are without merit. First, as discussed above, the supporting affidavits attached to the warrants issued on September 8, 2012 did establish probable cause; therefore, any evidence obtained as a result of those searches could permissibly have been used to obtain the September 12, 2012 warrant for the Appellant's cell phone. However, it is the State's position that none of the evidence obtained as a result of those searches was used to obtain the fourth search warrant.

The affidavit in support of the search warrant for the Appellant's smart phone stated the following facts:

> Your Affiant, Detective D. Williams #846, is a peace officer under the laws of the State of Texas, and has been employed for the past eighteen years as a peace officer. She is currently assigned to the Criminal Investigation Division where she has investigated crimes against children for the past five years.

> On September 7, 2012 Sherry James reported that her sixteen year old daughter, Shania Gray was missing. James stated that she was to pick up Shania from Hebron High School on September 6, 2012 at around 1600 hours. When Shania had not returned home by the next day, James reporter her missing.

> In March 2010 [sic] Gray reported that she was the victim of a felony criminal offense in which Franklin Davis was the suspect. Davis was subsequently arrested for that offense in July of 2011 and was released on bond in August 2011.

On September 7, 2012, Detectives discovered, through cell phone records, that Franklin Davis and Shania Gray had been in contact with one another on September 6, 2012. Those records also revealed that Davis' and Gray's cell phones were in the same areas at the same times including Hebron High School at around 1600 hours on September 6, 2012.

On September 8, 2012, Detective Chevallier spoke with Franklin Davis at the Carrolton Police Department. Davis was advised of his Miranda Warning, which he waived. Davis provided Chevallier a voluntary oral statement admitting to his involvement in the disappearance of Shania Gray. During the course of the investigation, Gray voluntarily submitted his personal cell phone, a black T Mobile My Touch LG E-739, serial number 205KPSL357486, for analysis.

Davis stated that he was able to obtain Gray's personal cell phone number off of Facebook. Using a false identity, Davis contacted Gray using an AT&T prepaid cell phone, 903-603-8786, but he used his personal cell phone in order to collect evidence about the previous criminal offense that Gray reported in March 2010.

On September 6, 2012, Davis contacted Gray using his false identity and arranged to meet her at Hebron High School. Davis stated that when arrived at the high school, Gray was surprised to see him. Gray got into Davis' car after he told her that he wanted to talk to her about the March 2010 [sic] criminal case. Davis stated that he drove Gray to the trail head for Champion Trail at Valley View Lane and IH 635. Davis stated that during the drive to that location, Gray saw a .380 pistol that Davis had in his possession. At one point, Gray asked Davis if he was going to hurt her and he replied that he only wanted to talk about the March 2010 [sic] case. Davis told Chevallier that he and Gray got out of the car and onto the trail and then down toward the Trinity River. Davis stated that he used the .380 pistol that he had brought with him to shoot Gray twice. Davis stated that Gray fell partially into the river and began asking, "Why Wish?" Wish is a nickname that Davis admitting [sic] to using. Davis then reached down and pulled Gray up on to the bank. Davis stated that he then stepped on her neck until she stopped breathing.

106

On September 8, 2012, at about 1630 hours, Irving Police Department responded to a body that was found in the Trinity River near Valley View Lane and IH 635. The female body was wearing the same clothes as Shania Gray was wearing at the time she went missing. Officers located a backpack near the body that contained the school identification of Shania Gray.

Davis then led Detective to several locations in an attempt to locate evidence. Davis led Detectives to the location where he killed Gray. That location was a short distance upstream from where Davis shot and killed Gray. Davis then led Detectives to a pond at the intersection of Royal Lane and Las Colinas Boulevard where a .380 pistol was located where Davis said he threw it.

Your affiant believes that the black T Mobile My Touch LG-E739 serial number 205KPSL357486, will contain evidence of Franklin Davis communicating with Shania Gray and accessing her Facebook[.]

(CR2: 201–03).

Though Appellant asserts that evidence obtained pursuant to the previous three warrants was used to obtain this warrant, Appellant fails to identify the complained-of evidence. The State asserts that the information contained in the affidavit was obtained from the Appellant during the interviews he had with detectives Williams, Chevallier, Teniente and Griggs. (SX: 57, 57B, 57C).

The Appellant voluntarily came to the Carrollton Police Department in the early morning hours of September 8, 2012. He agreed to speak to Detective Williams concerning Shania's disappearance. (RR61: 226–231; SX: 57, 57C). During his initial interview, he denied knowing anything her disappearance. (RR61: 226–31; RR62: 24–27; SX: 57, 57C). He also denied the sexual assault

107

allegations that were pending and told Williams that Shania had sent him several text messages in which she said that she had made up the allegations because her mother made her. (SX: 57, 57C). The Appellant said the messages were still on his cell phone, and he offered to show them to Williams. (SX: 57, 57C). After the interview, the Appellant was arrested for outstanding traffic warrants from Balch Springs and was also placed on a forty-eight hour investigative hold. (RR62: 39–41; SX: 57, 57C).

When the Appellant requested to speak with detectives a few hours later, the Appellant told Detective Chevallier and Detective Teniente that he forgot to tell Detective Williams about recordings he had on his cell phone of conversations he had with Shania that would prove that he was innocent of the sexual assaults. (SX: 57, 57B). He continued to deny any involvement in her disappearance. (SX: 57, 57B). During that interview, Shania's body was found. (RR62: 73). Subsequently, the Appellant agreed to take Chevallier and Griggs to the location where Shania was murdered and to show them where he had disposed of the gun, Shania's iPhone, and his shoes. (RR62: 78–79; SX: 58).

On September 9, 2012, the Appellant asked to speak to the detectives, and he was subsequently interviewed by Williams and Grigg. (RR62: 117–18; SX: 72, 72A). In that interview, the Appellant provided the detectives with details about how he murdered Shania. (SX: 72, 72A). The Appellant told the detectives that he

had set up a fake Facebook page in order to get information he could use against Shania. (SX: 72, 72A). The Appellant told the detectives he used his T-Mobile smart phone to login to Facebook. (SX: 72, 72A). The Appellant admitted that he purchased a GoPhone from Walmart to contact Shania, and had recorded six or seven conversations with her on his T-Mobile smart phone. (SX: 72, 72A).

It was this information, obtained during the Appellant's voluntary interviews with the detectives, that was alleged in the affidavit supporting the search warrant for this cell phone. (CR2: 201–03). None of the items of evidence obtained pursuant to the first three search warrants were used to obtain this warrant. Because the Appellant has failed to show that the first three search warrants were invalid, and that any evidence obtained from those searches was used to obtain the warrant to search his cell phone, Issue 10 should be overruled.

### STATE'S RESPONSE TO ISSUE 11: THE EVIDENCE IS LEGALLY SUFFICIENT TO SUPPORT THE APPELLANT'S CONVICTION FOR CAPITAL MURDER.

In Issue 11, Appellant contends the evidence is insufficient to support his conviction for capital murder because the State failed to present evidence that he was in the "course of committing and attempting to commit obstruction,"—that the Appellant's motive in murdering Shania was to prevent her future testimony against him in his trial for the four sexual assault offenses. (Appellant's Brief at p. 81). Instead, Appellant argues that he murdered Shania because she ruined his life by lying about the sexual assaults. (Appellant's Brief at p. 81). The Appellant

further argues that because he murdered her out of anger and revenge, he is guilty only of first degree murder, not capital murder. (Appellant's Brief at p. 86). Contrary to these claims, the evidence is legally sufficient to support the Appellant's conviction for capital murder.

### *Standard of Review*

When reviewing a challenge to the sufficiency of the evidence, an appellate court considers all the evidence in the light most favorable to the verdict to determine whether any rational trier of fact could have found the essential elements of the offense beyond a reasonable doubt. *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *Laster v. State*, 275 S.W.3d 512, 517 (Tex. Crim. App. 2009). This standard gives full play to the responsibility of the trier of fact to resolve conflicts in the testimony, to weigh the evidence, and to draw reasonable inferences from basic facts to ultimate facts. *Jackson*, 443 U.S. at 319. The appellate court does not reweigh the evidence or substitute its judgment for that of the factfinder. *King v. State*, 29 S.W.3d 556, 562 (Tex. Crim. App. 2000). In conducting a review, circumstantial evidence is as probative as direct evidence in establishing guilt; circumstantial evidence alone can be sufficient to establish guilt. *Clayton v. State*, 235 S.W.3d 772, 778 (Tex. Crim. App. 2007). In a case involving circumstantial evidence, "[e]ach fact need not point directly and independently to the guilt of the appellant, as long as the cumulative force of all the incriminating circumstances is

sufficient to support the conviction." *Hooper v. State*, 214 S.W.3d 9, 16–17 (Tex. Crim. App. 2007).

## *Applicable Law*

A person commits the offense of capital murder if he intentionally commits murder in the course of committing or attempting to commit the offense of obstruction. Tex. Penal Code Ann. § 19.03 (a)(2) (West Supp. 2014). A person commits obstruction if, he intentionally or knowingly harms or threatens another by unlawful act to prevent or delay the service of another as a witness, prospective witness, or a person who has reported or who the actor knows intends to report the occurrence of a crime. Tex. Penal Code Ann. § 36.06(a) (West 2015). Significantly, a "prospective witness" is "any person who may testify in an official proceeding," and the term includes a person who has been involved in an offense with a defendant. *Ortiz v. State*, 93 S.W.3d 79, 86 (Tex. Crim. App. 2002) (quoting *Morrow v. State*, 862 S.W.2d 612, 614 (Tex. Crim. App. 1993)).

## *Application*

Contrary to the Appellant's assertions, the record is replete with evidence showing that the Appellant's motive for murdering Shania was to prevent her from testifying against him at his upcoming sexual assault trial. In fact, the evidence revealed that the Appellant adopted an elaborate scheme in an effort to influence

111

the upcoming trial, and when he was ultimately unable to get the results he desired, the Appellant eliminated Shania as a witness.

The evidence showed that in April 2011 Shania made an outcry of sexual assault, telling her mother that the Appellant had assaulted her while she was babysitting his daughter and two other children. As a result of that admission, the Appellant was indicted on four counts of sexual assault of a child in August 2011.

On July 24, 2012, the Appellant had a court setting for the sexual assault cases. (SX: 20 at p. 1). Roughly one week before that court date, the Appellant conducted multiple Google searches concerning the legality of recording phone conversations and using them as evidence in court. (SX: 43, 44). The Appellant also searched Google for the "best way to get off of a sexual assault charge." (SX: 44). Six minutes after that query, the Appellant conducted another Google search, this time for: "With no proof that you did the murder can you still be held in jail". (SX: 44).

At approximately the same time, the Appellant began to look for Shania on MySpace and Facebook. However, Shania's MySpace page was no longer updated, and her Facebook page was private. The Appellant began to look for ways to access her account. First, he created a fake Facebook profile under the name Jazmine Brown and tried to communicate with Shania. Shania, however, did not accept the friend request from Jazmine. Next, the Appellant contacted his

nephew Domee Elkins for access to his Facebook page. The Appellant chose Elkins because he was young and handsome. The Appellant sent Shania a friend request under Elkins' profile, and she accepted.

As a result, the Appellant was able to gain access to Shania's Facebook page and found her phone number. The Appellant then contacted her by text message using the "throwaway phone" he purchased at Walmart. The Appellant told her he was a relative of Elkins, and had seen her Facebook page because she was "friends" with Elkins. The Appellant told her his name was Artis Powell and he was interested in getting to know her. The Appellant told Shania his middle name was Dwayne, and he went by "D." The Appellant had previously looked for a Facebook profile belonging to someone that looked similar to him in appearance, and had decided on Artis Powell. Shania immediately sent a text message back, and he told her if she wanted to see what he looked like, she should visit Powell's Facebook page. Earlier that evening, the Appellant sent Powell a message from the Jazmine Brown Facebook page, warning Powell not to respond to any messages from Shania because she was underage.

On July 17, 18, and 19, the Appellant called Shania on the "throwaway" phone, pretending to be "D." The Appellant recorded the conversations with his T-Mobile smart phone and attempted to elicit statements from Shania that were inconsistent with the statements she made to police during the sexual assault

113

investigation. The Appellant also attempted to gain information he could use to impeach her credibility at trial and attack her character. Specifically, the Appellant asked her to tell him about her previous sexual relationships. The Appellant also attempted to manipulate Shania into not testifying by suggesting that she could go to prison if she was caught lying about the sexual assaults, and further suggested that she could be in danger if she testified at trial because the man she made the allegations against might hold a grudge against her if he went to prison and might come after her when he was released. When Shania told him that she just wanted everything "over and done with" the Appellant suggest that she tell the police she lied and then the charges would be dropped. (SX: 19, 19C). The Appellant assured her that she would not get in trouble because she was a minor. Shania never recanted the allegations.

In August 2012, the Appellant was notified that his trial was set for October 29, 2012. On August 27, 2012, the Appellant downloaded an application onto his T-Mobile smart phone called "Fake Call & SMS & Call Log." The application permitted the user to create fake text messages and call logs. Thirty minutes after installing the application, the Appellant created three fake text messages purporting to be from Shania. The second message stated: "Sorry I li3d on u but my momma mad3 m3 do it. If we go to court ima t3ll th3m u never touched me. My my momma go b3 mad @ m3 but fuck that bitch I can't stand her no ways. Please

4give me." (SX: 43). Three minutes after creating the fake text messages, the Appellant called his attorney Hugo Aguilar. (SX: 43). The following day, the Appellant created three more text messages also purporting to be from Shania. He also created an incoming call log, to make it appear that Shania had called him. On August 30, 2012, the Appellant purchased a Diamondback .380 handgun and reinitiated contact with Shania under his false identity. The two agreed to meet after school on September 6, 2012.

The Appellant testified that Shania was scared when she came out of her school to meet "D" but and saw him. Instead, the Appellant testified that he did not have the gun out at the time, but claimed that Shania agreed to get in the car with him. The Appellant testified that he told her he wanted to talk to her about the sexual assault allegations. Once she was in the car, the Appellant drove to Sam Houston Trail Park. Once there the Appellant made Shania walk down an embankment to the Trinity River, where he shot her twice and stood on her throat until she stopped breathing. He then rolled her body into the river and left the park to dispose of the evidence.

When he was questioned by detectives with the Carrollton Police Department, the Appellant denied any involvement in Shania's disappearance and told the police that he was innocent of the sexual assault charges. The Appellant told them that Shania had sent him text messages recanting the allegations. Even

115

after confessing to Shania's murder, the Appellant still relied on the text messages, never once admitting that they were fake.

The elaborate nature and timing of the Appellant's scheme support the conclusion that the Appellant was trying to influence the upcoming trial. The jury could have rationally concluded that when the Appellant was ultimately unable to manipulate Shania into recanting the allegations or gain the information he was looking for, he eliminated her as a witness. While the Appellant claimed he murdered her for revenge, the jury was certainly free to reject the Appellant's testimony. *Lancon v. State*, 253 S.W.3d 699, 707 (Tex. Crim. App. 2008)) ("[T]he trier of fact is the sole judge of the witnesses' credibility and is free to accept or reject any or all of the evidence presented by either side."). The Appellant admittedly lied throughout the investigation, and in fact, never told anyone that the text messages from Shania were fake until he was confronted with the results of the forensic examination of his phone. The Appellant even testified that he intended to use them as evidence at the trial knowing they were fake.

Considering all the evidence in the light most favorable to the jury's verdict, a rational trier of fact could have found the essential elements of capital murder beyond a reasonable doubt. As such, the evidence is legally sufficient to support the conviction. The State asks this Court to overrule Issue 11.

**STATE'S RESPONSE TO ISSUE 12: THE TRIAL COURT DID NOT ERR IN OVERRULING THE APPELLANT'S OBJECTION TO STATE'S EXHIBIT NUMBERS 40 AND 41.**

In Issue 12, Appellant contends that the trial court erred in overruling his Rule 403 objection to State's Exhibits 40 and 41, two photographs depicting the victim's body at the crime scene. (Appellant's Brief at pp. 91–94). Appellant's contentions lack merit and should be overruled.

### *Pertinent Facts*

During the testimony of Farmers Branch Police Officer Austin Tapp at Appellant's trial, the State offered State's Exhibits 38 through 41, photographs depicting the terrain where Shania's body was found and the condition of her body floating in the river. (RR61: 115–20). While defense counsel did not object to the admission of State's Exhibits 38 and 39, counsel objected to the admission of State's Exhibits 40 and 41. (RR61: 116). Specifically, defense counsel argued:

> MR. HAYES: Your Honor, we have no objection to State's Exhibits 38 and 39. I believe that they do show the terrain which the State is attempting to get at.
>
> 40 and 41, we do object to. I don't – they're pictures of the body floating in the river. I don't believe that there's a probative value added to the testimony at this time. I simply believe it's a prejudicial photograph and it doesn't really seem to add anything to the testimony, the terrain or the environment.
>
> I'd ask the Court to take a look at them and do a 403 balancing test on 40 and 41, Your Honor.

117

(RR61: 116). After reviewing the challenged photographs, the trial court concluded that the probative value of State's Exhibits 40 and 41 substantially outweighed the prejudicial effect, overruled the objection, and admitted the photographs into evidence. (RR61: 116–17).

### *Standard of Review*

A trial court's ruling on the admissibility of evidence is reviewed under an abuse of discretion standard. *See Weatherred v. State*, 15 S.W.3d 540, 542 (Tex. Crim. App. 2000). The trial court's ruling should be upheld if it is within the zone of reasonable disagreement. *Id.* And, it will be upheld if it is correct on any theory of law applicable to the case. *Romero v. State*, 800 S.W.2d 539, 543 (Tex. Crim. App. 1990).

### *Applicable Law*

The admissibility of a photograph is within the sound discretion of the trial judge. *Paredes v. State*, 129 S.W.3d 530, 539 (Tex. Crim. App. 2004); *Williams v. State*, 958 S.W.2d 186, 195 (Tex. Crim. App. 1997). Generally, a photograph is admissible if verbal testimony about the subject of the photograph is also admissible. *Gallo v. State*, 239 S.W.3d 757, 762 (Tex. Crim. App. 2007) (holding that, if verbal testimony is relevant, photographs of the same are also relevant).

The admissibility of photographic evidence alleged to be unduly prejudicial is governed by Texas Rule of Evidence 403. Tex. R. Evid. 403; *Emery v. State,* 881

118

S.W.2d 702, 710 (Tex. Crim. App. 1994). Under Rule 403, all relevant evidence is admissible unless "its probative value is substantially outweighed by the danger of unfair prejudice, confusion of the issues, or misleading the jury, or by considerations of undue delay, or needless presentation of cumulative evidence." Tex. R. Evid. 403.

In performing a Rule 403 analysis, "the trial court must consider the host of factors affecting probativeness . . . and balance those factors against the tendency, if any, that the photographs have to encourage resolution of material issues on an inappropriate emotional basis." *Ladd v. State*, 3 S.W.3d 547, 568 (Tex. Crim. App. 1999). Relevant factors a court may consider in making this determination include the number of exhibits offered, their gruesomeness, their detail, their size, whether they are black-and-white or color, whether they are close-up, whether the body is naked or clothed, the availability of other means of proof, and other circumstances unique to the individual case. *Chamberlain v. State*, 998 S.W.2d 230, 237 (Tex. Crim. App. 1999).

All probative evidence proffered by an adverse party will be prejudicial, but only *unfair* prejudice warrants exclusion of the evidence. *See Montgomery v. State*, 810 S.W.2d 372, 378 (Tex. Crim. App. 1990) (citing *United States v. Figueroa*, 618 F.2d 934, 943 (2nd Cir. 1980)).

*Application*

Here, Appellant argues that the trial court erred in admitting the photographs because they were extremely gruesome and were offered to appeal to the emotion of the jury rather than to aid in the fact finding process. (Appellant's Brief at pp. 93–94). The trial court did not abuse its discretion in admitting the complained-of photographs.

State's Exhibits 40 and 41 are two color photographs measuring 8 ½ by 11 inches. The photographs depict Shania's clothed body floating face-down in the Trinity River. The photographs were admitted during the testimony of Officer Tapp, the first officer to arrive at the crime scene. (RR61: 108–13). Officer Tapp testified that he was on bike patrol on the afternoon of September 6, 2012, when he received a call from dispatch sending him to investigate a possible person floating in the Trinity River near the intersection of Interstate 635 and Valley View Lane. (RR61: 109–10). When Officer Tapp arrived at the location, he observed a body in the water that did not appear to be moving. (RR61: 110). Once Officer Tapp was able to climb down the steep embankment to the river, he was able to see that the body was a female with a wound to the lower left side of her back. (RR61: 111–12).

State's Exhibits 38, 39, 40, and 41 were used by Officer Tapp to help the jury understand the crime scene's difficult terrain as well as the condition of

Shania's body when it was found. (RR61: 118–21). State's Exhibit 40 shows Shania's clothed body floating face-down in the river. (SX: 40). The back of her t-shirt is slightly raised and a wound is visible to her lower back. (SX: 40). Officer Tapp noted that he was able to determine the body belonged to a female because of the braided hair, but was unable to determine an approximate age because the body had "swelled up" from being in the water. (RR61: 119–20). Officer Tapp noted that he noticed the wound to her back because of "bubbles" forming in the area of the wound and fly activity. (RR61: 120). State's Exhibit 41 is a closer view of Shania's body and its position in the water, and the wound to her back is more visible. (SX: 41). Officer Tapp used the photographs to point out the wound. (RR61: 120).

While gruesome, the photographs are not unduly so, and are relevant because they accurately reflect the location and state of Shania's body when it was discovered, as well as the injuries inflicted on it. *See Ripkowski v. State*, 61 S.W.3d 378, 392 (Tex. Crim. App. 2001); *see also Shuffield v. State*, 189 S.W.3d 782, 788 (Tex. Crim. App. 2006). Such depictions give the photos substantial probative value. *Ripkowski*, 61 S.W.3d at 382. Accordingly, the photographs in question were probative of the crime scene and the injuries received by the victim and were necessary for the State to develop its case. Consequently, the probative value of the photographs was not substantially outweighed by their prejudicial effect and

121

thus, the trial court did not abuse its discretion in admitting the photographs. *See Shuffield v. State*, 189 S.W.3d 782, 787–88 (Tex. Crim. App. 2006) (holding that the trial court did not abuse its discretion in admitting crime-scene photographs where they were probative of the crime scene and injuries received by the victim, were necessary in developing the State's case, and were not overly gruesome); *Ladd*, 3 S.W.3d at 568 (holding that the trial court did not abuse its discretion in admitting ten photographs of the victim's body, including autopsy photos, because the photographs depicted the manner of death and were no more gruesome than the crime); *Long v. State*, 823 S.W.2d 259, 273 (Tex. Crim. App. 1991) (holding that the trial court did not abuse its discretion in admitting thirteen photographs of the victims' bodies at the crime scene because the photographs were limited in number, reflected the manner of death, and had to be viewed together to get an accurate assessment of the injuries sustained by the victims).

Issue 12 is without merit and should be overruled.

### STATE'S RESPONSE TO ISSUES 13, 14, 15, 16, 17, AND 18: THE TRIAL COURT DID NOT ERR IN SUSTAINING THE STATE'S OBJECTIONS TO DEFENSE EXHIBITS A, B, C, E, F AND G.

In Issues 13 through 18, Appellant contends that the trial court erred in sustaining the State's objections to the admission of Defense Exhibits A, B, C, E, F, and G, six recordings the Appellant made of phone conversations he had with the complainant while pretending to be "D." The State understands the

122

Appellant's argument to be that the trial court erred in excluding the recordings because they were offered to explain the circumstances surrounding the murder, under Article 38.36 of the Code of Criminal Procedure, and were not hearsay. (Appellant's Brief at pp. 101–03).

### *Relevant Facts*

During the testimony of Detective Williams, defense counsel offered seven audio recordings of phone conversations the Appellant had with Shania while pretending to be "D," the false persona the Appellant created to communicate with Shania. (RR63: 97). The State objected to the admission of the recordings, and a hearing was held outside the presence of the jury. (RR63: 97–113). At the hearing, the State informed the trial court about the contents of each recording and presented its objections to each of the seven recordings individually. (RR63: 97–113). The recordings were identified as Defense Exhibits A through G. (RR63: 102–13).

**Defense Exhibit A** contained a ten second recording of the Appellant stating: "Okay, I'm going to call her right now to prove my innocence." (RR63: 102). The call, however, goes directly to Shania's voicemail. (RR63: 102). The State raised hearsay and Rule 403 objections. (RR63: 102). Defense counsel offered no theory of admissibility or response to the State's objections. (RR63: 102). The trial court sustained the State's objections. (RR63: 102).

**Defense Exhibit B** contained a conversation, lasting approximately ten minutes, in which Shania told "D" about previous boyfriends and about an incident in which her mother caught her having sex. (RR63: 102–03). The State raised relevancy, hearsay and Rule 412 objections. (RR63: 103). Defense counsel responded that the recording went to the complainant's state of mind and supported the Appellant's theory of the case. (RR63: 103). The trial court sustained the State's objections. (RR63: 104).

**Defense Exhibit C** contains a conversation, lasting approximately ten minutes, in which Shania told "D" about the first time she had sex and about other sexual relationships. (RR63: 104). The State raised hearsay, Rule 403 and Rule 412 objections. (RR62: 105). Defense counsel argued that the recording was offered to impeach previous statements made by Shania concerning her sexual history. (RR63: 105). The State countered by stating that there was no evidence presently before the jury that this recording would contradict. (RR63: 106).

**Defense Exhibit D**[11] was a five second unintelligible recording. (RR63: 106). The State raised a relevancy objection to the recording, and defense counsel responded that they had "no objection." (RR63: 106). The trial court sustained the State's objection. (RR3: 106).

---

[11] Appellant does not complain about the exclusion of Defense Exhibit D on appeal. (Appellant's Brief at p. 95).

In **Defense Exhibit E**, "D" asks Shania to tell him "a big secret," which she refuses. (RR63: 106). "D" and Shania also discuss their height and weight and his car. (RR63: 107). The State raised Rule 403 and Rule 412 objections to the recording. (RR63: 107). Defense counsel reasserted their previous theories of admissibility that the recording was offered for purposes of impeaching statements made by Shania in the DCAC interview, in the REACH Clinic report, and in the Mesquite Police Department report. (RR63: 107). The State responded that there had not been any presentation of evidence from the REACH exam or from the DCAC interview. (RR63: 108–09). The State noted that the only mention of the DCAC interview occurred during defense counsel's cross-examination of the police officers and they could not use that cross-examination to "open their own door." (RR63: 108–09). The trial court sustained the State's objections. (RR63: 109).

**Defense Exhibit F** contains a conversation about Shania babysitting her brother, her involvement in church activities, and "D's" car. (RR63: 110). The State raised hearsay and relevancy objections. (RR63: 109–11). Defense counsel responded that the recording should be admitted under the rule of optional completeness. (RR63: 111). The trial court sustained the State's objections. (RR63: 111).

**Defense Exhibit G** contains a conversation about an audition Shania was preparing for. (RR63: 112). Shania sings on the recording. (RR63: 112). The State raised hearsay and relevancy objections. (RR63: 113). Defense counsel re-urged their previous arguments for the admissibility of the recordings. (RR63: 112). The trial court sustained the State's objections. (RR63: 112).

Defense Exhibits A through G were admitted for record purposes. (RR63: 112–13).

### *Preservation of Error*

Appellant's complaint is not preserved for this Court's review. This Court has held, and the rules of evidence make it clear, that in order to preserve error in the exclusion of evidence, the proponent is required to make an offer of proof and obtain a ruling. *Reyna v. State*, 168 S.W.3d 173, 176 (Tex. Crim. App. 2005); *Williams v. State*, 937 S.W.2d 479, 489 (Tex. Crim. App. 1996); Tex. R. Evid. 103(a)(2). In some cases, another notion of preservation comes into play, known as "party responsibility." *Reyna*, 168 S.W.3d at 176–77 (finding that the defendant was responsible for informing the court of a constitutional basis for the admission of evidence he sponsored; his evidentiary argument did not preserve the constitutional error). The basis for party responsibility is Appellate Rule 33.1. *Id.* at 177; Tex. R. App. P. 33.1. The rule provides that as a prerequisite to presenting a complaint for appellate review, the record must show that the party "stated the

grounds for the ruling that [he] sought from the trial court with sufficient specificity to make the trial court aware of the complaint." Tex. R. App. P. 33.1(a)(1). This means that it is not enough for the proponent of the evidence to tell the court that the evidence is admissible, but the proponent must have told the court why the evidence was admissible. *Reyna*, 168 S.W.3d at 177.

While a reviewing court may uphold a trial court's ruling on the admission or exclusion of evidence on any legal theory or basis application to the case, it may not reverse a trial court's ruling on any theory or basis that might have been applicable but was not raised at trial. *Martinez v. State*, 91 S.W.3d 331, 336 (Tex. Crim. App. 2002). Additionally, the issue on appeal must comport with the complaint made at trial; otherwise, the appellant has preserved nothing for review. *See* Tex. R. App. P. 33.1; *Pena v. State*, 285 S.W.3d 459, 464 (Tex. Crim. App. 2009) (concluding that complaint on appeal must comport with the complaint made at trial).

First and foremost, the Appellant did not raise Article 38.36 as a basis for the admission of the recordings at trial, in fact, he never mentioned the statute. (RR63: 96–97, 101–13). Instead, the Appellant vaguely asserted that the recordings were admissible, not for the truth of the matter asserted, but were offered: (1) to show the complainant's state of mind concerning sexual activity; (2) to impeach the complainant's credibility concerning statements she made in her

DCAC interview, in the REACH examination, and in her interview with the Mesquite Police Department; and (3) under the rule of optional completeness. (RR63: 102–13). Accordingly, Appellant has failed to preserve his complaint for review. *See Darnes v. State*, 118 S.W.3d 916, 919 (Tex. App.—Amarillo 2003, pet. ref'd) (holding appellant's complaint that the evidence was admissible pursuant to Article 38.36 was not preserved for appellate review where appellant never mentioned the statutes as a ground for supporting the admission of the evidence).

In any event, the trial court's rulings in this case were proper.

### *Standard of Review and Applicable Law*

A trial court's ruling on the admissibility of evidence is reviewed under an abuse of discretion standard. *Weatherred*, 15 S.W.3d at 542; *Martinez v. State*, 327 S.W.3d 727, 736 (Tex. Crim. App. 2010). A trial court has broad discretion in its decision to admit or exclude evidence, which should not be disturbed if within the reasonable zone of disagreement. *Guzman*, 955 S.W.2d at 89. The mere fact that a trial court may decide a matter within its discretionary authority differently than an appellate judge in similar circumstances does not demonstrate an abuse of discretion. *Montgomery*, 810 S.W.2d at 379–80. Rather, an abuse of discretion is shown when the trial court's ruling is "arbitrary or unreasonable," made "without reference to any guiding rules or principles." *Id*.

The proponent of evidence ordinarily has the burden of establishing the admissibility of the proffered evidence. *See Marquez v. State*, 921 S.W.2d 217, 222–23 (Tex. Crim. App. 1996); *Vinson v. State*, 252 S.W.3d 336, 340 (Tex. Crim. App. 2008). If no objection is made, the evidence is generally deemed admissible. *Vinson*, 252 S.W.3d at 340. However, once an objection is made, the proponent must demonstrate that the proffered evidence overcomes the stated objection. *Id*. (citing *Idaho v. Wright*, 497 U.S. 805, 816 (1990)).

Article 38.36(a) of the Code of Criminal Procedure allows, in all prosecutions for murder, either party "to offer testimony as to all relevant facts and circumstances surrounding the killing and the previous relationship existing between the accused and the deceased, together with all relevant facts and circumstances going to show the condition of the mind of the accused at the time of the offense." Tex. Code Crim. Proc. Ann. art. 38.36(a) (West 2005). Evidence that is admissible under Article 38.36 is still subject to the limitations provided by the Texas Rules of Evidence. *See Garcia v. State*, 201 S.W.3d 695, 702–05 (Tex. Crim. App. 2006); *Smith v. State,* 5 S.W.3d 673, 679 (Tex. Crim. App. 1999).

Hearsay is defined as "a statement, other than one made by the declarant while testifying at the trial or hearing, offered in evidence to prove the truth of the matter asserted." Tex. R. Evid. 801(d). The matter asserted is defined as "any matter explicitly asserted, and any matter implied by a statement, if the probative

value of the statement as offered flows from declarant's belief as to the matter." Tex. R. Evid. 801(c). Hearsay statements are not admissible except as provided by statute or by the rules of evidence. Tex. R. Evid. 802.

### *Application*

As noted above, evidence that is offered under Article 38.36 must still meet the admissibility requirements of the Texas Rules of Evidence. *Garcia*, 201 S.W.3d at 702–05; *Smith,* 5 S.W.3d at 679. Therefore, even if the recordings were admissible under Article 38.36, which the State does not concede, the recordings were properly excluded as hearsay. The Appellant has failed to identify any exception to the hearsay rule which would have permitted the admission of the recordings of Shania telling the Appellant about her church activities, babysitting, or singing. These recordings were not excited utterances, present sense impressions or statements of Shania's state of mind. *See* Tex. R. Evid. 803.

While the Appellant argues that the recordings of Shania discussing her past sexual relationships were admissible under the "state of mind" exception to the hearsay rule, this claim is without merit. The "state of mind" exception creates an exception to the hearsay rule for a "statement of the declarant's then existing state of mind . . . but not including a statement of memory or belief to prove the fact remembered or believed . . . ." Tex. R. Evid. 803(3). The statements made by Shania about her past sexual relationships were descriptions of past events—of

facts remembered. These types of statement are specifically excluded from the state of mind exception. Tex. R. Evid. 803(3); *see Glover v. State*, 102 S.W.3d 754, 762–63 (Tex. App.—Texarkana 2002, no pet.). Consequently, the statements were not admissible under the state of mind exception.

Moreover, it is clear that the Appellant offered the recordings for the express purpose of disparaging Shania's character in front of the jury. He wanted to call attention to the fact that Shania had sexual relationships with other men prior to the sexual assaults. The trial court properly excluded the recordings.

Regardless, the Appellant suffered no harm from the court's exclusion of the recordings. *See* Tex. R. App. P. 44.2(b). The record reflects that Appellant testified about the contents of the recordings on cross-examination:

> MR. BIRMINGHAM: Okay. So now we talk about these seven text messages -- or these seven voice recordings. The first one just goes to voice mail. It's just the phone ringing?
>
> APPELLANT: Right.
>
> MR. BIRMINGHAM: Okay. So tell these folks why it's so important when you we're talking about how there's seven phone recordings and I'm hiding stuff, what's so important about that?
>
> APPELLANT: Nothing on -- about that one.
>
> MR. BIRMINGHAM: But that isn't what you told these folks.
>
> APPELLANT: I told them that it was a few text messages -- I mean a few recordings that don't prove anything, it's just her voice mail. It was one where I was saying I'm -- this is my name, whatever the – I'm fixing to prove my innocence in sexual assault charges.

MR. BIRMINGHAM: And that's all it says?

APPELLANT: On those two or maybe three of them, yes.

MR. BIRMINGHAM: Okay. So when y'all throw the number around like there's six or seven, there's about really three, right?

APPELLANT: But it was a total of six or seven that was on the phone.

MR. BIRMINGHAM: Here's the bombshell, right, here's the bombshell that you were so desperate to get out: Shania snuck off with a boy and had sex with him and got caught by her mother, right?

APPELLANT: At what point? Which one are you talking about?

MR. BIRMINGHAM: The one where she was supposed to be at the track meet. Do you recall that?

APPELLANT: I recall that she did not get caught by her mom, she actually got -- they got pulled over after they was on the way back to the school.

MR. BIRMINGHAM: And the deal is that the police were right there, and Shania's mom eventually found out about that. She told you that, right?

[…]

MR. BIRMINGHAM: Okay. The other thing that's on there is that this other one is, you know, she had sex with a guy that was in the Army that was 20 years old.

APPELLANT: The same guy that I actually spoke to when I went to -- when I first got arrested on the sexual assault charges and I told Detective Snyder then that she had made a mention about a guy that she had sex with that was in the Army. She told me she had sex when she was 13 years old.

132

MR. BIRMINGHAM: So that, that is what you want this jury so desperately to hear --

APPELLANT: That's the --

MR. BIRMINGHAM: -- that Shania had sex with somebody while she was supposed to be at a track meet and that she had sex with a dude that was in the Army -- supposedly in the Army who was about 20 years old, right?

APPELLANT: The one at the track meet, no; but the one about the guy at -- the Army guy, yes.

MR. BIRMINGHAM: Okay. You also talked to her whenever you're -- in the video -- in the audio recording that we do have, these tactics that you have with her, you're –you can see what you're trying to do as far as building character evidence. That's why you tell her, "Hey, I guess it's good then that you weren't a virgin because that's a grown-ass man's penis."

APPELLANT: Sounds about right.

MR. BIRMINGHAM: Yeah. Those are your words.

APPELLANT: Yeah, that's what I'm saying. Sounds about what I said.

MR. BIRMINGHAM: Because you're trying to get her to admit that she wasn't a virgin, right?

APPELLANT: Pretty much, yeah.

(RR65: 130–35). Accordingly, the same or essentially the same evidence was placed in front of the jury. This Court should overrule Issues 13 through 18.

133

**STATE'S RESPONSE TO ISSUES 19, 20, 21: THE TRIAL COURT DID NOT ERR IN SUSTAINING THE STATE'S OBJECTION TO THE PROFFERED TESTIMONY OF DEFENSE WITNESSES ARTY HAYES, ASHLYE SAMS[12] AND LAMAR LEGGITON.**

In Issues 19, 20, and 21, the Appellant contends that the trial court erred in sustaining the State's objections to the proffered testimony of defense witnesses Arty Hayes, Ashlye Sams, and Lamar Leggiton. The Appellant contends that all three witnesses should have been permitted to testify concerning statements the Appellant made to each of them in which he denied sexually assaulting Shania Gray. The Appellant contends the statements were not hearsay because they were admissible under Rule 801(e)(1)(B) as the Appellant's prior consistent statements. Appellant's contentions are without merit and these three issues should be overruled.

### *Applicable Law*

Hearsay is a statement, other than one made by the declarant while testifying at trial, offered in evidence to prove the truth of the matter asserted. Tex. R. Evid. 801(d). Hearsay statements are not admissible except as provided by statute or by the rules of evidence. Tex. R. Evid. 802. Generally, a witness's prior statement that is consistent with the witness's trial testimony is inadmissible hearsay. Tex. R. Evid. 613(c). However, a statement is not hearsay if the declarant testifies at the trial and is subject to cross-examination concerning the statement, and the

---

[12] In his brief, the Appellant cites to the name "Ashley Sims;" however, the record reflects the correct spelling of this witness's name to be "Ashlye Sams."

statement is consistent with the declarant's testimony and is offered to rebut an express or implied charge against the declarant of recent fabrication, improper influence, or motive. Tex. R. Evid. 801(e)(1)(B). The United States Supreme Court has set out, and this Court has approved, four requirements that must be met for prior consistent statements to be admissible:

(1) the declarant must testify at trial and be subject to cross-examination;

(2) there must be an express or implied charge of recent fabrication or improper influence or motive of the declarant's testimony by the opponent;

(3) the proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony; and,

(4) the prior consistent statement must be made prior to the time that the supposed motive to falsify arose.

*Hammons v. State*, 239 S.W.3d 798, 804 (Tex. Crim. App. 2007) (citing *Tome v. United States*, 513 U.S. 150,156–58 (1995)).

Rule 801(e)(1)(B) sets out a minimal foundation requirement of an implied or express charge of fabrication or improper motive, such that even an attack upon the accuracy of the witness's memory might suffice to permit the introduction of a prior consistent statement. *Hammons*, 239 S.W.3d at 804. However, the rule cannot be construed to permit the admission of what would otherwise be hearsay any time a witness's credibility or memory is challenged. *Id*. at 805.

The rationale for Rule 801(e)(1)(B) is relevancy. *Haughton v. State*, 805 S.W.2d 405, 408 (Tex. Crim. App. 1990). A declarant's prior consistent

135

statements are relevant to his credibility only when the prior statements were made prior to the time the supposed motive to falsify arose. *Id.*; *see also Hammons*, 239 S.W.3d at 804; *Johnson v. State*, 208 S.W.3d 478, 504 (Tex. App.—Austin 2006, pet. ref'd). A prior statement that is made after the motive to falsify arose lacks trustworthiness and is not relevant to the declarant's credibility at trial. *See generally Haughton*, 805 S.W.2d at 408. Such a statement does not rebut the charge of recent fabrication. *Johnson*, 208 S.W.3d at 504.

The trial court has substantial discretion to admit prior consistent statements under the rule. *Hammons*, 239 S.W.3d at 805. The trial court's ruling that a prior consistent statement is inadmissible is reviewed only for an abuse of discretion. *Id.*

### *Issue 19: Arty Hayes*

Before the defense called Arty Hayes to testify, the following exchange occurred:

THE COURT: Mr. Wyatt, this is your witness, correct?

MR. WYATT: Yes, Your Honor.

THE COURT: Are you going to proffer expected testimony?

MR. WYATT: Yes. The witness that will be called is Pastor Arty Hayes from Texarkana. He is the brother-in-law of Franklin Davis. The testimony that we anticipate coming from Mr. Hayes is about what Franklin Davis did in the meantime after the sexual assaults arose but before the murder case and what he had done to counsel Frank, what he had talked about with Frank, but -- and we believe all that is absolutely admissible.

But we wanted to bring to the State's attention that there are prior consistent statements which will be asked of Mr. Hayes. And we wanted to give the State -- tell them exactly what was going to be -- what we anticipate the testimony is going to be.

THE COURT: How is the talking with the defendant not being offered by the defendant and therefore subject to hearsay rule?

MR. WYATT: We're not asking about hearsay, Your Honor. We're asking about what happened. Not specifically about what exactly was said, but what exactly happened.

We don't believe it's hearsay. We don't believe it's hearsay because it's his statements about exactly what he was going through firsthand from the defendant, Your Honor. And under the rules, under 801(d)1(B), when we look at -- sorry. When we look at prior consistent statements, there's a four-prong test that must be adhered to.

Your Honor, under *Hammons vs. State*, Court of Criminal Appeals 239 S.W. 3d 798, 2000, Texas Court of Criminal Appeals case, Your Honor, and in that, we believe that the prongs of the prior consistent statement testimony have been met, Your Honor. Those prongs -- would you like me to –

THE COURT: Are you referring to 801(e)1(B)?
MR. WYATT: I'm sorry, yes.

THE COURT: It's not the rule you cited.

MR. WYATT: Yes, I cited the federal rule that they had in this case, Your Honor, so I was mistaken in that.

The four-prong test that they have is the declarant must testify at trial and be subject to cross-examination, as Mr. Davis has done.

There must be an expressed or implied charge of recent fabrication or improper influential motive of the declarant's testimony by the opponent. That's been taken care of by cross-examination of Mr. Davis.

137

The proponent must offer a prior statement that is consistent with the declarant's challenged in-court testimony. That prong has also been adhered to or satisfied in this case.

And No. 4, the prior consistent statement must be made prior to the time that the supposed motive to falsify arose, which is the murder charge.

All four prongs of that have been met, Your Honor, and we believe that Franklin's prior consistent statements, since they have been put into question by the prosecution, that they can absolutely come in at this point in time that he did not have sex with Shania Gray.

That's been questioned by the State, asked by the Defense in the exhibits that have been put in, all the videotapes that have been put in. So -- and the recordings by the State that Franklin Davis made. All those things that have been put into evidence satisfy those four prongs. We believe that we can call witnesses to testify to prior consistent statements of Mr. Davis in the guilt/innocent phase of the trial.

THE COURT: Response from the State?

MR. WILSON: The proffer fails to meet 801(e)1(B) specifically failing to show that the statement was a recent fabrication. These denials have been throughout, so there's no recent fabrication aspect to it, so therefore they failed to meet the evidentiary predicate. The testimony should be excluded.

[…]

THE COURT: Okay. You may call the witness. You will not be allowed to put on any consistent statements. It is not a recent fabrication or improper influence, as Mr. Wilson correctly argued, but you may put the witness on for the other matters that you indicated. Make sure you instruct him not to go into any prior consistent statements. You understand that?

138

(RR65: 253–56, 258).  Outside the presence of the jury, the defense called Hayes to make a record of the testimony that was being excluded. (RR65: 259–62). Hayes testified that he met with the Appellant after the Appellant was accused of sexually assaulting Shania Gray. (RR65: 260).  The Appellant had come to him for counseling and spiritual guidance, and he denied the allegations. (RR65: 260–62). The trial court and defense counsel instructed Hayes that he was not permitted to testify that the Appellant denied the allegations. (RR65: 262).  However, when Hayes testified before the jury, he ignored those instructions:

> MR. WYATT: When Frank came to see you, he came to see you specifically about some issues he was having, correct?
>
> HAYES: Yes, sir.
>
> MR. WYATT: Okay. And those issues being the allegations that he was facing concerning the allegations by Shania Gray of the sexual assault, right?
>
> HAYES: Yes, sir.
>
> [...]
> MR. WYATT: How was his demeanor when you took him into the pastor's study?
>
> HAYES: Well, he was -- he was -- he was very disturbed about the situation and different things like that, and just wanted to speak with us on it and -- and let us know, you know, that **I – I'm innocent man. I'm innocent**.
>
> THE COURT: Sir, I told you not to do that.
>
> HAYES: Excuse me. Your Honor, okay.

139

THE COURT: Don't do it again.

HAYES: Yes, sir. Yes, sir. Okay.

(RR65: 265, 267) (emphasis added).

Because Hayes testified to the exact statements the trial court excluded, the Appellant's complaint is moot. The jury was able to hear that the Appellant denied the sexual assault allegations during his counseling with Hayes, and the trial court did not instruct the jury to disregard the testimony. Accordingly, Appellant's Issue 19 should be overruled.

### *Issues 20 and 21: Ashlye Sams and Lamar Leggiton*

Prior to calling Ashlye Sams as a witness, the defense made a proffer of the testimony they intended to elicit from her. (RR65: 280–83). Sams testified that she had known Appellant for thirty years—her entire life. (RR65: 281). Sams also testified that she learned that the Appellant had been accused of the sexual assault of a child, and had spoken with him about the charges on the phone sometime in 2012. (RR65: 281). During the conversation, the Appellant denied the allegations and professed his innocence. (RR65: 281). The State objected to the proffered testimony. (RR65: 283). The trial court sustained the objection. (RR65: 283).

The defense also proffered the testimony of Lamar Leggiton. Leggiton testified that he and the Appellant had been best friends for twenty-five years. (RR65: 284). After Appellant was released from jail following his arrest for the

140

fours charges of sexual assault, Leggiton was able to talk to the Appellant on the phone. (RR65: 284). Appellant told Leggiton that he had not sexually assaulted Shania. (RR65: 285). The State objected to the proffered testimony, arguing that a proper predicate had not been established for admission under Rule 801(e)(1)(B) as a prior consistent statement. (RR65: 286). The trial court sustained the objection. (RR65: 287).

The trial court properly sustained the State's objections to the proffered testimony of Sams and Leggiton. Contrary to the Appellant's assertions, the Appellant failed to establish each of the four factors that predicate the admission of a prior consistent statement under Rule 801(e)(1)(B). As discussed above, this Court has recognized four requirements that must be met for prior consistent statements to be admissible as nonhearsay. *Hammons*, 239 S.W.3d at 804. Appellant has failed to satisfy two of the four requirements. First, Appellant failed to show that there was an express or implied charge of recent fabrication or improper influence or motive. *Id*. The record reflects that the Appellant had always denied that he sexually assaulted Shania. The State never made any suggestion that the Appellant's denial had ever deviated or that he had altered his testimony regarding the same. Rather, the State merely brought into question the Appellant's credibility, which does not equate to a charge of recent fabrication. *See* Tex. R. Evid. 611(b); *Bosquez v. State*, 446 S.W.3d 581, 586 (Tex.

App.—Fort Worth 2014, pet. ref'd); *Linney v. State*, 401 S.W.3d 764, 781–82 (Tex. App.—Houston [14th Dist.] 2013, pet. ref'd).

Additionally, Appellant's statements to Sams and Leggiton did not come prior to the time that his motive to falsify arose. *Hammons*, 239 S.W.3d at 804. While Appellant argued at trial that his motive to lie arose when he was charged with Shania's murder, in reality his motive to lie arose when he was indicted on four counts of sexual assault of a child. While the Appellant's statements were made prior to the murder, they occurred after the sexual assault charges. The sexual assault charges and the subsequent murder were intertwined. The State's theory in this case was that the Appellant murdered Shania in order to prevent her from appearing as a witness against him in the upcoming sexual assault trial. Accordingly, his motive to lie arose at the time of the sexual assault charges. *See Bosquez*, 446 S.W.3d at 586–87; *Johnson*, 208 S.W.3d at 503–04.

Because the Appellant failed to establish the predicate for the admission of his statements under Rule 801(e)(1)(B), the statements were hearsay offered solely to bolster the Appellant's credibility. Therefore, the exclusion of the complained-of testimony was a proper exercise of the trial court's discretion. Issues 19, 20 and 21 should be overruled.

**STATE'S RESPONSE TO ISSUE 22: THE TRIAL COURT PROPERLY DENIED THE APPELLANT'S REQUEST FOR A JURY INSTRUCTION ON ANTI-SPECULATION DURING THE GUILT-INNOCENCE STAGE OF HIS TRIAL.**

In Issue 22, Appellant contends that the trial court erred in denying his request for an instruction on anti-speculation in the jury charge during the guilt-innocence stage of the trial. Appellant's contention is without merit and should be overruled.

### *Pertinent Facts*

On November 8, 2013, during a brief discussion about the jury charge, the State and defense relayed that neither party had any objection to the charge. (RR64: 247–48). However, several days later on November 12, the following exchange occurred:

> THE COURT: Any objections to the charge?
>
> MR. PARKS: Let's hold off a minute. Let's talk about something.
>
> THE COURT: There were no objections yesterday.
>
> MR. PARKS: I understand. That's before I talked to my co-counsel, and he insists that I request a charge on anti-speculation.
>
> THE COURT: Okay. What's the State's response to that?
>
> MS. YEATTS: I'm not clear the charge being requested, Judge.
>
> MR. PARKS: The language would be a charge to the jury they must render a verdict based solely on the evidence that they have heard and not upon speculation.
>
> THE COURT: Okay. That request is denied. Anything else? Any other objections?

MR. PARKS: No, sir.

(RR66: 19–20).

### *Standard of Review and Applicable Law*

This Court's review of purported error in a jury charge involves a two-step process. *Kirsch v. State*, 357 S.W.3d 645, 649 (Tex. Crim. App. 2012). This Court must first determine whether error occurred. *Id.* If this Court finds no error, then the analysis ends. *Id.* If error occurred, then this Court must analyze the error for harm. *Id.*; *see also Almanza v. State*, 686 S.W.2d 157, 171 (Tex. Crim. App. 1985) (op. on reh'g). The degree of harm required for reversal depends on whether the error was preserved. *Kirsch*, 357 S.W.3d at 649; *Druery v. State*, 225 S.W.3d 491, 504 (Tex. Crim. App. 2007). Error properly preserved will require reversal as long as the error is not harmless. *Druery*, 225 S.W.3d at 504; *Almanza*, 686 S.W.2d at 171. When jury charge error is not preserved, the error must have been egregious, i.e., the error was so harmful that it denied the defendant a fair and impartial trial. *Druery*, 225 S.W.3d at 504; *Almanza,* 686 S.W.2d at 171. Upon review, this Court must consider the jury charge in its entirety, the state of the evidence, including contested issues and the weight of the probative evidence, the arguments of counsel and any other relevant information contained within the record. *Almanza,* 686 S.W.2d at 171; *see also Villarreal v. State*, 453 S.W.3d 429, 433 (Tex. Crim. App. 2015).

144

Article 36.14 of the Code of Criminal mandates that a trial court submit a charge setting forth the law "applicable to the case." Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007). A defendant must be given an opportunity to examine the charge and object to any errors of commission or omission. Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007). Generally, a defendant must object to the trial court's charge or submit special requested instructions in order to preserve error on appeal. Tex. Code Crim. Proc. Ann. art. 36.14, 36.15 (West 2007). Objections must distinctly specify each ground upon which they are predicated. Tex. Code Crim. Proc. Ann. art. 36.14 (West 2007). Objections and special requested instructions must be in writing or dictated to the court reporter. Tex. Code Crim. Proc. Ann. art. 36.14, 36.15 (West 2007).

### *Application*

At trial, Appellant failed to make a proffer of the requested instruction either orally or in writing. (RR66: 19–20). While Appellant stated that he wanted the court to instruct the jury that "they must render a verdict based solely on the evidence that they have heard and not upon speculation," this was not sufficient to meet the requirement of Article 36.15. (RR66: 19–20). Accordingly, the Appellant failed to properly preserve his complaint for review. Even if this issue was presented, it is without merit.

Appellant claims that the trial court should have included an instruction in the charge similar to the one found in *Thomas v. State*: "You will not consider, discuss, or speculate as to anything that is not shown or supported by the evidence in this case." *Thomas v. State*, No. 05-05-01379-CR, 2006 WL 2022404, 2006 Tex. App. LEXIS 6303, at *21 (Tex. App.—Dallas July 20, 2006, no pet.) (not designated for publication). In *Thomas*, the State attempted to admit "documents purporting to be 'certified copies of judgment[s] and sentences in prior cases'" for the defendant during the punishment phase of his trial. *Id*. at *20. The prosecution's sponsoring witness, a clerk of the court, was unable to testify that the defendant was the same person as the one named in the prior cases. *Id*. When the prosecution informed the court that they would need to call a fingerprint expert, the defendant objected on the grounds that the prosecution had not disclosed such a witness on their witness list. *Id*. The trial court sustained the objection and the evidence was not admitted. *Id*.

The defense then requested that the following instruction be included in the charge: "[T]he [S]tate attempted to offer certain documents into evidence that were not admitted by the Court. You are instructed that you cannot consider these documents, nor speculate to what they might have contained whatsoever in deliberating your punishment verdict." *Id*. at *20–21. The trial court denied the instruction, but instructed the jury as noted above and further included the jury that

146

it could not consider evidence of any prior crimes or bad acts unless it found beyond a reasonable doubt that appellant committed the prior crimes. *Id.* at *21. Accordingly, the instruction in *Thomas* was proper because it was meant to address a specific issue that arose during the trial.

Appellant, however, has failed to provide any authority in support of his claim that he was entitled to such an instruction in this case or that the trial court erred by denying the request. While the Appellant is correct that the jury may not base its verdict on mere speculation, juries are permitted to draw multiple reasonable inferences from the evidence. *Hooper v. State*, 214 S.W.3d 9, 16 (Tex. Crim. App. 2007). The jury was properly instructed in this case. The following instructions were included in the charge:

> You are the exclusive judges of the facts proved, of the credibility of the witnesses, and of the weight to be given to the testimony. But you are bound to receive and to follow the law of the Court.
>
> […]
>
> The jury is only permitted to receive evidence regarding the case from the witness stand. During your deliberations, you are not to consider, refer to, or discuss any matters or issues not in evidence before you.
>
> […]
>
> Mere sentiment, conjecture, sympathy, passion, prejudice, public opinion, or public feeling is to play no part in your deliberations.

(CR3: 168–69). Thus, the trial court properly instructed the jury not to consider anything outside of the evidence heard from the witness stand in reaching its

verdict or base its verdict on conjecture. The trial court did not err in denying Appellant's request for an anti-speculation instruction. Issue 22 should be overruled.

**STATE'S RESPONSE TO ISSUE 23: THE TRIAL COURT DID NOT ERR IN OVERRULING APPELLANT'S OBJECTION TO THE PROSECUTION'S JURY ARGUMENT DURING THE GUILT-INNOCENCE PHASE OF TRIAL.**

In Issue 23, Appellant contends that the trial court erred in overruling his objection to the State's closing argument during the guilt-innocence phase of trial. Appellant, however, fails to show that the complained-of argument was improper.

*Applicable Law*

The purpose of closing argument is to facilitate the jury's proper analysis of the evidence presented at trial so that it may arrive at a just and reasonable conclusion based on the evidence alone and not on any fact not admitted into evidence. *Campbell v. State*, 610 S.W.2d 754, 756 (Tex. Crim. App. [Panel Op.] 1980). Proper jury argument generally falls within one of four areas: (1) summation of the evidence, (2) reasonable deduction from the evidence, (3) answer to an argument of opposing counsel, and (4) plea for law enforcement. *Freeman v. State*, 340 S.W.3d 717, 727 (Tex. Crim. App. 2011).

The prosecutor may comment on the merits of the argument made by defense counsel or the defendant's credibility as a witness. *See, e.g., Garcia v. State*, 126 S.W.3d 921, 925 (Tex. Crim. App. 2004); *Satterwhite v. State*, 858

148

S.W.2d 412, 425 (Tex. Crim. App. 1993). However, argument that strikes at a defendant over the shoulders of defense counsel is improper. *See Davis v. State*, 329 S.W.3d 798, 821 (Tex. Crim. App. 2010); *Gallo*, 239 S.W.3d at 767; *Wilson v. State*, 7 S.W.3d 136, 147 (Tex. Crim. App. 1999). A prosecutor's argument runs a risk of improperly striking at a defendant over the shoulder of counsel when it is made in terms of defense counsel personally and when it explicitly impugns defense counsel's character. *Brown v. State*, 270 S.W.3d 564, 572 (Tex. Crim. App. 2008).

Even when an argument exceeds the permissible bounds of the approved areas, such will not constitute reversible error unless, in light of the record as a whole, the argument is extreme or manifestly improper, violative of a mandatory statute, or injects new facts harmful to the accused into the trial proceeding. *Wesbrook v. State*, 29 S.W.3d 103, 115 (Tex. Crim. App. 2000). The remarks must have been a willful and calculated effort on the part of the State to deprive appellant of a fair and impartial trial. *Id*. An instruction to disregard, which the jury is presumed to follow, will generally cure the improper argument. *Id*.

### *Application*

Appellant contends that the trial court erred in overruling his objection to the State's striking at him over defense counsel's shoulders and shifting the burden of proof during its closing argument in the guilt-innocence phase of his trial.

During closing argument in the guilt-innocence phase, defense counsel made

the following argument:

> MR. HAYES:  They have to prove to you beyond a reasonable doubt that this murder was committed to prevent something from happening in the future. And nothing has proven that [sic] you. There's been nothing. Four days of testimony about it being premeditated, that doesn't get them there. Four days of testimony that he was angry, that doesn't get them there. Four days of testimony that she filed charges, that doesn't get them there. Those retaliations, that doesn't get them there.
>
> In order to jump from first degree murder to capital murder, that very specifically has to be proven. That's what we talked to each of you about in voir dire, and that just didn't get them there.
>
> All you see was a guy who lost everything, who behaved in a horrible, horrible way and committed a horrible, horrible act.
>
> Think about it. Did you hear a single thing where he said, "I did it to keep her from testifying"?
>
> We played everything. There's 14 hours of Frank talking. Did he ever say that? There are even times when the detectives tried to get him to mention it. Detective Williams, top-notch detective, she couldn't get him to admit it. She tried to. She tried to pin him down. He said the exact same thing he told everybody else, "I told her how much she fucked up my life."
>
> Told her what she did in the past affected his life. He was at his breaking point because she ruined his life. "Fucked up everything. I couldn't take care of my kids, my household. Had to get rid of my car. I went from having diamond earrings and a nice job to being wiped out completely."
>
> Nothing about what was going to happen in the future. They tried to get him to pin it down.

Keep in mind, never searched anything about that particular offense, and he never talked to a lawyer. He didn't know what he was doing. They tried to walk him around the best they could, and he didn't give it to them. Do you know why? He lied a lot, but the thing he's being consistent about is why. Why he did it.

And unless they prove something other than that, he's guilty of murder. And he can still get up to a life sentence in murder. No one's trying to say he's not guilty, no one, because he is. But the system doesn't work unless you punish someone for what they did. The system never works if you punish someone for what the State wants you to do unless it's proven.

(RR66: 45–46). Defense counsel further argued:

MR. JOHNSON: So when you go back there, if you can even get past the fact that they didn't indict this case properly in the manner and means, the drowning, which is -- look at the autopsy, that's that it says. If you can get past that and you get to whether it's capital murder or just murder, you've got to come back with a verdict that is just murder, because it's not obstruction. Because that's not -- he did not kill her to prevent her from testifying, and that's what they have to prove. They didn't do that. They didn't do that beyond a reasonable doubt really.

Keep in mind, you come back with a verdict of murder, if you find it appropriate, you can still sentence Frank to life in prison. But at least do it for what the real charge is, what's really been proven to you.

(RR66: 58). In rebuttal, the State made the following complained-of argument:

MR. BIRMINGHAM: [H]e's the only person that said he didn't do it because she was a witness or reported a crime. He's the only one that says that.

It only comes from Frank. It only comes from Frank.

So what type of guy is Frank? He wants you to believe that he could beat these charges. Frank, the one whose credibility you're supposed to believe, the one who you're supposed to believe is a truth teller,

Franklin tells you, "I solved this case for Carrollton." He walks in and talks to Detective Chevallier and he says, "Y'all got it wrong. I'm going to tell you what happened because I think I can beat this case." He's telling you he can beat this capital murder case.

We spend two days talking about what we had, and the secret, the secret is in his phone. I agree with Franklin Davis 100 percent when he talks to Chevallier, "technology is a mother-fucker."

What do we get from the phone? What do we know before Franklin ever says he did anything? We know that his cell phone tower -- that his cell phone, here in State's Exhibit Number 37, was bouncing off the same tower as Shania Gray and Hebron High School. It was bouncing off the same tower as Sherry Gray and Hebron High School at the time that she went missing. It was bouncing off the towers the night before when he wasn't supposed to be anywhere in Mesquite. We know that not because Franklin told us, but because we solved that case.

Detective Williams solved that case. Andrew Hoog told us about those fake text messages, the ones that he says so tearfully, "You've got to believe me, I made these -- I didn't make these, Shania sent them to me, and they're going to get me off."

We solved that, not him. We knew that Franklin had these audio recordings because we had his phone. We knew that Franklin had this throw-away phone saved in his contacts. We knew that not because he told us, but because we investigated that case.

We knew that Shania died by asphyxiation and by gunshot wounds not because he told us, but because we did the autopsy in this case. We didn't need Franklin to tell you he did it. We knew he did it before he walked into that interrogation room.

***He wants you to give him credit and find him guilty of the lesser included offense of murder. They keep bringing up the punishment range. They want you to think about the punishment range. Make you feel better about doing something that's not supported by what Franklin says.***

MR. HAYES: Judge, now I have to object. I think that's improperly striking at the defendant over counsel's shoulder and it shifts the burden.

THE COURT: Fair reply. Overruled. Ten minutes.

MR. BIRMINGHAM: That's why they do that. They want you to look everywhere but what happened on the shores of the Trinity River.

(RR66: 66–69) (emphasis added).

Appellant argues that the comment referring to defense counsel's attempt to direct the jury away from the guilt-innocence stage of the trial suggested that defense counsel were misleading the jury, bringing their credibility and veracity with the jury into question. Appellant summarily argues that the comments were manifestly improper, harmful, and prejudicial.

The trial court properly overruled the Appellant's objection because the argument was made in response to the argument made by defense counsel. The prosecutor's comments were not a personal attack on defense counsel; rather, they were made in answer to counsel's argument that the jury should accept the Appellant's assertions that he killed Shania because she had ruined his life and not to prevent her from testifying against him, and therefore, he was guilty only of murder. On two occasions during the defense team's closing argument counsel mentioned that the jury could find the Appellant guilty of murder, the lesser offense, and still sentence the Appellant to life in prison.

It is clear from the context of the argument that the prosecutor's statement was not directed at defense counsel personally, but was an attack on the argument made by defense counsel.  Such an argument was permissible and appropriate. *See Garcia*, 126 S.W.3d at 925 (concluding that a prosecutor's argument that defense counsel was "going to put himself before twelve citizens of this community and he's going to argue that hogwash that you've heard" was merely a colorful way of attacking the merits of defense counsel's argument); *Banks v. State*, 643 S.W.2d 129, 134 (Tex. Crim. App. 1982) (holding "all these rabbit trails, all these smoke screens that he wants you to hide behind and chase down" proper as comment on defendant's failure to produce testimony other than his own words); *Hinojosa v. State*, 433 S.W.3d 742, 764–65 (Tex. App.—San Antonio 2014, pet. ref'd) (deciding that prosecutor's use of terms such as "tactics," "smoke and mirrors," and "hide the ball" were appropriate in response to the argument made by defense counsel); *Acosta v. State*, 411 S.W.3d 76, 93–94 (Tex. App.—Houston [1st Dist.] 2013, no pet.) (concluding that prosecutor's argument that the jury should "not to be fooled" by evidence presented by the defense, which was "good lawyering," was proper in response to the argument made by defense counsel).  Consequently, the trial court did not err by overruling the Appellant's objection to this argument.

### *Error, if any, was Harmless*

Further, even if this Court were to find that the State's argument was improper, any error was harmless. Improper argument is non-constitutional error, and non-constitutional error that does not affect a defendant's substantial rights must be disregarded. *Brown*, 270 S.W.3d at 572; Tex. R. App. P. 44.2(b). To determine whether an appellant's substantial rights were affected, an appellate court balances three factors: (1) the severity of the misconduct (i.e., the prejudicial effect), (2) any curative measures, and (3) the certainty of conviction absent the misconduct. *See Brown*, 270 S.W.3d at 572–73. In evaluating the severity of the misconduct, the reviewing court must assess whether the argument injected new and harmful facts or was, in light of the entire argument, extreme or manifestly unjust and willfully calculated to deprive appellant of a fair and impartial trial. *Id.* at 573.

Viewing the State's closing argument as a whole, the record does not demonstrate that there was a willful, calculated effort to deprive the Appellant of a fair and impartial trial. The prosecutor's argument was made in response to the argument made by defense counsel that the jury could still sentence the Appellant to life in prison if they found him guilty of murder rather than capital murder. It is clear from the context of the argument that the prosecutor did not have an improper

motive and the complained-of statements were only a small portion of the whole argument.

Finally, the evidence of Appellant's guilt was overwhelming. The Appellant testified that he murdered Shania. The only disputed issue was whether Appellant had done so in order to prevent her from testifying against him in the upcoming sexual assault trial. While Appellant vehemently denied this and instead argued that he killed her because she had ruined his life, there was considerable evidence that proved the Appellant killed Shania to prevent her from testifying.

The State presented evidence of the Appellant's elaborate plan to manipulate Shania using a false identity. The evidence showed that Appellant pretended to be a young man named "D" who was interested in getting to know Shania. The Appellant called Shania using this false identity and recorded their conversations. In the conversations, the Appellant manipulated Shania into talking about the sexual assault allegations and about her sexual history, hoping to get Shania to make statements that he could use to attack her credibility at the trial.

He also attempted to dissuade her from testifying by suggesting that she could go to jail if she was caught lying and by telling her that the man she was testifying against might hold a grudge against her and come after her when he got out of jail. When this tactic ultimately failed, the Appellant created a series of fake text messages, which he intended to use as evidence at the trial. The six messages,

all appearing to be from Shania, contained her alleged recantation of the sexual assault allegations.

The Appellant then used the false identity to lure Shania into a meeting, during which he drove her to a secluded portion of the Trinity River, forced her to walk down an embankment to the river, and shot her in the back. When she fell into the water, the Appellant shot her again in the neck. He then pulled her out of the water, laid her on the ground, and placed his foot on her throat until she stopped breathing. After rolling her body into the river, he left the scene to dispose of the gun and other evidence. When questioned by the police about Shania's disappearance, the Appellant denied any involvement, and continued to maintain that he was innocent of the sexual assault charges. The Appellant relied on the fake text messages as evidence that he was innocent of the sexual assaults and also as evidence that he would have had no reason to harm Shania now that she had recanted.

Based on this evidence, the jury most certainly would have convicted Appellant regardless of the prosecutor's statements. Thus, any error in the prosecutor's argument did not affect appellant's substantial rights. *See Brown*, 270 S.W.3d at 572; Tex. R. App. P. 44.2(b). Accordingly, Issue 23 is without merit and should be overruled.

157

In Issue 24, the Appellant contends that there was insufficient evidence to support the jury's answer to Special Issue No. 1, the future dangerousness special issue. Specifically, the Appellant asserts that he had no prior violent offense convictions and defense witnesses testified that he was essentially a low risk for future dangerousness. (Appellant's Brief at pp. 113–16). Appellant's contentions are without merit and should be overruled.

## *Applicable Law*

The State has the burden of proving the punishment issue of future dangerousness beyond a reasonable doubt. Tex. Code Crim. Proc. Ann. art. 37.071, §§ 2(b)(1), 2(c) (West Supp. 2014). In assessing the legal sufficiency of the evidence of future dangerousness, this Court views the evidence in the light most favorable to the verdict to determine whether a rational trier of fact could have found beyond a reasonable doubt that there is a probability that the appellant would commit criminal acts of violence that would constitute a continuing threat to society. *See Estrada*, 313 S.W.3d at 284.

In its determination of the special issues, the jury is entitled to consider all the evidence presented at the guilt phase of the trial, in addition to the evidence presented at the punishment phase. *Young*, 283 S.W.3d at 863. Some factors the jury may consider when determining whether appellant will pose a continuing

threat to society include: (1) the circumstances of the offense, including the defendant's state of mind and whether he was working alone or with other parties; (2) the calculated nature of his acts; (3) the forethought and deliberateness exhibited by the crime's execution; (4) the existence of a prior criminal record and the severity of the prior crimes; (5) the defendant's age and personal circumstances at the time of the offense; (6) whether the defendant was acting under duress or the domination of another at the time of the offense; (7) psychiatric evidence; and (8) character evidence. *See Wardrip v. State*, 56 S.W.3d 588, 594 (Tex. Crim. App. 2001); *Keeton v. State*, 724 S.W.2d 58, 61 (Tex. Crim. App. 1987). The circumstances of the offense and the events surrounding it may be sufficient in some instances to sustain a "yes" answer to the future-dangerousness special issue. *Young*, 283 S.W.3d at 863.

### *Application*

The evidence from both phases of the trial unquestionably demonstrates Appellant's future dangerousness. First, the facts of the offense, standing alone, are sufficient to support the jury's finding. The evidence showed that in April 2011 Shania made an outcry of sexual assault, telling her mother that the Appellant had assaulted her while she was babysitting his daughter and two other children. As a result of that admission, the Appellant was indicted on four counts of sexual

assault of a child in August 2011.  One year later, the Appellant was notified that the trial on the charges was set for October 29, 2012.

With only a few months until the trial, the Appellant began an elaborate plan to manipulate Shania into dropping the charges against him.  First, the Appellant created a false identity.  The Appellant found a Facebook profile for a young man that he believed Shania would find attractive, Artis Powell.  The Appellant contacted Shania and told her that he had seen her Facebook profile and wanted to get to know her.  The Appellant told Shania that he was Powell, but went by the nickname "D" because his middle name was Dwayne.  The Appellant then used a "throwaway phone" he purchased at Walmart to call Shania while pretending to be "D."  The Appellant recorded the conversations with Shania on his T-Mobile smart phone.

In the conversations, the Appellant attempted to elicit statements he could use against her at the sexual assault trial.  He manipulated her into talking to him about the sexual assaults, trying to get her to make statements that were inconsistent with what she told the police.   The Appellant also asked Shania about her past sexual relationships, looking for information he could use to disparage her character.  He attempted to dissuade her from testifying by suggesting that she could go to prison if she was caught lying.  He also told her that the man she was testifying against might hold a grudge against her if he went to prison and might

160

come after her when he was released.  The Appellant also suggested that she go to the police and tell them that she lied, so the charges would be dropped. He assured her that the police would not do anything to her because she was a minor.  Despite the Appellant's repeated manipulations, Shania did not recant the allegations or request to drop the charges.

When this tactic failed, the Appellant murdered Shania.  Realizing that Shania had a "crush" on "D," the Appellant lured her into meeting him after school.  The Appellant drove Shania to a secluded area at Sam Houston Trail Park and forced her to walk down an embankment to the Trinity River.  The Appellant then shot her in the back.  When she fell into the water, the Appellant shot her a second time in the neck.  When the Appellant realized she was not dead, he pulled her out of the water, laid her on the ground, and placed his foot on her throat until she stopped breathing.  The Appellant then rolled her body into the river and left the scene to dispose of the gun and other evidence.

The Appellant also created a series of fake text messages that he intended to use as evidence at the sexual assault trial.  The messages, made using an application he installed on his smart phone, appeared to be from Shania and contained a recantation of the sexual assault allegations.  When first questioned by the police, the Appellant denied any involvement in Shania's disappearance and also claimed that he had text messages that proved he was innocent of the sexual

assault charges. Even after he ultimately confessed to the murder, the Appellant continued to tell the detectives and the media about the text messages, never admitting to anyone that they were fake.

The calculated and deliberate nature of the Appellant's actions in committing this violent and heinous murder was sufficient to support the jury's finding of future dangerousness. *See Druery v. State*, 225 S.W.3d 491, 507 (Tex. Crim. App. 2007) (the circumstances of an offense can be some of the most revealing evidence of future dangerousness and may be sufficient to independently support an affirmative answer to the future dangerousness issue).

The State, however, did not rely solely on the facts of the offense to prove the Appellant's future dangerousness. During the punishment phase of his trial, the jury also heard about the Appellant's escape from Parkland Hospital while in police custody awaiting trial for capital murder.

Dallas County Sheriff's Deputy Steven Underwood was assigned to guard the Appellant on the evening of December 4, 2012. (RR66: 147). The Appellant had been admitted to Parkland Hospital on December 1, 2012 after complaining that he was dizzy. (RR68: 68). This was the Appellant's sixth trip to Parkland since his arrest. (RR68: 67–68). Underwood testified that the Appellant was due to be discharged at 9:30pm. (RR66: 147). At approximately 8:00pm, shortly after Underwood returned from a break, the Appellant asked Underwood if he could

162

take a shower before going back to jail. (RR65: 147).  Underwood agreed and decided to remove the Appellant's leg restraints and handcuffs. (RR66: 148).

Once the leg restraints were removed, the Appellant sat up on the side of the bed and faced Underwood. (RR66: 148).  When the handcuffs were also removed, the Appellant said: "I'm sorry, man," and grabbed Underwood by his gun holster and vest and backed him into the wall. (RR66: 148–50).  Underwood testified that the Appellant had some type of sharp object in his left hand and told him that he would cut him if he moved. (RR66: 150–51).  Underwood testified that he grabbed the Appellant and backed him into the left corner of the room. (RR66: 151).  The two wrestled around and the Appellant reached for Underwood's gun. (RR66: 151).

Underwood tried to knock the Appellant to the ground but was unable to; instead, the Appellant landed on a nightstand. (RR66: 151–52).  The two continued to wrestle, and then Underwood heard a "pop." (RR66: 152).  Underwood's holster had broken and the Appellant had his gun. (RR66: 152).  Underwood testified that he focused on holding onto the gun and keeping it pointed away from him during the struggle. (RR66: 152–53).  However, the Appellant was able to free himself from Underwood and pointed the gun at him. (RR66: 153–54).  The gun was a fully loaded 40-caliber Glock 22. (RR66: 167, 170).  Underwood put his hands in the air and complied with the Appellant's commands to get on the ground. (RR66:

155–56).  The Appellant then fled the room. (RR66: 157).  Later that night, Dallas SWAT was able to locate the Appellant a few blocks away from Parkland Hospital in a red Austin's Barbeque van parked between two buildings. (RR67: 54, 57–61; SX: 292–95).  Approximately twenty to twenty-five SWAT officers responded to the location. (RR67: 55).  After an unsuccessful attempt to negotiate with the SWAT team, the Appellant surrendered. (RR67: 61).

The State also presented evidence of the Appellant's history of emotionally and physically abusing the women in his life.  The Appellant testified on cross-examination that he had five children. (RR65: 182).  However, he also acknowledged that could have as many as eleven children. (RR65: 182–83).  Four of the mothers of his children testified at his trial concerning the abuse they suffered during their relationships.

Linda Crawford, the mother of the Appellant's twelve year-old son Trey, testified about multiple incidents in which the Appellant was physically violent with her. (RR66: 80).  Linda met the Appellant in 2000 when she was sixteen and the Appellant was eighteen. (RR66: 80–81).  Linda became pregnant with Trey a few months after the two began dating. (RR66: 83).  The first incident in which the Appellant became violent with her occurred when she was seven or eight months pregnant with Trey. (RR66: 85).  Linda surprised the Appellant at his apartment and found him with another woman. (RR66: 85, 101).  Linda tried to push her way

into the apartment, but the Appellant came outside, pushed her and told her to "get going and don't come around here." (RR66: 86, 103–04). He grabbed her by the throat and held her against the building, again telling her to leave. (RR66: 86). He pushed her and shoved her away from the apartment, all the way to a nearby convenience store. (RR66: 86).

Linda testified that sometime in 2001, after Trey was born, the Appellant called her to come over to his apartment so that they could be "intimate." (RR66: 87). While she was at his apartment, Labrena, the mother of Appellant's other son, returned home and wanted to know why Linda was there. (RR66: 87–88, 106). The Appellant pretended not to know, and feeling embarrassed, Linda began to argue with him. (RR66: 88). At one point, Linda threw a baby's milk bottle at the Appellant, hitting him in the face. (RR66: 116). The Appellant picked up the bottle and poured the milk over her head. (RR66: 116, 118–19).

As Linda was leaving, the Appellant swung a clothes hanger at her and hit her on her arm. (RR66: 88). Linda was holding Trey, who was a few months old at the time, and had to "let him go" in order to defend herself. (RR66: 88). She was able to catch Trey before he hit the ground, but she ended up with a cut on her arm from the clothes hanger. (RR66: 88). Following this incident, Linda's father called the police and Appellant was arrested for assault. (RR66: 88).

Linda testified that she knew the Appellant had multiple other children. (RR66: 89). He had a thirteen year-old daughter named Kurstyne with Latrice Brown, a twelve year-old son named Ahmad with Labrena Henderson, and another son named TK with a woman named Nicole. (RR66: 89–90). Linda did not learn that TK was the Appellant's son until he was arrested in this case, despite the fact that TK and his mother lived in her apartment complex and her son played with TK. (RR66: 90).

Labrena Henderson, the mother of the Appellant's son Ahmad, testified that she met the Appellant in 1999 while working at a McDonalds in Texarkana. (RR66: 122–23). The two began a romantic relationship and Linda gave birth to Ahmad Davis on September 24, 2001. (RR66: 124). Labrena testified that the Appellant, who was living with her at that time, would leave at night and not come back for days at a time. (RR66: 127). When he returned, she would ask him where he had been and he would get upset. (RR66: 128). On one occasion, he pushed her against the wall. (RR66: 127–28). Labrena immediately left and went to her mother's house. (RR66: 128).

Jennifer Dibrell, the mother of the Appellant's daughter Dezire, testified about several incidents of violence involving the Appellant. (RR67: 73–74). When Jennifer was pregnant with Dezire, she and the Appellant got into an altercation when she found out that the Appellant was with another woman rather than at his

166

sister's house. (RR67: 75). During that altercation, the Appellant grabbed her, and pinned her by her arms so that she could not move, and whispered in her ear: "I hope you lose your baby." (RR67: 75).

On another occasion, after Dezire was born, the Appellant pulled a knife on her during an argument. (RR67: 77). Dezire was present and saw the entire incident. (RR67: 78). Jennifer grabbed Dezire and held her so that the Appellant would not hurt either of them. (RR67: 77–78). On another occasion, the Appellant shot her in the leg with a BB gun during an argument. (RR67: 78). Finally, Jennifer testified that the Appellant forced her to have anal sex after one of their arguments. (RR67: 79–80). Jennifer testified that she felt that the Appellant was manipulative. (RR67: 80–81). When she caught him in a lie, he would act like she was crazy and tried to make other people think she was crazy too. (RR67: 80–81).

The Appellant was also violent with his wife Jawanna Arrington. Jawanna and the Appellant became engaged in August 2010 and married in June 2011. (RR66: 201–02). Jawanna testified that the Appellant "put his hands on her" on several occasions. (RR66: 202). He choked her, threatened her with knives, and on two occasions, put a gun to her head. (RR66: 202, 209–10). Jawanna testified that the violent incidents would begin with an argument, and when she responded to his anger with silence, he would grab her around the neck with both hands and choke

her. (RR66: 202–03). Jawanna testified that this happened more than twenty times over the course of their relationship. (RR66: 204).

Jawanna testified that they would argue about everything from the Appellant having a bad day to her catching him texting other women. (RR66: 205). On one occasion when they were arguing over her cell phone, the Appellant forced Jawanna to the floor against the fireplace. (RR66: 204). She ended up with bruises and scratches on her back from the bricks on the fireplace. (RR66: 204). Jawanna did not call the police because she loved the Appellant and did not want him to get in trouble, nor did she want her family to find out about the abuse. (RR66: 203).

Finally, the State offered certified copies of the Appellant's four prior convictions for: (1) burglary of a motor vehicle in 2001; (2) evading arrest in 2001; (3) failure to identify in 2001; and (4) fleeing or attempting to elude a police officer in 2007. (RR66: 138–142; SX: 244–48).

Appellant challenges the sufficiency of the evidence based on the lack of prior convictions for violent offenses and because defense witnesses testified that he was a low risk for future dangerousness. The Appellant's argument, however, fails to consider the substantial evidence of violence in his relationships. The evidence showed that the Appellant would lie and manipulate to get what he wanted. Over the course of five years he had five children with five different women. In fact, Linda, the mother of his son Trey, did not find out that TK was

168

the Appellant's son until this trial, even though he lived in the same apartment complex with her and played with her son. The Appellant was able to convince multiple women to continue their sexual relationships with him after he had left them for another woman. The evidence showed that the Appellant responded with violence when any of the women he was in a relationship with attempted to question or challenge him about his infidelity. The Appellant was manipulative and violent with men as well. He was able to get Deputy Underwood to remove his restraints under the pretense of taking a shower, then used that opportunity to overpower Underwood, steal his gun, and escape.

Viewed in the light most favorable to the verdict, there is sufficient evidence for a rational jury to find beyond a reasonable doubt that there is a probability that the Appellant would commit criminal acts of violence that would constitute a continuing threat to society. Thus, the evidence was legally sufficient to support the jury's answer to the future dangerousness special issue, and Issue 24 should be overruled.

**STATE'S RESPONSE TO ISSUES 25-35: THE TRIAL COURT PROPERLY DENIED APPELLANT'S REQUESTED JURY INSTRUCTIONS AND OVERRULED HIS OBJECTIONS TO THE CHARGE.**

In Issues 25 through 35, Appellant contends that the trial court erred in denying his requested instructions and overruling his objections to the court's

punishment charge. (Appellant's Brief at pp. 117–41). The Appellant's contentions lack merit and should be overruled.

On November 12, 2013, the Appellant filed a motion entitled "Defendant's Objections to the Charge at Punishment." (CR3: 174–89). In that motion, the Appellant raised 55 objections to the trial court's punishment charge. (CR3: 174–89). The Appellant's objections were overruled. (RR68: 130).

In Issue 25, the Appellant recites verbatim the paragraphs titled "Objections to Language in the Body of the Instructions" from his "Defendant's Objections to the Charge at Punishment." (CR3: 174–80). In Issues 26 through 35, the Appellant recites verbatim the paragraphs titled "Defendant's Objections to the Verdict Forms" from his "Defendant's Objections to the Charge at Punishment." (CR3: 174–88).

In his briefing on appeal, the Appellant asserts no additional analysis and provides no law other than that presented to the trial court. He concedes that similar claims have been previously rejected by this Court. Appellant indicates these issues are included in his direct appeal brief in order to preserve them for subsequent review by the federal courts. Although he asks this Court to reconsider its prior rulings, he does nothing to persuade the Court that its prior decisions were incorrect.

To the extent that the State is able to discern the Appellant's objections or requested instruction, the State agrees that with Appellant his claims are foreclosed by well-settled law. (*See* Appellant's Brief at p. 117). Where possible, the State has attempted to address the Appellant's claims or has attempted to provide the Court with a citation to the applicable statute or to authority wherein the same or similar issue, instruction, or objection has been addressed and rejected.

### Issue 25: Objections to the Punishment Charge

### Issue 25

- 25(1): The trial court's punishment charge does not contain the complained-of language: "In order for the Court to assess proper punishment ...." (CR3: 190–97).

- 25(2): The trial court's punishment charge does not contain language "instructing each juror as if it [sic] he/she were one decision making body." (CR3: 190–97).

- 25(3): Appellant objects to particular language used in the charge pertaining to answering the special issues, including the use of "determine," "shall answer," or "arriving at the answers to." (CR3: 175). The court's charge only utilized the phrase "shall answer" in one instance—in Appellant's favor.[13] Generally regarding the jury's answers to the special issues, the trial court used a combination of "duty to determine," "in deliberating on," "shall next consider," "in arriving at," and "in determining your answers." (CR3: 190–95). Appellant presents no support, either at trial or on appeal, for the contention that use of this language was erroneous or violated his constitutional rights.

---

[13] Regarding special issue number one, the charge instructed the jurors that if they did not find beyond a reasonable doubt that the answer to the first special issue (regarding future dangerousness) should be yes or if they had a reasonable doubt as to the answer, then they "shall answer" the special issue "no." (CR3: 191).

- 25(4): The punishment charge did not utilize the term "mandatory punishment."

- 25(5): *Mays v. State*, 318 S.W.3d 368, 397 (Tex. Crim. App. 2010); *Martinez v. State*, 924 S.W.2d 693, 698–99 (Tex. Crim. App. 1996); *see also Luna v. State*, 268 S.W.3d 594, 609–10 (Tex. Crim. App. 2008).

- 25(6): Appellant seems to complain that the trial court failed to explain to the jury that its directive to consider "all of the evidence" controls over the definition of mitigating evidence (evidence that a juror might regard as reducing the Defendant's moral blameworthiness). Such an instruction, for the jury to prioritize one instruction and disregard another, would be wholly improper, and the State asks this Court to reject this complaint.

- 25(7): *Estrada*, 313 S.W.3d at 306–07; *Gardner v. State*, 306 S.W.3d 274, 303 (Tex. Crim. App. 2009).

- 25(8): *Russeau v. State*, 291 S.W.3d 426, 434–35 (Tex. Crim. App. 2009).

- 25(9): *Rodriguez v. State*, No. AP-75,901, 2011 Tex. Crim. App. Unpub. LEXIS 320, at *62–63 (Tex. Crim. App. Mar. 16, 2011) (not designated for publication).

- 25(10): Appellant complains that a charge which lists the death sentence option first in reciting the available sentencing options erroneously implies that death is the default sentence. Appellant presents no support, either at trial or on appeal, for the contention that informing the jury that the available punishments are "either death or confinement . . . for life without parole" was erroneous or violated his constitutional rights.

- 25(11): *Soliz v. State*, 432 S.W.3d 895, 904 (Tex. Crim. App. 2014).

- 25(12): Appellant complains that the trial court should have substituted "[n]one of you have to agree on why you vote 'No' on Special Issue No. 1 or why you vote 'Yes' on Issue No. 2" for the following statutory language: "Members of the jury need not agree on what particular evidence supports a negative answer to Special Issue No. 1." However,

Appellant presents no support, either at trial or on appeal, for the contention that the statutory language the trial court used was erroneous or violated his constitutional rights.

- 25(13): The charge does not contain the complained-of instruction that the State's proof must only exclude all reasonable doubt.

- 25(14): Appellant objects to the Court failing to provide an instruction that each juror individually should determine what reasonable doubt means. Appellant presents no support, either at trial or on appeal, for the contention that failure to give such a written instruction was erroneous or violated his constitutional rights.

- 25(15): *Saldano v. State*, 232 S.W.3d 77, 106–07 (Tex. Crim. App 2007).

- 25(16): *Mays*, 318 S.W.3d at 396; *Cantu v. State*, 939 S.W.2d 627, 649 (Tex. Crim. App. 1997).

- 25(17): Appellant alleges that the trial court's instruction to the jury to not be swayed by mere sentiment, conjecture, or sympathy, when applied to the mitigation special issue, improperly limits the scope of evidence the jurors might consider. Appellant provides no support for this allegation, and the State asks this Court to reject his contention as unfounded.

- 25(18): Appellant sought an instruction that each juror's opinion was to be respected and any juror who felt bullied, harassed, or intimidated should pass a note indicating so to the bailiff. Failure to provide such an instruction was not erroneous and did not violate Appellant's constitutional rights, and the State asks this Court to reject this complaint.

### Issues 26-35: Objections to the Verdict Form

### Issue 26

- The Appellant does not present an Issue 26.

## *Issue 27*

- *Renteria*, 206 S.W.3d at 709; *Russeau v. State,* 171 S.W.3d 871, 886 (Tex. Crim. App. 2005).

## *Issue 28*

- 28(1)-28(11):  *Russeau*, 291 S.W.3d at 434; *Escamilla v. State*, 143 S.W.3d 814, 828 (Tex. Crim. App. 2004); *Blue v. State*, 125 S.W.3d 491, 504–05 (Tex. Crim. App. 2003).

## *Issue 29*

- 29(1)-29(2):  *Russeau*, 291 S.W.3d at 434; *Druery*, 225 S.W.3d at 509.

## *Issue 30*

- 30(1)-30(4):  *Russeau*, 291 S.W.3d at 435; *Druery*, 225 S.W.3d at 509; *Escamilla*, 143 S.W.3d at 828; *Ladd*, 3 S.W.3d at 572–73.

## *Issue 31*

- 31(1):  *Jackson v. State*, 33 S.W.3d 828, 833–34 (Tex. Crim. App. 2000); *Espada v. State*, No. AP-75,219, 2008 Tex. Crim. App. Unpub. LEXIS 806, at *38–39 (Tex. Crim. App. 2008) (not designated for publication).

- 31(2):  *Espada*, 2008 Tex. Crim. App. Unpub. LEXIS 806, at *39–40.

- 31(3):  *Saldano*, 232 S.W.3d at 105–07.

- 31(4):  *Mosley v. State*, 983 S.W.2d 249, 261 n.16 (Tex. Crim. App. 1998); *Espada*, 2008 Tex. Crim. App. Unpub. LEXIS 806, at *39.

## *Issue 32*

- 32(1):  *Saldano*, 232 S.W.3d at 106.

- 32(2):  *Russeau*, 291 S.W.3d at 434–36.

- 32(3)-(5):  *Saldano*, 232 S.W.3d at 105–07.

- 32(6): *Raby v. State*, 970 S.W.2d 1, 9 (Tex. Crim. App. 1998).

- 32(7)-(8): *Saldano*, 232 S.W.3d at 105–07.

- 32(9): *Saldano*, 232 S.W.3d at 105–07; *Thuesen v. State*, No. AP-76,375, 2014 Tex. Crim. App. Unpub. LEXIS 191, at *159–60 (Tex. Crim. App. Feb 26, 2014) (not designated for publication).

### *Issue 33*

- 33(1): *Smith v. State*, 297 S.W.3d 260, 278 (Tex. Crim. App. 2009); *Russeau*, 291 S.W.3d at 886.

- 33(2): Tex. Code Crim. Proc. Ann. art. 37.071, § 2(a) (West Supp. 2014); *Threadgill v. State*, 146 S.W.3d 654, 672 (Tex. Crim. App. 2009).

- 33(3): *Cantu*, 939 S.W.2d at 644.

### *Issue 34*

- 34(1)-(2): *Renteria*, 206 S.W.3d at 709; *Russeau,* 171 S.W.3d at 886.

### *Issue 35*

- *Russeau*, 291 S.W.3d at 436; *Saldano*, 232 S.W.3d at 105–07.

### *Conclusion*

The trial court did not abuse its discretion in denying Appellant's requested instructions or in overruling Appellant's objections to the charge. Accordingly, the State asks this Court to overrule Issues 25 through 35 as meritless.

**STATE'S RESPONSE TO ISSUES 36-37: THE TRIAL COURT PROPERLY DENIED APPELLANT'S REQUESTED JURY INSTRUCTION DEFINING EVIDENCE THAT REDUCES "MORAL BLAMEWORTHINESS."**

In Issues 36 and 37, Appellant contends that the trial court erred in denying his requested instruction defining evidence that reduces "moral blameworthiness." On April 30, 2013, the Appellant filed a pretrial motion entitled "Defense's Requested Charge Defining Evidence That Reduces Moral Blameworthiness.[14]" (CR2: 120, 126, 132). The State filed a response the same day. (CR2: 138–43). The trial court denied the motion on May 2, 2013. (CR2: 125, 137).

In his motion, Appellant challenges Article 37.071, sections 2(e)(1) and 2(f)(4), arguing that the sections are unconstitutional because they narrow the jury's consideration of mitigating factors. (CR2: 120–37); Tex. Code Crim. Proc. Ann. art. 37.071, §§ 2(e)(1), 2(f)(4) (West Supp. 2014). As explained in the State's response, and as Appellant acknowledges in his brief, this Court has already considered these arguments and has rejected them. *See Roberts v. State*, 220 S.W.3d 521, 534 (Tex. Crim. App. 2007); *see also Coble v. State*, 330 S.W.3d 253, 296 (Tex. Crim. App. 2010); *Mays*, 318 S.W.3d at 396. While Appellant requests that this Court review these issues again and reverse its position, he presents no new arguments for the State to address. Accordingly, the State asks

---

[14] It appears to undersigned counsel that the Appellant filed three copies of this motion.

this Court to decline his invitation to revisit these claims and overrule Issues 36 and 37.

### STATE'S RESPONSE TO ISSUES 38-48: THE TRIAL COURT PROPERLY DENIED APPELLANT'S CHALLENGES TO THE DEATH PENALTY STATUTE.

In Issues 38 through 48, Appellant challenges the constitutionality of the Texas death penalty statute. He acknowledges that these issues have been previously submitted to this Court and overruled, citing *Saldano v. State*, 232 S.W.3d 77 (Tex. Crim. App. 2007). Nonetheless, he raises these grounds to invite this Court to review its prior stance on these issues and to preserve the issues for further review in the federal courts. (Appellant's Brief at p. 143).

In Issue 38, Appellant contends that the trial court erred in denying his pretrial motion entitled "Motion Requesting the Court to Find Tex. Code Crim. Proc. Art. 37.071 Section 2(f)(4) to be Unconstitutional." (Appellant's Brief at p. 143).

In Issue 39, Appellant contends that trial court erred in denying his pretrial motion entitled "Motion to Declare the '10-12 Rule' Unconstitutional." (Appellant's Brief at p. 144).

In Issue 40, Appellant contends that the trial court erred in denying his pretrial motion entitled "Motion for Court to Find Art. 37.071 of the Texas Code of Criminal Procedure Unconstitutional as Applied to this Defendant." (Appellant's Brief at p. 144).

In Issue 41, Appellant contends that the trial court erred in denying his pretrial motion entitled "Motion to Declare the Capital Sentencing Statute Unconstitutional Because it Allows Juries to Decide Future Dangerousness Based Solely of the Factors of the Case." (Appellant's Brief at p. 144).

In Issue 42, Appellant contends that the trial court erred in denying his pretrial motion entitled "Motion to Preclude Death as a Sentencing Option and to Declare Texas Death Penalty Statute Unconstitutional Because of Juror's Inability to Predict Future Dangerousness." (Appellant's Brief at p. 144).

In Issue 43, Appellant contends that the trial court erred in denying his pretrial motion entitled "Motion to Declare the Capital Sentencing Statute Unconstitutional Because it Has Become a *De Facto* Mandatory Death Penalty Statute." (Appellant's Brief at p. 144).

In Issue 44, Appellant contends that the trial court erred in denying his pretrial motion entitled "Motion to Find that the Death Penalty in the State of Texas is Unconstitutional on the Ground that its Capital Sentencing Procedure Fails to Meet Minimum Requirements Set Forth in *Furman v. Georgia* and its Progeny, as Evinced by the Findings of the Capital Jury Project and other Research." (Appellant's Brief at p. 145).

In Issue 45, Appellant contends that the trial court erred in denying his pretrial motion entitled "Motion to Declare Article 37.071, § 2(a) of the Code of

178

Criminal Procedure Unconstitutional on its Face under Due Course of Law and Due Process." (Appellant's Brief at p. 145).

In Issue 46, Appellant contends that the trial court erred in denying his pretrial motion entitled "Motion to Declare Article 37.071, § 2(a) of the Code of Criminal Procedure Unconstitutional on its Face for Lack of Standards." (Appellant's Brief at p. 145).

In Issue 47, Appellant contends that the trial court erred in denying his pretrial motion entitled "Motion to Hold Statutory Definition of Mitigating Evidence Unconstitutional, as Applied to Impose a 'Nexus' Limitation, and to Grant Defendant's Requested Clarifying Voir Dire, Instruction, Argument and Motion in Limine." (Appellant's Brief at p. 145).

In Issue 48, Appellant contends that the trial court erred in denying his pretrial motion entitled "Motion to Preclude the Death Penalty as Sentencing Option (Denial of Equal Protection)." (Appellant's Brief at p. 146).

Appellant invites this Court to revisit its prior decisions on these issues, which he agrees have all been previously overruled. (*See* Appellant's Brief. at p. 143–46); *Saldano*, 232 S.W.3d at 107–09 (overruling multiple challenges to death penalty statute); *Escamilla*, 143 S.W.3d at 828–29 (same). Appellant presents no new arguments for the State to address. Accordingly, the State asks this Court to

decline his invitation to revisit these legal claims and to overrule Issues 38 through 48.

## **PRAYER**

The State prays that this Honorable Court will affirm the judgment of the trial court.

Respectfully submitted,

/s/ Rebecca D. Ott

_____

**Susan Hawk**
**Criminal District Attorney**
Dallas County, Texas

**Rebecca D. Ott**
**Assistant District Attorney**
State Bar No. 24074842
Frank Crowley Courts Building
133 N. Riverfront Blvd., LB-19
Dallas, Texas 75207-4399
(214) 653-3625 | (214) 653-3643 *fax*
rebecca.ott@dallascounty.org

## CERTIFICATE OF COMPLIANCE

I hereby certify that there are 43,689 words in this document, excluding the caption, statement regarding oral argument, table of contents, index of authorities, statement of the case, statement of  issues presented, signature, certificate of service, and certificate of compliance. This number exceeds the maximum allowable number of words provided in Tex. R. App. P. 9.4(i)(2)(A).   The State is filing a Motion to Exceed the Word Count contemporaneously with this brief.

/s/ Rebecca D. Ott

_____

Rebecca D. Ott


## CERTIFICATE OF SERVICE

I hereby certify that a true copy of the foregoing brief was served on John Tatum, attorney for Appellant, 990 South Sherman Street, Richardson, Texas, 75081, jtatumlaw@gmail.com, via email and United States mail, on July 29, 2015.

/s/ Rebecca D. Ott

_____

Rebecca D. Ott